1 | ROBBINS GELLER RUDMAN
    & DOWD LLP
2 | DARREN J. ROBBINS (168593)
    ROBERT R. HENSSLER JR. (216165)
3 | 655 West Broadway, Suite 1900
    San Diego, CA 92101-3301
4 | Telephone: 619/231-1058
    619/231-7423 (fax)
5 | darrenr@rgrdlaw.com
    bhenssler@rgrdlaw.com
6
    Lead Counsel for Plaintiff
7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| PAWEL I. KMIEC, Individually and on Behalf of All Others Similarly Situated, | No. 8:12-cv-00222-CJC(JPRx) |
| Plaintiff, | CLASS ACTION |
| vs. | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| POWERWAVE TECHNOLOGIES INC., et al., | |
| Defendants. | |

FILED

2012 JUL 23 PM 4:41

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
SANTA ANA

BY _____

718102_1

# TABLE OF CONTENTS

**Page**

I.     JURISDICTION AND VENUE .................................................. 1

II.    INTRODUCTION AND OVERVIEW ......................................... 1

III.   CLAIMS ASSERTED IN THE COMPLAINT ............................. 3

IV.    PLAINTIFFS ........................................................................... 3

V.     DEFENDANTS ........................................................................ 4

VI.    SOURCES OF ALLEGATIONS ................................................. 6

VII.   FACTUAL BACKGROUND TO DEFENDANTS' SCHEME ................... 10

       A.    Nature of Powerwave's Business ....................................... 10

       B.    Because of Declining Demand Powerwave Engaged in a Revenue Recognition Scheme that Masked the True Demand for Its Products ...................................................... 12

VIII.  DEFENDANTS' FALSE STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ............................... 19

IX.    THE TRUTH BEGINS TO EMERGE ........................................ 31

X.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING AND GAAP VIOLATIONS DURING THE CLASS PERIOD ............................................. 44

       A.    Powerwave Improperly Recognized Revenue on Contingent Sales with Team Alliance, in Violation of GAAP ............................. 45

       Sales of Defective Product ........................................................ 46

       Bulk Orders ............................................................................. 47

       B.    Powerwave Recorded Premature and Inflated Revenue in Violation of GAAP and the SEC's Revenue Recognition Requirements .............................................. 47

       C.    Powerwave's Disclosures Regarding Revenue Recognition Were False and Misleading and in Violation of GAAP and SEC Guidance ........................................................ 50

       D.    Powerwave's Revenue Recognition Scheme Is Supported by the 92% Increase in DSO in 3Q11 ...................... 52

       E.    Powerwave's Revenue Recognition Scheme Also Affected Inventory ..................................................... 55

- i -

718102_1

# TABLE OF CONTENTS

**Page**

F.    Powerwave's Financial Statements Violated Fundamental Accounting Concepts ........................................................................ 57

XI.   DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF THE TRUTH ABOUT POWERWAVE'S BUSINESS ................................ 58

XII.   FRAUDULENT SCHEME AND COURSE OF BUSINESS ...................... 61

XIII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................ 61

A.    Defendants' Post Class Period Conduct of Shipping Unneeded Products to Customers Supports a Strong Inference of Scienter ........ 62

B.    Each of Defendants' False Statements and Omissions Involved One of Powerwave's Core Operations ................................................... 62

C.    Powerwave's Incentive Compensation Structure Created an Incentive for Fraud and Strongly Supports an Inference of Scienter ............................................................................................. 63

D.    Defendants' Fraudulent Conduct Allowed Defendants to Preserve Powerwave's Credit and Debt Ratings and Raise $100 Million in the July 20, 2011 Offering ....................................................... 65

E.    Defendants' Misleading Statements About the Reasons for the 3Q11 "Nightmare" Support a Strong Inference of Scienter ............... 66

F.    SOX Certification ....................................................................... 68

     1.    Defendants Signed False Statements Regarding Powerwave's Internal Controls and Procedures ........................ 68

     2.    Reasons Why Defendants' Internal Controls and Procedure Statements Were Materially False and Misleading ................................................................................ 70

XIV.   LOSS CAUSATION/ECONOMIC LOSS ................................................. 72

XV.   ANY PURPORTED RISK WARNING WERE INADEQUATE OR MATERIALLY FALSE AND MISLEADING ............................................ 74

XVI.   NO SAFE HARBOR ................................................................................. 75

XVII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET .................................................................................. 75

XVIII.     CLASS ACTION ALLEGATIONS ................................................... 76

CLAIMS FOR RELIEF ........................................................................................ 78

COUNT I ............................................................................................................. 78

718102_1

# TABLE OF CONTENTS

**Page**

COUNT II ..................................................................................................... 78

PRAYER FOR RELIEF ................................................................................ 79

JURY DEMAND .......................................................................................... 79

718102_1

## I.   JURISDICTION AND VENUE

1.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the Securities and Exchange Commission ("SEC"). Jurisdiction is conferred by §22 of the Securities Act of 1933 ("1933 Act") (15 U.S.C. §77v) and §27 of the 1934 Act (15 U.S.C. §78aa). Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act. Powerwave Technologies, Inc.'s ("Powerwave" or the "Company") headquarters are located at 1801 East St. Andrew Place, Santa Ana, CA 92705 and many of the acts and transactions constituting the violations of the securities laws alleged herein occurred in this District.

