1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

**SOUTHERN DIVISION**

11

12  PAWEL I. KMIEC,

13              Plaintiff,

14       vs.

15

16  POWERWAVE TECHNOLOGIES
    INC, RONALD J. BUSCHUR, and
17  KEVIN T. MICHAELS,

18              Defendants.

    ) **Case No.: CV 12-00222 CJC (JRPx)**
    )
    )
    )
    )
    ) **ORDER GRANTING DEFENDANTS'**
    ) **MOTION TO DISMISS**
    )
    )
    )
    )
    )
    )

19

20  **I.  INTRODUCTION & BACKGROUND**

21

22       This is a consolidated securities class action brought against Ronald J. Buschur,

23  Kevin Michaels, (together, the "Individual Defendants"), and Powerwave Technologies

24  Inc., ("Powerwave"), (collectively, "Defendants").  The claims are asserted on behalf of

25  all persons who purchased or otherwise acquired Powerwave securities between

26  October 28, 2010 and October 18, 2011, (collectively "Plaintiffs").  Plaintiffs seek to

27  recover for violations of §§ 10(b) and 20(a) of the 1934 Securities Exchange Act and

28  Rule 10b-5, for allegedly false and misleading statements related to demand for

1 Powerwave's products and the company's revenue recognition.  Defendants filed a

2 motion to dismiss the Amended Consolidated Complaint ("Complaint") for failure to

3 state a claim upon which can be granted.  (Dkt. No. 46.)  Specifically, Defendants argue

4 that Plaintiffs have failed to meet the heightened pleading requirements of Federal Rule

5 of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15

6 U.S.C. § 78u-4(b).  For the following reasons, the Court **GRANTS** Defendants' motion

7 to dismiss.[1]

8

9 **II.  BACKGROUND**

10

11     Powerwave is in the business of designing, manufacturing, marketing, and selling

12 wireless solutions for wireless communications networks.  (Compl. ¶ 4.)  Mr. Buschur

13 served as Powerwave's President and Chief Executive Officer during the class period,

14 and Mr. Michaels served as the Chief Financial Officer.  (*Id*. ¶¶ 9–10.)  One of

15 Powerwave's largest customers during the class period was AT&T.  (*Id*. ¶ 26.)

16 Powerwave sold many products to AT&T through third party "Turf Partners," including

17 Team Alliance and Goodman.  (*Id*. ¶¶ 25–26.)  Beginning in the third fiscal quarter of

18 2010 ("3Q10") and continuing until 2Q11, Plaintiffs allege that Powerwave shipped

19 unneeded products to Team Alliance in order to meet revenue goals.  (*Id*. ¶ 30.)  These

20 "bulk orders" would be arranged the day before the end of the quarter, and ranged in

21 value from $15–25 million.  (*Id*. ¶¶ 31, 41.)  The products would be shipped from China

22 to the United States via boat rather than air so that the actual delivery would be delayed.

23 (*Id*. ¶ 30.)  Powerwave allegedly granted Team Alliance discounts and incentives for the

24 orders, including special extended payment terms and rights of return.  (*Id*. ¶¶ 30, 33,

25 39.)  At the end of 1Q11, Plaintiffs allege that Powerwave knowingly sent a bulk order

26

27 [1] Having read and considered the papers presented by the parties, the Court finds this matter
appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly,

28 the hearing set for January 28, 2013 at 1:30 p.m. is hereby vacated and off calendar.

1   of defective products to Team Alliance.  (*Id.* ¶ 44.)  The bulk order contained a promise

2   to replace the defective products once Powerwave had functional products available in a

3   later quarter.  (*Id.* ¶ 44.)

4

5        Plaintiffs allege that this practice of placing bulk orders caught up to Powerwave

6   in 3Q11, when its revenue fell far short of projections.  On October, 18, 2011,

7   Powerwave issued a press release stating that it expected its third quarter revenue to be

8   in the range of $75–79 million.  (*Id.* ¶ 89.)  Previous estimates for the quarter were $162

9   million.  (*Id.* ¶ 95.)  Plaintiffs allege that even though Defendants primarily attributed

10  the sharp decline in revenue to weak capital expenditure by AT&T, in reality, the

11  decline occurred because Powerwave's customers had accumulated too much inventory

12  in past quarters.  (*Id.* ¶¶ 154–55.)  In other words, because Powerwave's customers had

13  accepted so many unneeded products during the first and second quarters, they did not

14  demand nearly as many Powerwave products in the third quarter.  After the revelation of

15  Powerwave's 3Q11 revenue, Powerwave's stock price dropped significantly.  (*Id.* ¶¶ 5,

16  168.)