2.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## II.   INTRODUCTION AND OVERVIEW

3.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the securities of Powerwave between October 28, 2010 and October 18, 2011, inclusive (the "Class Period"), against Powerwave and certain of its officers and/or directors for violations of the 1934 Act. These claims are asserted against Powerwave and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls and filings with the SEC.

4.     Powerwave engages in the design, manufacture, marketing and sale of wireless solutions for wireless communications networks worldwide. This action concerns defendants' false statements and omissions regarding demand, and the Company's financial statements. During the Class Period, defendants caused Powerwave to report artificially inflated financial results in an effort to meet or exceed

718102_1

1  Powerwave's financial guidance in the face of a market that analysts believed would

2  experience slow growth through the 2011 fiscal year.  Defendants' false explanation

3  for their tremendous feat was that Powerwave's products were technically superior to

4  the competition and that, as a result, Powerwave's growth would exceed that of the

5  market as a whole.

6      5.    In truth, defendants knew or recklessly disregarded that demand for

7  Powerwave's products was actually steeply declining.  To off-set the declining

8  demand, and cloak the Company's deteriorating financial condition, defendants

9  engaged in an accounting scheme to artificially inflate its revenue and earnings by: (1)

10  shipping "bulk orders" of unsold and/or unsellable inventory to resellers on a

11  contingent basis whereby Powerwave would grant special extended payment terms

12  and rights to return the product; and (2) knowingly and deliberately shipping product

13  that Powerwave knew did not function "with the promise to replace" the defective

14  products in a later quarter.  Defendants' false statements and omissions artificially

15  inflated Powerwave's stock price, allowing defendants and the Company to complete

16  a $100 million bond offering and collect millions in performance bonuses.  As the

17  truth about defendants' false statements and omissions were revealed, Powerwave

18  shareholders suffered millions of dollars in damages and the Company's common

19  stock price plummeted from a Class Period high of $4.69 per share to $.68 per share

20  on October 19, 2011 – a 85% decline in little over five months, from which

21  Powerwave's stock price never recovered.

22

23

24

25

26

27

28

718102_1



**Powerwave Technologies**
October 28, 2010 - October 18, 2011

### III.    CLAIMS ASSERTED IN THE COMPLAINT

6.    Lead Plaintiff the Government of Bermuda Contributory and Public Service Superannuation Pension Plans (the "Bermuda Pension Plans") asserts claims arising from allegations of securities fraud in violation of §10(b) of the 1934 Act against those defendants, Powerwave and certain of the Company's senior executives, who made materially false and misleading statements that caused the price of Powerwave securities to be artificially inflated over the course of the Class Period. The Bermuda Pension Plans also asserts control-person claims under §20(a) of the 1934 Act.

### IV.    PLAINTIFFS

7.    On April 26, 2012, the Court appointed the Bermuda Pension Plans as Lead Plaintiff to represent the proposed class of Powerwave shareholders. During the Class Period, the Bermuda Pension Plans purchased and held shares of Powerwave

---

[1]    The "Dollars Per Share" reflects the 1-for-5 reverse stock split. *See* ¶175.

718102_1

1   common stock. As a result of the defendants' conduct detailed herein, the Bermuda

2   Pension Plans suffered damages in connection with its purchases of Powerwave

3   securities.

4   **V.    DEFENDANTS**

5        8.    Defendant Powerwave engages in the design, manufacture, marketing

6   and sale of wireless solutions for wireless communications networks worldwide. The

7   Company offers antennas, boosters, combiners, cabinets, shelters, filters, radio

8   frequency power amplifiers, remote radio head transceivers, repeaters, tower-mounted

9   amplifiers ("TMI's"), and advanced coverage solutions for use in frequency bands,

10  including cellular, PCS, 3G, and 4G wireless communications networks.

11  Powerwave's common stock was listed and traded on the National Association of

12  Securities Dealers Automated Quotations ("NASDAQ") under the symbol PWAV

13  during the Class Period.