17

18       Plaintiffs' allegations are supported by statements from six confidential witnesses

19  ("CW" or "CWs") describing contemporaneously available information regarding the

20  demand for Powerwave products, and Powerwave's practice of making last-minute bulk

21  orders.  (*See id.* at ¶¶ 16–22, 28–49.)  The CWs are former Powerwave employees and a

22  Powerwave customer.  (*See id.* at ¶¶ 16–22.)

23

24  **III.  DISCUSSION**

25

26       A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

27  sufficiency of the claims asserted in the complaint.  The issue on a motion to dismiss for

28  failure to state a claim is not whether the claimant will ultimately prevail but whether

the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 1370, 1374 (9th Cir. 1997). When evaluating a Rule 12(b)(6) motion, the Court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007). When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

### A. Violations of Section 10(b) of the Securities and Exchange Act of 1934

A complaint seeking recovery under § 10(b) of the 1934 Securities Exchange Act is subject to the particularity requirement of Federal Rule of Civil Procedure 9(b), *see Semegen v. Weidner*, 780 F.2d 727, 729, 734–35 (9th Cir. 1985), and the PSLRA, *see In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1995) ("*Silicon Graphics*") (". . . Congress generally intended to raise the pleading standards to eliminate abusive securities litigation."). The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs are also required to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *See Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added in *Gompper*).

1    For purposes of establishing scienter, the complaint is considered in its entirety.

2    *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, at 322 (2007) ("The

3    inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong

4    inference of scienter, not whether any individual allegation, scrutinized in isolation,

5    meets that standard."); *see also In re VeriFone Holdings, Inc. Sec. Litig.*, No. 11-15860,

6    2012 WL 6634351, at *6 (9th Cir. Dec. 21, 2012) ("The district court here did not err as

7    a matter of law by first engaging in an individualized discussion of the complaint's

8    allegations and then summarily concluding that 'in combination' the allegations did not

9    sufficiently allege scienter.").  The inference of scienter must be "cogent and at least as

10   compelling as any opposing inference one could draw from the facts alleged."  *Id*. at

11   309.  In adopting this standard, the Court observed that the "inference that the defendant

12   acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the

13   'most plausible of competing inferences.' "  *Id*. at 317 (*quoting Fidel v. Farley*, 392

14   F.3d 220, 227 (6th Cir. 2004)).  Thus, district courts are instructed to evaluate

15   allegations of scienter in a § 10(b) action by answering the following question: "When

16   the allegations are accepted as true and taken collectively, would a reasonable person

17   deem the inference of scienter at least as strong as any opposing inference?"  *Id*. at 326.

18   The Ninth Circuit has held that the higher standard for pleading scienter "naturally

19   results in a stricter standard for pleading falsity."  *In re Daou Sys., Inc.*, 411 F.3d 1006,

20   1015 (9th Cir. 2005).  This is because " 'falsity and scienter in private securities fraud

21   cases are generally strongly inferred from the same set of facts,' and the two

22   requirements may be combined into a unitary inquiry under the PSLRA."  *In re The*

23   *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) ("*Vantive*") (*quoting*

24   *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).

25

26   ///

27   ///

28   ///

### 1. Statements Regarding Contemporaneous Demand

Plaintiffs identify a number of allegedly false or misleading statements regarding contemporaneous demand for Powerwave products.  (Pl.'s Opp'n at 10.)  Plaintiffs allege that on October 3, 2010, Powerwave issued a press release announcing its financial results for 3Q10, in which Mr. Buschur stated: "[W]e see signs of improvement in overall demand for wireless infrastructure equipment."  (Compl. ¶ 50.)  This statement is comparable to a number of other statements made prior to 3Q11: "[w]e continue to see signs of improvement in overall demand for wireless infrastructure equipment," (*id*. ¶ 53); "the demand for Powerwave's advanced products are extremely strong," (*id*. ¶ 66); "we have been seeing an increase in demand for our products," (*id*.); "we're seeing demand across the board," (*id*.); "demand has continued to be improving and strong," (*id*. ¶ 72); and "[Powerwave has] maintained [its] overall market share within the wireless communications infrastructure equipment market," (*id*. ¶¶ 58, 70).  Plaintiffs also allege that certain statements made in 3Q11 are actionable, including, "we are on track for meeting the bottom range of our 2011 annual revenue guidance," (*id*. ¶ 74), and "[w]ireless demand is very healthy," (*id*. ¶ 83).