14       9.    Defendant Ronald J. Buschur ("Buschur") served as the Company's

15  President and Chief Executive Officer ("CEO") during the Class Period. During the

16  Class Period, Buschur participated in the issuance of false and misleading statements

17  and failed to disclose the true facts about Powerwave's business. At no time during

18  the Class Period did Buschur or any other defendant assert that they were not aware of

19  material aspects of Powerwave's business or finances. Moreover, Buschur issued

20  statements in press releases and led the Company's conference calls with analysts and

21  investors, representing himself as a primary person with knowledge about the

22  Company's business, outlook, financial reports and business practices. In addition to

23  issuing statements throughout the Class Period, Buschur repeatedly had the

24  opportunity to correct the misstatements and omissions by and on behalf of

25  Powerwave, and failed to do so.

26       10.   Defendant Kevin Michaels ("Michaels") served as the Company's Chief

27  Financial Officer ("CFO") during the Class Period. During the Class Period, Michaels

28  participated in the issuance of false and misleading statements and failed to disclose

- 4 -

718102_1

the true facts about Powerwave's business.  At no time during the Class Period did Michaels or any other defendant assert that they were not aware of material aspects of Powerwave's business or finances.  Moreover, Michaels issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as a primary person with knowledge about the Company's business, outlook, financial reports and business practices.  In addition to issuing statements throughout the Class Period, Michaels repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of Powerwave, and failed to do so.

11.    Buschur has been with the Company since 2001 and became CEO of Powerwave and a member of the Board of Directors (the "Board") in February 2005. Michaels has been with the Company since 1996.  According to the Company's 2010 Form 10-K, which was filed with the SEC on February 17, 2011, the Company was small, consisting of approximately 2,100 employees throughout the entire Class Period.  The vast majority of these employees – approximately 1,900 – were on manufacturing, quality, supply chain, sales and research and development.

12.    Defendants Buschur and Michaels (collectively, the "Individual Defendants"), by virtue of their high-level positions with the Company, had access to adverse, undisclosed information about Powerwave's business, operations, financial statements, markets and present and future business prospects, via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and reports and other information was provided to them as part of their positions.

13.    By virtue of their high level positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Powerwave's quarterly reports and other public filings, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each of the Individual Defendants, by virtue of their high level positions with

- 5 -

718102_1

Powerwave, directly participated in the management of the Company and was directly involved in the day-to-day operations of the Company. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and were aware, or recklessly disregarded, that false and misleading statements regarding Powerwave were being issued, and approved or ratified these statements, in violation of the federal securities laws.

14.    Powerwave had internal systems that allowed senior management – the Individual Defendants – to monitor up-to-date quarterly revenues. According to former employees, the Company used a Hyperion system and a salesforce.com system to provide senior management with updated forecasts and revenues.

15.    As officers and controlling persons of a publicly-held company whose common stock was traded on the NASDAQ during the Class Period, and governed by the federal securities laws, each of the Individual Defendants had a duty to disseminate promptly accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Powerwave common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## VI.    SOURCES OF ALLEGATIONS

16.    Plaintiffs' allegations are based upon the investigation of plaintiffs' counsel, including information contained in SEC filings by Powerwave, regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, conference call transcripts and other public statements issued by the Company, as well as media reports and other sources of information about the

- 6 -

718102_1

Company, including information obtained from more than 15 former employees of Powerwave. Information provided by the former employees of Powerwave are reliable and credible because: (a) each of the witnesses worked at Powerwave during or immediately prior to the Class Period; (b) each witness stated that they had personal knowledge of the information provided; (c) the witnesses' job titles and responsibilities show that they had personal knowledge of the information provided; (d) the witness accounts corroborate one another; and (e) the witness accounts are corroborated by other information alleged herein.

17. CW1 was a Senior Demand Planner at Powerwave from 2008 until November 2011, when CW1 was laid off. CW1's duties included analyzing the sales forecasts for Powerwave's North and South American network operator customers for all of Powerwave's products. CW1's network operator customers included AT&T, Verizon, T-Mobile and several others. During 2011, CW1 reported to Materials Manager Alain Ducharme ("Ducharme"). Ducharme reported to Senior Director of Supply Chain Operations Mike Ryberg ("Ryberg") who reported to Chief Operating Officer ("COO") Marv MaGee ("MaGee"). CW1 was involved in determining how and when Powerwave could realize revenues on product sales to North and South American customers. To that end CW1 participated in weekly Sales Operations meetings held every Monday morning in which CW1 assessed just how confident the sales personnel were that projected orders were going to materialize. After those meetings, on Monday afternoons, CW1 met with Powerwave's corporate planning group as part of the larger objective of determining how many orders had already been invoiced in a given quarter (and thereby revenue already recognized), how many orders were "in backlog" (i.e., orders that had been received, but had yet to be fulfilled), and how many orders were projected to come in during the quarter, as well as how many orders needed to come in to meet projected revenue targets for a given quarter. CW1 prepared a Sales and Operations Planning Report – known internally as an "S&OP Report" – that was discussed in the Monday meetings. CW1 also

- 7 -

1  performed a "risk analysis" so that executives could closely monitor the Company's

2  progress in achieving its projected revenues over a given quarter. As part of the risk

3  analysis, CW1 prepared a "Gap Report" which showed Powerwave's present

4  forecasted revenue vs. actual revenue.

5      18.    CW2 was a Director of Financial Planning at Powerwave from January

6  2007 until November 2011, when CW2 was laid off. As Director of Financial

7  Planning, CW2 was responsible for "developing and executing" a forecasting process

8  that began with a "bottoms-up" sales forecast from the Company's sales force and

9  then forecasting expenses and costs to derive forecasts of margins and profits. This

10 forecasting process was undertaken annually and then updated on a quarterly basis.