Only two of the confidential witnesses, CW1 and CW3, provide any information specifically related to demand for Powerwave products.  According to CW1, Powerwave began "seeing a slowdown" in business with AT&T as early as March 2011.  (*Id*. ¶ 48.)  CW3 confirmed that AT&T began "drastically slowing down when it wanted new cell-sites built."  (*Id*. ¶ 49.)  These accounts alone, however, are insufficient to show the falsity of the statements regarding contemporaneous demand.  The CW accounts do not describe with any detail the rate at which AT&T's demand was decreasing, or whether any decreases in demand from AT&T were significant enough to offset other demand.  In fact, the Complaint suggests that demand was actually increasing between 3Q10 and 2Q11.  Plaintiffs include a chart documenting net sales to

Team Alliance, the Turf Partner responsible for sales to AT&T.  The chart shows that Powerwave sales to Team Alliance jumped from $17,249,000 in 3Q10 to $19,127,000 in 1Q11 and finally to $47,779,000 in 2Q11.  (*Id.* ¶ 25.)  The bulk orders alone cannot explain this increase.  The bulk orders allegedly began in the 3Q10, which means that, even if the sales numbers are inflated, they are inflated for all three quarters.  Plaintiffs have not alleged any facts to suggest that the value of the bulk orders increased significantly from 3Q10 to 2Q11.

Plaintiffs also attempt to connect the existence of bulk orders to a reduction in demand.  Essentially, they argue that the practice of bulk orders began in order to make up for reductions in demand.  However, Plaintiffs allege that the bulk orders began in 3Q10, well before the alleged decrease in demand, which CW1 states began in March 2011.  (*Id.* ¶ 48.)  Plaintiffs provide no other facts to suggest that there was a slowdown in demand before March 2011.

With respect to the statements made in 3Q11, Plaintiffs have failed to plead facts giving rise to a strong inference of scienter.  Plaintiffs contend that the Individual Defendants admitted that they were able to see confirmed orders six weeks in advance, yet made positive statements regarding demand six weeks before the end of 3Q11.  Though such a fact might give rise to an inference of scienter, Plaintiffs mischaracterize Mr. Buschur's comments on this point.  When asked how far in advance the Individual Defendants could see confirmed orders, Mr. Buschur replied: "I think five to six weeks is generous . . . . And that's the reason that we think it's very critical for the long-term of the Company to have diversification in other vertical markets, so we're not so dependent on this market that doesn't seem to have that great a visibility, and can't forecast its demands very well." (Compl. ¶ 128.)  Plaintiffs also allege that the Individual Defendants had access to internal forecasting data and sales reports that contradicted their positive outlook, including a "Gap Report" prepared by CW1

showing Powerwave's present forecasted revenue versus actual revenue.  (*Id*. ¶ 17.)
While Plaintiffs generally allege the existence of such materials, they provide no facts
regarding the actual contents of the reports.  Such conclusory allegations fail to create a
strong inference of scienter.

Plaintiffs include a number of other general allegations in an attempt to show
scienter.  For instance, Plaintiffs assert that "culturally," the Individual Defendants
excised considerable control over Powerwave.  (*Id*. ¶ 39.)  Plaintiffs also allege a motive
for the Individual Defendants to commit fraud.  For example, Plaintiffs state that the
Individual Plaintiffs had considerable incentive to commit fraud because their
compensation was tied to certain performance metrics, and they faced no penalties if
their fraud was discovered.  (*Id*. ¶¶ 140–147.)  Additionally, Plaintiffs state that, because
of the alleged fraud, Powerwave was able to preserve its credit and debt ratings, and
raise considerable capital in a July 20, 2011 offering.  (*Id*. ¶¶ 148–152.)  While these
allegations are certainly relevant to the Individual Defendants' knowledge, they are
insufficient to create a strong inference of scienter.

Even considering all of the allegations in the Complaint holistically, Plaintiffs fail
to create a strong inference of scienter with respect to statements regarding
contemporaneous demand.