11 CW2 reported directly to Michaels, but once Treasurer Tom Spaeth ("Spaeth") was

12 hired, CW2 reported to Spaeth, who reported to Michaels. At the end of quarters,

13 CW2 met with Michaels and Spaeth in Michaels' office to discuss end of quarter

14 margins.

15     19.    CW3 was a Senior Manager of Strategic Sourcing with Goodman

16 Networks ("Goodman") (an AT&T "Turf Partner" and Powerwave customer), from

17 November 2009 until February 2012 when he was laid off. CW3's role included

18 ordering equipment and products from three primary vendors that Goodman used to

19 build cell-sites on behalf of AT&T. These vendors included Andrews/CommScope,

20 Powerwave, and a German firm – Kathrein. According to CW3, the primary products

21 purchased from Powerwave were antennas, diplexers and TMIs. Goodman's activity

22 on behalf of AT&T covered the entire U.S.

23     20.    CW4 worked at Powerwave as a Senior Inside Sales Rep on

24 Powerwave's Customer Relationship Management ("CRM") team from 1994 until

25 March, 2012 when CW4 was laid off. CW4 was the CRM team member assigned to

26 AT&T. As an Inside Sales Rep, CW4 dealt directly with the Powerwave sales team

27 assigned to AT&T as well as with AT&T personnel. The AT&T personnel CW4 most

28 often dealt with were members of AT&T's supply chain management group which

- 8 -

was located in Seattle. As an Inside Sales Rep CW4 was essentially responsible for receiving AT&T orders and ensuring that the order terms were not only entered into Powerwave's Oracle system, but also that the orders were fulfilled according to AT&T's delivery requirements. This entailed dealing with Powerwave's supply chain organization to ensure that the products necessary to fulfill orders were being manufactured.

21.    CW5 started at the Company in 2004 and worked as National Sales Manager for Powerwave's Tier 2 accounts in the U.S. and Canada. These Tier 2 accounts included US Cellular, Cricket and MetroPCS. As part of his job, CW5 participated in regular sales calls with the various Account Managers, MaGee, and the V.P. of Sales. CW5 left Powerwave of his own volition in June 2011.

22.    CW6 worked at Powerwave from around February 2007 through November 2011 when CW6, and numerous other employees, were laid off. During CW6's time at the Company CW6 had been Global Inventory Manager. Initially, CW6 reported to Ryberg, but at some point, began reporting to Martin Cooper ("Cooper"). Both Ryberg and Cooper reported to current COO MaGee. CW6 continued having dealings with Ryberg even after he began reporting to Cooper. As Global Inventory Manager, CW6 had been primarily responsible for monitoring the levels of component/raw material inventory held by Powerwave facilities around the world. CW6 ensured that Powerwave had adequate quantities of such materials to meet production demands and would also facilitate the movement of component inventory from one location to another depending on the respective needs of the locations. Another function of CW6's job was to dispose of Excess and Obsolete component inventory. In addition, as part of CW6's job duties, CW6 had insight to the forecasted demand for Powerwave's products. In this regard, CW6 worked with Powerwave's Planners to determine the component and raw material inventory that would be needed to fulfill expected demand.

718102_1

## VII.   FACTUAL BACKGROUND TO DEFENDANTS' SCHEME

### A.   Nature of Powerwave's Business

23.    Powerwave was founded in 1985 and became a public company through an initial public offering ("IPO") in 1996. The Company sells its products through its direct sales force, independent sales representatives, and resellers to wireless original equipment manufacturers ("OEM's") and individual wireless network operators. Powerwave's customers include the OEM's: Alcatel-Lucent, Ericsson, Huawei, Motorola, Nokia Siemens and Samsung. Powerwave's network operator customers include AT&T, Bouygues, Orange, Sprint, T-Mobile, Verizon Wireless and Vodafone. While defendants repeatedly claimed to have technically superior products, there were other companies competing for the same business – including CommScope, Comba Telecom, Fujitsu Limited, Hitachi Kokusai, Japan Radio and Tyco Electronics. In addition, Powerwave also competes with the OEM's – who are also customers – Alcatel-Lucent, Ericsson, Huawei, Motorola, Nokia Siemens and Samsung.

24.    During the Class Period, Powerwave sold a relatively few products to a handful of customers. In fact, according to the Company, Powerwave's sale of its antennas and base stations represented 90% of Powerwave's business during the Class Period. In addition, according to the Company, sales to North American customers represented over 40% of Powerwave's business during the Class Period.

25.    During the Class Period, a substantial portion of Powerwave's sales were made through resellers or various "Turf Partners."[2] Powerwave's major reseller for AT&T was Team Alliance. Turf Partners typically purchased Powerwave product through resellers such as Team Alliance. The Turf Partner would then use the product

---

[2]    These "Turf Partners" included: Goodman, Black & Veatch, NSORO and Bechtel.