## 2.  Statements of Optimism

Plaintiffs additionally allege that the Individual Defendants made false or
misleading statements regarding Powerwave's ability to take advantage of the demand
for wireless products.  Plaintiffs assert that the following statements are actionable:
"Powerwave [is] highly competitive . . . without compromising our superior quality and
our leading edge technology product solutions," (*id*. ¶ 55); "[w]e believe that

Powerwave has the products and solutions necessary for these types of cost effective deployments, and are well positioned to benefit from this demand," (*id*.); "[Powerwave] is in excellent position," (*id*.); "we have positioned Powerwave to be in an excellent position from which to build upon and capture both the short-term and long-term growth opportunities that are in the global wireless infrastructure marketplace," (*id*. ¶ 78); "we are in a very strong position in with these new technologies," (*id*. ¶ 83).

Such statements are vague, and do not offer any specific details or forecasts regarding Powerwave's performance.  As such, they are mere puffery, and therefore not actionable.  *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."); *In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002) ("General statements of optimism and "puffing" about a company or product are not actionable" under Rule 10(b)"); *cf Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("District courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and we can think of no sound reason why they should not do so.").

### 3. Forward-Looking Statements Regarding Revenue Projections

Plaintiffs allege that certain forward-looking statements made by the Individual Defendants concerning revenue projections are actionable.  On February 1, 2011, Mr. Michaels stated that Powerwave had established a 2011 revenue range of $650 to $680 million.  (Compl. ¶ 54.)  Throughout the year, the Individual Defendants continually stated that they believed Powerwave was on track to meet that goal.  On May 5, 2011, for instance, Mr. Michaels stated, "we continue to believe that we will achieve our fiscal 2011 annual revenue range of $650 million to $680 million."  (*Id*. ¶ 65.)  Mr. Buschur

1   reiterated that "we continue to believe that we will be able to achieve our annual

2   revenue guidance of $650 million to $680 million." (*Id*. ¶ 66.)  At least three of the

3   statements occurred during 3Q11.  On July 12, 2011, Mr. Michaels stated that "we

4   continue to believe that we are on track for meeting the bottom range of our 2011

5   annual revenue guidance of $650 million to $680 million." (*Id*. ¶ 74.)  At an August 4,

6   2011 conference call, Mr. Michaels reiterated that he "continue[d] to believe that we

7   will achieve our 2011 annual revenue guidance of $650 million to $680 million." *(Id*. ¶

8   79.)  Mr. Buschur also stated that "we're pretty confident still that we should be able to

9   achieve the guidance that we had given for the full year." (*Id*. ¶ 81.)

10

11      Under the PLSRA's safe harbor provision, false or misleading forward-looking

12  statements are actionable if (1) not accompanied by meaningful cautionary language;

13  and (2) defendants had actual knowledge that the statements were false or misleading.

14  15 U.S.C. § 78u–5(c)(1); *see In re Cutera Sec. Litig.*, 610 F.3d 1103, 1113 (9th Cir.

15  2010).  Plaintiffs contend that these revenue projections are false because at the time

16  when made, Powerwave had been artificially boosting its revenue numbers through bulk

17  orders.  Without such bulk orders, Plaintiffs argue, Powerwave's revenue would have

18  been well below projections in 1Q11 and 2Q11.  Although Defendants were able to

19  meet their projections in the first half of 2011, it came at the cost of shifting revenue

20  away from future quarters.  As a result, it was inevitable that Powerwave would have a

21  dramatic drop in revenue sometime in the future.

22

23      Though the Individual Defendants were clearly wrong in their projections,

24  Plaintiffs have failed to allege sufficient facts to support a strong inference that the

25  Individual Defendants had actual knowledge of the falsity of their statements.  There is

26  nothing inherently wrong with bulk orders at the end of quarters, even if those orders

27  contain discounts or incentives.  Therefore, the Individual Defendants' knowledge of the

28  existence of the bulk orders alone is not sufficient.  Plaintiffs must additionally show

1   that they were aware of the impropriety of such orders.  Plaintiffs allege that the bulk

2   orders were improper because they did not represent actual demand, were accompanied

3   by improper rights of return, and consisted of defective products.  Plaintiffs fail to create

4   a strong inference that the Individual Defendants were aware of any of these facts.

5

6        Plaintiffs point to the statements of CW5 regarding the approval of incentives and

7   discounts in an attempt to show scienter.  CW5 notes that Mr. Buschur would typically

8   need to approve orders with significant discounts or incentives, such as the bulk orders.