- 10 -

718102_1

as part of building segments or elements of a network building the wireless cell site or infrastructure for AT&T. Powerwave's sales to Team Alliance were as follows:

| ($000's) | 3Q10 | 1Q11 | 2Q11 | 2nd Half 2011 |
|---|---|---|---|---|
| Net Sales to Team Alliance | $ 17,249 | $ 19,127 | $ 47,779 | $ 4,205 |
| As a percent of total Powerwave sales | 11% | 14% | 28% | 3% |

26.    The North American wireless carrier AT&T was one of Powerwave's largest customers during the Class Period. But, as discussed above, Powerwave did not sell directly to AT&T, but sold to the Turf Partner – through Team Alliance. The role of AT&T Turf Partners was acknowledged and explained by Michaels in an August 2, 2010 earnings conference call:

> One other thing just to note for you. I think on customers, I'm sure from an operator basis in North America, our overall largest relationship there is AT&T. We don't necessarily sell everything directly there. So, it doesn't count as a 10% customer, but we sell through their Turf Partners and such. So, I think in this relationship it would be over a 10% customer. It just doesn't show up that way [sic] technically.

27.    During the Class Period, AT&T was going through a transition as it announced the purchase of T-Mobile on March 20, 2011. According to the *New York Times*, the deal "would create the largest wireless carrier in the nation." Also, according to the *New York Times*, critics, including Senator Herb Kohl of Wisconsin, immediately denounced the merger on anti-trust grounds, saying it could lead to higher prices for consumers. On May 11, 2011, the Senate held hearings on the proposed merger – and strongly questioned whether the merger should be allowed.

718102_1

**B. Because of Declining Demand Powerwave Engaged in a
Revenue Recognition Scheme that Masked the True
Demand for Its Products**

28.    Former employees of Powerwave have confirmed that contrary to the Individual Defendants' claims of strong demand, demand was actually steeply declining during the Class Period. In fact, contrary to defendants' claims, according to CW1 and CW3, Powerwave began "seeing a slowdown" with AT&T at least as soon as when the T-Mobile merger was announced in March 2011. In order to artificially counteract the slow down in demand, Powerwave engaged in what CW1 called "shady" business practices to try to hide the Company's true financial condition. Powerwave's "shady" business practices occurred in 3Q10, 4Q10, 1Q11, and 2Q11 and included improper revenue recognition accounting practices that violated GAAP and SEC guidance as detailed in §X.

29.    CW1, CW4, CW5 and CW6 explained that Powerwave's relationship with AT&T involved third-party "Turf Partners" that actually built different segments or elements of AT&T's network and a reseller – Team Alliance – that also processed orders from the Turf Partners for Powerwave products. In essence, according to CW1, CW4, CW5 and CW6, a Turf Partner would place its order with Team Alliance, which would then issue an order to Powerwave and purchase the products with instructions for Powerwave to drop ship the products directly to the Turf Partner's premises. CW3 confirmed that the Turf Partner Goodman placed its orders for Powerwave products through Team Alliance.

30.    But, according to CW1, the Team Alliance arrangement had another, "shady benefit" for Powerwave because beginning in 3Q10 and then continuing every quarter thereafter up until 3Q11, Powerwave was able to ship unneeded product to Team Alliance in order for Powerwave to make revenue goals. As a quarter drew to an end, CW1 explained that Powerwave personnel would "look around" at whatever inventory was unsold and would then obtain "a bulk order" from Team Alliance that permitted Powerwave to ship these items prior to the end of the quarter. According to

- 12 -

1  CW1, if Powerwave had "overbuilt" inventory that could not be sold because actual

2  orders for the inventory had not been received, Powerwave could persuade Team

3  Alliance to issue orders for a portion of the inventory.  Powerwave would purposely

4  ship the inventory to Team Alliance by boat rather than air from China so as to ensure

5  that the products had shipped and were in transit while delaying delivery by three to

6  four weeks.  The delayed delivery was important to Team Alliance because it did not

7  need the product.  CW1 understood that Powerwave granted Team Alliance special

8  extended payment terms and rights of return in order to get Team Alliance to accept

9  delivery of the products – products Team Alliance did not need – without having to

10  assume the full responsibility of paying for the products.  CW2, CW5 and CW6

11  confirmed that Powerwave engaged in this end-of-quarter practice.

12      31.    According to CW1, Powerwave's quarters always ended on a Sunday.

13  CW1 knew that CW1 would be working that weekend because the bulk orders would

14  be arranged on the Saturday – the day before the last day of the quarter.

15      32.    CW5 stated that from CW5's participation in sales calls, CW5 knew that

16  Powerwave routinely shipped large volumes of inventory to Team Alliance at the ends

17  of quarters.  CW5's impression from what CW5 heard on the sales calls was that

18  Powerwave was typically "trying to make a deal" by informing Team Alliance of the

19  inventory Powerwave had on hand and asking what Team Alliance was willing to

20  order of that inventory.