9   Again, however, there is nothing *per se* improper about offering discounts and

10  incentives with end of the quarter bulk orders.  Plaintiffs additionally emphasize the fact

11  that, when reporting on the 3Q11 reports, the Individual Defendants acknowledged a

12  "massive inventory buildup."  Contrary to Plaintiff's assertions, Mr. Buschur's

13  comments regarding the buildup were much more qualified.  He stated: "[T]here

14  probably is some inventory that is sitting there . . . .  I would anticipate there is some

15  inventory sitting there being positioned for the next couple of quarters."  (Compl. ¶ 91.)

16  These cautioned statements are far from an admission that Powerwave's revenue

17  problems were caused by a "massive inventory buildup," as Plaintiffs suggest.

18

19       Even considering all of the allegations in the Complaint holistically, including

20  those discussed in connection with statements regarding contemporaneous demand,

21  Plaintiffs fail to create a strong inference of scienter with respect to forward-looking

22  projections.

23

24  ///

25  ///

26  ///

27  ///

28  ///

### 4. Improper Revenue Recognition

Plaintiffs allege that Defendants improperly recognized certain revenue related to the bulk orders.  Specifically, Plaintiffs allege that Powerwave's accounting violated General Accepted Accounting Principles ("GAAP") by improperly recognizing sales made on a contingency basis.  Generally speaking, a seller may recognize revenue from a sale with a right of return so long as the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.  (*Id*. ¶ 108.)  Plaintiffs assert that "Team Alliance did not accept full responsibility for [the bulk orders] and Powerwave, in substance, retained the risk of ownership of the product."  (*Id*. ¶ 106.)  In other words, Plaintiffs allege that the bulk orders were actually contingency sales, and therefore should not have been immediately recognized as revenue.  Plaintiffs point to a number of allegations they contend support this conclusion.  CW1, for instance, states that Powerwave granted Team Alliance special "extended payment terms and rights of return in order to get Team Alliance to accept delivery of the products . . . ."  (*Id*. ¶ 30.)  However, simply granting a right of return does not, in and of itself, constitute a violation of GAAP.  (*See id*. ¶ 108.)  CW1 provides no details as to the actual terms of the "special" rights of return.  Without additional facts detailing such terms, it is not possible to determine whether the sales were in fact contingent on the resale of the products.

Plaintiffs also allege that a significant portion of the bulk orders were in fact returned.  In support, Plaintiffs rely almost entirely on CW6, who observed that the "finished goods inventory accounts would increase shortly after the fifth or sixth day of the new quarter."  (*Id*. ¶ 36.)  CW6 did not personally handle product returns, and was not aware of any actual returns.  Instead, CW6 "strongly suspected that these increases in finished goods reflected returns from Team Alliance."  (*Id*.)  Such a suspicion is not sufficient to create a strong inference that the orders were sold on a contingency basis.

Plaintiffs also cannot rely on allegations regarding the increase in the Days Sales Outstanding ("DSO") in order to show improper revenue recognition.  Plaintiffs argue that the fact that DSO increased dramatically in 3Q11 is evidence that Powerwave did not require that Team Alliance pay for the bulk orders.  Plaintiffs, however, fail to connect the DSOs to Team Alliance or to the bulk orders.  Additionally, the increase in DSO could have been caused by the general slowdown in the market for Powerwave products rather than any special terms granted to Powerwave.

With respect to the order containing defective products, Plaintiffs have adequately alleged improper revenue recognition.  However, Plaintiffs have failed to adequately plead scienter.  Though the allegations in the Complaint create a strong inference that the Individual Defendants were aware of the existence of bulk orders, for the reasons discussed in connection with statements regarding revenue projections, Plaintiffs fail to create a strong inference that the Individual Defendants, or anyone else responsible for Powerwave disclosures, were aware of the allegedly improper nature of the bulk orders.

**B.  Violation of Section 20(a) of the Securities and Exchange Act of 1934**

Plaintiffs have also failed to state a claim for control person liability pursuant to Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a), against the Individual Defendants.  In order to establish control person liability, Plaintiffs must allege (1) a primary violation of Section 10(b) by Powerwave, and (2) the exercise of actual power or control by one of the Defendants over Powerwave.  15 U.S.C. § 78t(a); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 394 (9th Cir. 2010); *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999).  Because Plaintiffs have failed to adequately allege a violation of Section 10(b), they cannot state a claim under Section 20(a) against any of the Individual Defendants.  *See In re Oracle Corp.*, 627 F.3d at 394.

**III.  CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss for failure to state a claim.  Plaintiffs have twenty days leave to amend their Complaint consistent with this order.  Defendants have twenty days thereafter to file a responsive pleading.

DATED:      January 25, 2013

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

-14-