21      33.    In addition, CW5 stated that the end-of-quarter orders required the

22  extension of discounts and incentives to the customer.  It was CW5's understanding

23  that such discounts and incentives had to be approved by Buschur.  CW5 based this

24  perception on "word of mouth" that CW5 heard during various sales calls in which the

25  Account Managers working on a particular deal discussed the terms of the transaction.

26  In those calls, MaGee and the VP of Sales (CW5 could not recall this person's name)

27  would make comments to the effect that a proposed discount or incentive needed

28

718102_1

1   Buschur's approval and/or that a particular discount or incentive had received

2   Buschur's approval.

3       34.    According to CW6, "Team Alliance was our best friend at the end of the

4   quarter" and Powerwave was "dependent on Team Alliance to meet numbers," in

5   1Q11 and 2Q11. CW6 said it was definitely the case that Powerwave made large

6   shipments to Team Alliance at the ends of 1Q11 and 2Q11. CW6 knew about the

7   large, end-of-quarter shipments to Team Alliance from CW6's regular meetings and

8   discussions with Planning personnel where it would be discussed that Team Alliance

9   would be taking a particular amount of product from Powerwave. CW6 stated that

10  MaGee knew about the shipments to Team Alliance, but it was Ryberg who seemed to

11  deal directly with Team Alliance so far as getting the orders.

12      35.    Once CW6 found out about the Team Alliance shipments at the ends of

13  quarters CW6 began to consider them problematic. Even though these shipments

14  were not under the scope of CW6's responsibility, CW6 questioned why Powerwave

15  would ship so much product to Team Alliance since CW6 did not believe there was

16  any identified end-user for the products. CW6 could not recall the exact size of the

17  end-of-quarter shipments to Team Alliance, but believed they were typically worth

18  millions of dollars.

19      36.    In addition, CW6 observed on a number of occasions that the finished

20  goods inventory accounts would increase shortly after the fifth or sixth day of the new

21  quarter. In essence, at the end of a quarter CW6 would see the finished goods

22  inventory levels go down as goods were shipped and then go back up shortly after the

23  new quarter got underway. Although CW6 did not handle product returns – returns

24  were handled by Cooper and MaGee – CW6 strongly suspected that these increases in

25  finished goods reflected returns from Team Alliance.

26      37.    CW3 confirmed that in order to get Goodman to accept Powerwave

27  inventory for which AT&T did not order, Powerwave would extend special

28  concessions *that were not reflected in the formal documentation for the transactions*

718102_1

1  (*e.g.*, purchase order and invoice). CW3 stated that concessions, made through verbal

2  side agreements, were extended to Goodman by Powerwave in order to get Goodman

3  to issue Purchase Orders and accept delivery. These sales were often authorized by

4  Powerwave employee Ryberg and Powerwave's District Manager assigned to

5  Goodman, Isaac Bustamante ("Bustamante").

6      38.   Thus, these special contingent arrangements with reseller Team Alliance

7  and Turf Partner, Goodman, allowed Powerwave to artificially inflate and manipulate

8  its revenues. According to CW1, Powerwave was well aware of the inventory levels

9  at Team Alliance and how much product was needed to fulfill true customer

10  requirements.   CW1 stated that Team Alliance sent their inventory report to

11  Powerwave on an regular basis. According to CW1, Powerwave had to keep track of

12  the inventory being held by Team Alliance because there were times when

13  Powerwave received orders from other customers and Powerwave would use Team

14  Alliance's inventory to fill those other customer orders.

15      39.   According to CW2, the approval for the large end-of-quarter deals came

16  from Buschur and Michaels.   CW2 based CW2's awareness that Buschur and

17  Michaels were directly involved in approving the end-of-quarter deals and terms

18  because the internal controls at Powerwave required that deals above a certain

19  threshold – say, several million dollars – and involving discounts and other

20  concessions had to be approved by Buschur and Michaels. And "culturally" CW2

21  said that Powerwave was tightly controlled and managed by Buschur and Michaels.

22      40.   CW1 knew about the "shady" end-of-quarter "orders" from Team

23  Alliance and the terms of these "orders" through "countless conversations" with

24  CW1's manager Ducharme – who dealt directly by phone with Team Alliance – in

25  which they would discuss how much unsold inventory was on-hand. In addition,

26  according to CW1, CW1 received e-mails where the last-minute, end-of-quarter Team

27  Alliance orders were discussed. According to CW1, once the amount of unsold

28  inventory was determined "we'd have Team Alliance cut a Purchase Order" for that

- 15 -

718102_1

1   amount of product.  CW2 also confirmed that large end-of-quarter "orders" were

2   obtained from Team Alliance during the Class Period.

3        41.    According to CW1, the "last minute" "orders" that Powerwave got from

4   Team Alliance in 3Q10, 4Q10, 1Q11 and 2Q11 were very big – at least $15 million

5   each quarter and as high as $25 million in a quarter.  CW1 stated that the last-minute

6   bulk orders to Team Alliance were done to close the gap in forecasted sales for the

7   quarter.  Additionally, according to CW1, salesmen Lance Craft ("Craft") and Greg

8   Moetl ("Moetl") were forced by COO MaGee to inflate forecasted sales.

9        42.    CW2 corroborated CW1, explaining that the large end-of-quarter deals

10  made up a large portion of quarterly revenue during this time.  CW2 said that CW2

11  "didn't like" the large end-of-quarter orders, but "was powerless to change it."  CW2

12  and other personnel often wondered "why we were operating this way" and concluded

13  that "management was not competent."

14       43.    Bogus revenue from Team Alliance was critical to Powerwave during the

15  Class Period.  This is confirmed in Powerwave's SEC filings.  *See* ¶25.  On May 5,

16  2011, Powerwave filed its Form 10-Q for the quarterly period ended April 3, 2011 and

17  disclosed that "[f]or the first quarter of 2011, Nokia Siemens accounted for

18  approximately 25% of total net sales, [and] Team Alliance, one of the Company's

19  North American resellers accounted for approximately 14% of total net sales."  On

20  August 10, 2011, Powerwave filed its Form 10-Q for the six months ended July 3,

21  2011 and disclosed that "for the first half of 2011, total sales to Team Alliance, one of

22  our North American resellers, accounted for approximately 22% of sales."  In

23  addition, the August 10, 2011 Form 10-Q revealed that "[f]or the second quarter of

24

25

26

27

28

718102_1

1  2011, sales to Team Alliance, one of our North American resellers, accounted for

2  approximately 28% of our total sales."[3]

3       44.   One particularly egregious shipment of product to Team Alliance

4  occurred at the very end of 1Q11. At that time, CW1 said that ***Powerwave knowingly***

5  ***and deliberately shipped product that it knew did not function and which had been***

6  ***"put aside by quality" because it was "bad product."***[4]   According to CW1,

7  Powerwave shipped the product – which were a new type of LTE Antenna – to Team

8  Alliance as part of the end-of-quarter bulk order "with the promise to replace" the

9  defective products once Powerwave had functional products available in a later

10 quarter. CW1 recalled being in a meeting in which Ryberg spoke by phone to the

11 Powerwave factory in China directing them to ship the defective products and in a

12 later meeting hearing Ryberg tell the Chinese factory the specific products that needed

13 to be replaced.

14      45.   CW1 could not recall exactly how many of the defective products went

15 out in the 1Q11 shipment, but estimated that many thousands of the products were

16 shipped; the selling price of the products ranged from $700-$13,000 so the aggregate

17 amount was significant and at least $15 million. Throughout 2011, "we were working

18 on swapping out" the defective products, but the situation had not been resolved as of

19 CW1's lay-off in November 2011 at which time "we were still trying to get [the

20 products] built correctly" and Powerwave "still owed Team Alliance good"

21 replacements.

22      46.   During 3Q11 Team Alliance balked at accepting anymore of the

23 Powerwave inventory and, according to CW1, "said 'no more.'"   In essence,

24

25 [3]     In the February 28, 2012 Form 10-K, for the fiscal year ended January 1, 2012,
   Powerwave revealed that "[f]or fiscal 2011, sales to Team Alliance, one of our North
26 American resellers, accounted for approximately 16% of revenues."

27 [4]     All citations are omitted and emphasis is added unless otherwise noted.

28

- 17 -

718102_1

1  according to CW1, Team Alliance "wouldn't allow us" to ship any more product and

2  "drew the line." By 3Q11, Team Alliance was holding very large quantities of

3  Powerwave product for which there was no identified or confirmed end-user demand

4  – CW1 estimated there was as much as $40 million of such inventory (per its "retail

5  value"). In fact, CW1 heard from Ducharme during 3Q11 that far from taking on

6  additional Powerwave product, Team Alliance wanted to return to Powerwave the

7  excessive product it was already holding.

8      47.    CW2 confirmed that because of the large end-of-quarter "orders" in

9  1Q11 and 2Q11, Powerwave was unable to duplicate such deals in 3Q11. During the

10  Class Period, CW2 heard from co-workers at Powerwave that "we had filled the

11  channels in 1Q and 2Q" 2011.

12      48.    Because of CW1's position as Senior Demand Planner, CW1 was acutely

13  aware of the Company's business with AT&T. CW1 said that Powerwave began

14  "seeing a slowdown" in business with AT&T as soon as the AT&T/T-Mobile merger

15  was announced in March 2011.

16      49.    CW3 confirmed this. According to CW3, around the time of AT&T's

17  proposed merger with T-Mobile, March 2011, AT&T began drastically slowing down

18  when it wanted new cell-sites built. CW3 emphasized that not only was Powerwave

19  fully apprised of the drop-off in AT&T new cell-site construction and attendant drop-

20  off in purchasing by Goodman, but also that there was no indication whatsoever going

21  into and during 3Q11 that the situation would improve. When the drop-off in new

22  AT&T cell-site construction activity began, in 1Q11 according to CW3, CW3

23  promptly notified various Powerwave personnel by email, telephone conversation, and

24  in-person meetings that Goodman was going to delay and push-out the delivery of any

25  existing orders they had placed with Powerwave.

26

27

28

718102_1

## VIII.  DEFENDANTS' FALSE STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

50.     The Class Period commences on October 28, 2010.   On that date Powerwave issued a press release announcing its financial results for its third quarter, the period ending October 3, 2010.  For the quarter, the Company reported net sales of $156.8 million, compared with $139.0 million in the third quarter of fiscal 2009. Defendant Buschur commented on the results, stating, in pertinent part, as follows:

"For the third quarter of 2010, we were able to show growth of 12.8% over the same period last year . . . ."  "More importantly, we were able to continue our improvements in our gross margins for this year, with the added benefit of demonstrating strong profitability on both a GAAP and pro forma basis for the third quarter.  While we continue to experience longer than normal supply chain lead times and global macro economic issues which continue to impact our business, *we see signs of improvement in overall demand for wireless infrastructure equipment. In particular, we believe that strong North American wireless capital spending patterns should remain throughout the next year.*  We will continue to work to position Powerwave to capitalize on the long-term growth opportunities within the global wireless infrastructure marketplace."

51.     Following the issuance of the press release, also on October 28, 2010, Powerwave held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants Michaels and Buschur made positive statements about the Company, current demand, and its operations.

52.     On November 2, 2010, Powerwave filed its quarterly report on Form 10-Q for the quarterly period ending October 3, 2010.  In the 3Q10 Form 10-Q defendants emphasized that Powerwave has "maintained [its] overall market share

- 19 -

718102_1

1   within the wireless communications infrastructure equipment market," and that its

2   "proprietary design technology is a further differentiator for our products."

3       53.    On February 1, 2011, the Company issued a press release announcing

4   financial results for 4Q10, the period ending January 2, 2011, which reported net sales

5   of $175.6 million, compared to $142.6 million for the same period the prior year.

6   Defendant Buschur commented on the results, stating, in pertinent part, as follows:

7          "For the fourth quarter of 2010, we were able to show growth of 23%

8          over the same period last year and 12% sequentially over the third

9          quarter of this year . . . ." "More importantly, we were able to continue

10          our improvements in our operating income for this year, with the added

11          benefit of demonstrating strong profitability on both a GAAP and pro

12          forma basis for the fourth quarter and year results.  We ***continue to see***

13          ***signs of improvement in overall demand for wireless infrastructure***

14          ***equipment***, driven globally by the continued increase in demand for

15          smartphones and the requirements for faster data transmission rates.  We

16          are continuing to work to position Powerwave to capitalize on the long-

17          term growth opportunities we believe are available within the global

18          wireless infrastructure marketplace."

19       54.    Following the issuance of the press release, also on February 1, 2011,

20   Powerwave held a conference call with analysts and investors to discuss the

21   Company's fiscal 2010 earnings and operations.   During the conference call,

22   defendants Michaels and Buschur made positive statements about the Company and

23   its current operations.  Buschur bragged that for the fiscal year 2010, "we met our

24   annual guidance," and that 2010 was Powerwave's "first fully profitable year on a

25   GAAP basis since 2005."  Michaels stated that Powerwave was establishing a fiscal

26   2011 annual revenue range "of $650 million to $680 million."  Michaels added that

27   "[t]he midpoint of this range represents annual growth of 12% which we believe is

28   above the expected growth rates for the industry."

718102_1

55.    During the February 1, 2011 conference call, Buschur also made the following statements:

As you know, during the last few years we completed our manufacturing consolidation activities, which has enabled Powerwave to have a highly competitive, low costs manufacturing structure that is highly flexible and scalable *without compromising our superior quality and our leading edge technology and product solutions*. Our focus on expense management has positioned this Company to be truly a lean and mean operation.

*    *    *

The demand in the Wireless data is exploding, as can be seen by the exponential growth in the use of Smart Phones utilizing voice, video and data.    This demand is fueling requirements for cost effective infrastructure deployments for both upgrading to existing 2G, 3G, and 4G deployment technologies.    We believe that Powerwave *has the products* and solutions necessary for these types of cost effective deployments, and we *are well positioned* to benefit from this demand.

*    *    *

**Charles Johns** – *Canaccord Genuity – Analyst*

Great.  And then Ron, maybe a last one for you.  Just wondering, when you look out longer term and think of the LTE and the various carrier deployments that should occur this year, maybe you could just talk about Powerwave's strategic position relative to these LTE builds.

**Ron Buschur** – *Powerwave Technologies – President and CEO*

I think *we're in an excellent position*, when I look at the selection criteria of our products and solutions across the carrier arena.  I think, as you can see from our antenna deployments, as well as our tower mounted amplifiers in some of our base stations subsystems, we have

- 21 -