1 | ROBBINS GELLER RUDMAN
   | & DOWD LLP
2 | DARREN J. ROBBINS (168593)
   | ROBERT R. HENSSLER JR. (216165)
3 | ROBERT K. LU (198607)
   | 655 West Broadway, Suite 1900
4 | San Diego, CA 92101-3301
   | Telephone: 619/231-1058
5 | 619/231-7423 (fax)
   | darrenr@rgrdlaw.com
6 | bhenssler@rgrdlaw.com
   | rlu@rgrdlaw.com
7 |
   | Lead Counsel for Plaintiff
8 |



9

# UNITED STATES DISTRICT COURT

10

## CENTRAL DISTRICT OF CALIFORNIA

11

### SOUTHERN DIVISION

| | |
|---|---|
| PAWEL I. KMIEC, Individually and on Behalf of All Others Similarly Situated, | ) No. 8:12-cv-00222-CJC(JPRx) |
| Plaintiff, | ) CLASS ACTION |
| vs. | ) FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| POWERWAVE TECHNOLOGIES INC., et al., | ) |
| Defendants. | ) |

811515_2

# TABLE OF CONTENTS

**Page**

I.      JURISDICTION AND VENUE ........................................................... 1

II.     INTRODUCTION AND OVERVIEW.............................................. 1

III.    CLAIMS ASSERTED IN THE COMPLAINT ................................ 3

IV.     PLAINTIFFS .................................................................................... 4

V.      DEFENDANTS................................................................................. 4

VI.     SOURCES OF ALLEGATIONS ...................................................... 8

VII.    FACTUAL BACKGROUND TO DEFENDANTS' SCHEME.................. 12

        A.    Nature of Powerwave's Business ....................................... 12

        B.    During the Class Period Powerwave Relied on Bulk Orders that
              Were Contingent on Resale, Explicitly Waived Payment, and/or
              Were Defective Product to Inflate Revenues Beyond Legitimate
              Demand ............................................................................... 14

        C.    Defendants' Admissions Corroborate and Confirm the Revenue
              Recognition Scheme ........................................................... 22

              1.   Powerwave's Revenue Recognition Scheme Is
                   Confirmed by the Fact that Accounts Receivable
                   Attributed to Team Alliance Spiked to *2000%* More than
                   Sales in 3Q11 .......................................................... 22

              2.   Powerwave's Revenue Recognition Scheme Is
                   Corroborated by the 92% Increase in DSO in 3Q11 ............... 24

              3.   On October 18, 2011, Buschur  Admitted that an
                   Inventory Buildup of a "Couple of Quarters" at North
                   American Customers Was a Cause of the Dramatic
                   Decline in Demand .................................................. 27

VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS ISSUED DURING THE CLASS PERIOD ........................... 29

        A.    3Q09 Press Release, and Report on Form 10-Q .................. 29

        B.    4Q10 Press Release and Conference Call, and Report on Form
              10-K.................................................................................. 31

        C.    Financial Analysts Contrast Powerwave's Bullish 2011
              Guidance with the "Lackluster" Growth Expected for the
              Industry ............................................................................. 36

        D.    1Q11 Press Release, and Conference Call and Report on Form
              10-Q.................................................................................. 37

- i -

**Page**

E.  May 24, 2011 Barclays Capital Global Communications Conference ........................................................................ 43

IX.  THE TRUTH BEGINS TO EMERGE ....................................... 45

A.  2Q11 Press Releases and Conference Call ........................... 45

B.  August 9, 2011 Canaccord Genuity Global Growth Conference and 2Q11 Report on Form 10-Q .......................... 51

C.  3Q11 Press Releases and Conference Calls......................... 54

X.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING AND GAAP VIOLATIONS DURING THE CLASS PERIOD ................................................................ 59

A.  Powerwave Improperly Recognized Revenue on Contingent Sales with Team Alliance, in Violation of GAAP .............. 61

Sales of Defective Product .......................................................... 61

Bulk Orders that Included a Right of Return if the Product Could Not be Resold or Explicitly Waived Payment ............................... 62

B.  Powerwave Recorded Premature and Inflated Revenue in Violation of GAAP and the SEC's Revenue Recognition Requirements ........................................................................ 63

C.  Powerwave's Disclosures Regarding Revenue Recognition Were False and Misleading and in Violation of GAAP and SEC Guidance ................................................................................ 66

D.  Powerwave's Financial Statements Violated Fundamental Accounting Concepts .......................................................... 69

XI.  DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF THE TRUTH ABOUT POWERWAVE'S BUSINESS ............... 70

XII.  FRAUDULENT SCHEME AND COURSE OF BUSINESS ...................... 73

XIII.  ADDITIONAL SCIENTER ALLEGATIONS ............................................ 73

A.  Each of Defendants' False Statements and Omissions Involved One of Powerwave's Core Operations.................................... 74

B.  Powerwave's Incentive Compensation Structure Created an Incentive for Fraud and Strongly Supports an Inference of Scienter.................................................................................... 75

C.  Defendants' Fraudulent Conduct Allowed Defendants to Preserve Powerwave's Credit and Debt Ratings and Raise $100

811515_2

**Page**

Million in the July 20, 2011 Offering Thus Delaying a
Bankruptcy Filing ................................................................................ 77

D.   Defendants' Misleading Statements About the Reasons for the
3Q11 "Nightmare" Support a Strong Inference of Scienter .............. 78

E.   SOX Certification .............................................................................. 80

    1.   Defendants Signed False Statements Regarding
Powerwave's Internal Controls and Procedures ...................... 80

    2.   Reasons Why Defendants' Internal Controls and
Procedure Statements Were Materially False and
Misleading .............................................................................. 82

XIV.  LOSS CAUSATION/ECONOMIC LOSS ..................................................... 84

XV.  ANY PURPORTED RISK WARNING WERE INADEQUATE OR
MATERIALLY FALSE AND MISLEADING ............................................. 87

XVI.  NO SAFE HARBOR ............................................................................ 87

XVII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-
ON-THE MARKET ............................................................................ 88

XVIII.    CLASS ACTION ALLEGATIONS .................................................... 89

CLAIMS FOR RELIEF ................................................................................ 90

COUNT I ................................................................................................ 90

For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All
Defendants ......................................................................................... 90

Count II ................................................................................................. 91

For Violation of §20(a) of the 1934 Act Against All Defendants ............... 91

PRAYER FOR RELIEF ............................................................................... 91

JURY DEMAND ....................................................................................... 92

# I.     JURISDICTION AND VENUE

1.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the Securities and Exchange Commission ("SEC"). Jurisdiction is conferred by §22 of the Securities Act of 1933 ("1933 Act") (15 U.S.C. §77v) and §27 of the 1934 Act (15 U.S.C. §78aa). Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act. Powerwave Technologies, Inc.'s ("Powerwave" or the "Company") headquarters are located at 1801 East St. Andrew Place, Santa Ana, CA 92705 and many of the acts and transactions constituting the violations of the securities laws alleged herein occurred in this District.

2.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

# II.    INTRODUCTION AND OVERVIEW

3.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the securities of Powerwave between October 28, 2010 and October 18, 2011, inclusive (the "Class Period"), against certain Powerwave officers and/or directors for violations of the 1934 Act. Powerwave is excluded from the proposed class. These claims are asserted against certain Powerwave officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls and filings with the SEC.

4.     Powerwave engages in the design, manufacture, marketing and sale of wireless solutions for wireless communications networks worldwide. This action concerns defendants' false and misleading statements and omissions regarding: (1) demand; (2) the basis for and reliability of its financial forecasts; (3) risks to its business; and (4) the Company's financial statements. During the Class Period,

811515_2

- 1 -

1   defendants caused Powerwave to report artificially inflated financial results in an
2   effort to meet or exceed Powerwave's financial guidance in the face of a market that
3   analysts believed would experience "lackluster" growth through the 2011 fiscal year.
4   Defendants' false explanation for their tremendous feat was that Powerwave's
5   products were technically superior to the competition and that, as a result,
6   Powerwave's growth would exceed that of the market as a whole.

7       5.     In truth, defendants knew or recklessly disregarded that demand for
8   Powerwave's products was actually steeply declining.   According to former
9   employees, to off-set the declining demand, and cloak the Company's deteriorating
10  financial condition, defendants engaged in a revenue recognition scheme to artificially
11  inflate its revenue and earnings by: (1) shipping "bulk orders" of unsold and/or
12  unsellable inventory to resellers on a contingent basis whereby Powerwave would
13  *explicitly waive payment*, and/or *grant rights to return the product if it could not be*
14  *sold*, and (2) knowingly and deliberately shipping product that Powerwave knew did
15  not function with the promise to replace the defective products in a later quarter.
16  According to former employees with knowledge of the bulk orders, the last-minute
17  bulk orders were done to try to meet Powerwave's quarterly and year-end forecasts
18  because actual orders had not been received. *In other words, according to former*
19  *employees, the bulk orders were done to hide the fact that demand was not as strong*
20  *as defendants claimed*.

21      6.     Defendants' false statements and omissions artificially inflated
22  Powerwave's stock price, allowing defendants and the Company to complete a $100
23  million bond offering and collect millions in performance bonuses and salaries. The
24  $100 million bond offering was completed just before defendants revealed the figures
25  reflecting the Company's true financial condition and delayed a bankruptcy filing –
26  allowing defendants to continue paying themselves for another 15 months. As the
27  truth about defendants' false statements and omissions were revealed, Powerwave
28  shareholders suffered millions of dollars in damages and the Company's common

811515_2

- 2 -

stock price plummeted from a Class Period high of $4.69 per share to $.68 per share on October 19, 2011 – a 85% decline in little over five months, from which Powerwave's stock price never recovered. Indeed, on January 28, 2013, the Company filed for bankruptcy protection and the Company's stock is now virtually worthless.

**Powerwave Technologies**
October 28, 2010 - October 18, 2011



## III.   CLAIMS ASSERTED IN THE COMPLAINT

7.      Lead Plaintiff the Government of Bermuda Contributory and Public Service Superannuation Pension Plans (the "Bermuda Pension Plans") asserts claims arising from allegations of securities fraud in violation of §10(b) of the 1934 Act against those defendants, certain of the Company's senior executives, who made materially false and misleading statements that caused the price of Powerwave securities to be artificially inflated over the course of the Class Period. The Bermuda Pension Plans also asserts control-person claims under §20(a) of the 1934 Act.

---

[1]     The "Dollars Per Share" reflects the 1-for-5 reverse stock split. *See* ¶203.

811515_2

## IV.  PLAINTIFFS

8.   On April 26, 2012, the Court appointed the Bermuda Pension Plans as Lead Plaintiff to represent the proposed class of Powerwave shareholders.  During the Class Period, the Bermuda Pension Plans purchased and held shares of Powerwave common stock.  As a result of the defendants' conduct detailed herein, the Bermuda Pension Plans suffered damages in connection with its purchases of Powerwave securities.

## V.   DEFENDANTS

9.   Defendant Ronald J. Buschur ("Buschur") served as the Company's President and Chief Executive Officer ("CEO") during the Class Period.  During the Class Period, Buschur participated in the issuance of false and misleading statements and failed to disclose the true facts about Powerwave's business.  At no time during the Class Period did Buschur or any other defendant assert that they were not aware of material aspects of Powerwave's business or finances.  Moreover, Buschur issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as a primary person with knowledge about the Company's business, outlook, financial reports and business practices.  In addition to issuing statements throughout the Class Period, Buschur repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of Powerwave, and failed to do so.

10.   Defendant Kevin Michaels ("Michaels") served as the Company's Chief Financial Officer ("CFO") during the Class Period.  During the Class Period, Michaels participated in the issuance of false and misleading statements and failed to disclose the true facts about Powerwave's business.  At no time during the Class Period did Michaels or any other defendant assert that they were not aware of material aspects of Powerwave's business or finances.  Moreover, Michaels issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as a primary person with knowledge about the Company's

811515_2

- 4 -

1 │ business, outlook, financial reports and business practices.  In addition to issuing
2 │ statements throughout the Class Period, Michaels repeatedly had the opportunity to
3 │ correct the misstatements and omissions by and on behalf of Powerwave, and failed to
4 │ do so.

5 │      11.   Buschur has been with the Company since 2001 and became CEO of
6 │ Powerwave and a member of the Board of Directors (the "Board") in February 2005.
7 │ Michaels has been with the Company since 1996.  According to the Company's 2010
8 │ Form 10-K, which was filed with the SEC on February 17, 2011, the Company was
9 │ small, consisting of approximately 2,100 employees throughout the entire Class
10 │ Period.  The vast majority of these employees – approximately 1,900 – were on
11 │ manufacturing, quality, supply chain, sales and research and development.

12 │      12.   Defendants Buschur and Michaels (collectively, "defendants"), by virtue
13 │ of their high-level positions with the Company, had access to adverse, undisclosed
14 │ information about Powerwave's business, operations, financial statements, markets
15 │ and present and future business prospects, via internal corporate documents,
16 │ conversations and connections with other corporate officers and employees,
17 │ attendance at management and Board meetings and committees thereof, and reports
18 │ and other information was provided to them as part of their positions.

19 │      13.   By virtue of their high level positions with the Company, defendants
20 │ possessed the power and authority to control the contents of Powerwave's quarterly
21 │ reports and other public filings, press releases and presentations to securities analysts,
22 │ money and portfolio managers and institutional investors, *i.e.*, the market. Each of the
23 │ defendants, by virtue of their high level positions with Powerwave, directly
24 │ participated in the management of the Company and was directly involved in the day-
25 │ to-day operations of the Company.  The defendants were involved in drafting,
26 │ producing, reviewing and/or disseminating the false and misleading statements and
27 │ information alleged herein, and were aware, or recklessly disregarded, that false and
28 │

1 misleading statements regarding Powerwave were being issued, and approved or
2 ratified these statements, in violation of the federal securities laws.

3     14.    Powerwave had internal systems that allowed senior management – the
4 defendants – to monitor up-to-date quarterly revenues.   According to former
5 employees, the Company used a Hyperion system and a salesforce.com system to
6 provide senior management with updated forecasts and revenues.

7     15.    Powerwave's common stock was listed and traded on the National
8 Association of Securities Dealers Automated Quotations ("NASDAQ") under the
9 symbol PWAV during the Class Period.   As officers and controlling persons of a
10 publicly-held company whose common stock was traded on the NASDAQ during the
11 Class Period, and governed by the federal securities laws, each of the defendants had a
12 duty to disseminate promptly accurate and truthful information regarding the
13 Company's financial condition and performance, growth, operations, financial
14 statements, business, markets, management, earnings and present and future business
15 prospects, and to correct any previously-issued statements that had become materially
16 misleading or untrue, so that the market price of Powerwave common stock would be
17 based upon truthful and accurate information.   Defendants' misrepresentations and
18 omissions during the Class Period violated these specific requirements and
19 obligations.

20 **VI.**    **STATEMENT OF THE CASE**

21     16.    Plaintiffs allege that during the Class Period, Powerwave ran its business
22 in a manner which operated as a fraud or deceit upon investors by using a variety of
23 improper artifices and devices to inflate revenues and conceal declining demand for its
24 products.   In particular, defendants: (i) failed to disclose the extent to which
25 Powerwave's business was reliant upon end-of-quarter bulk orders that explicitly
26 waived payment and/or granted the customer a right of return if the product could not
27 be resold, to try to meet forecast expectations for its performance; (ii) issued
28 materially false and misleading financial statements that failed to properly account for

- 6 -

revenues from bulk orders that waived payment and/or granted the customer a right of return if the product could not be resold; (iii) issued financial guidance to investors that failed to disclose the improper bulk orders; and (iv) concealed the extent to which the bulk orders presented a significant risk to demand for the Company's products.

17.    Through extraordinary inducements including waiving payment, granting the customer a right of return if the product could not be resold, and/or intentionally shipping defective product that would be replaced in a later quarter, Powerwave had been able to coerce its largest customer into purchasing more product than it actually needed. Powerwave's end-of-quarter bulk orders were therefore cannibalizing sales from future periods, and its business practices were unsustainable. While the practice assisted the Company in meeting the quarterly and yearly earnings expectations defendants had set for the market, the sales purportedly generated by the bulk orders created a false picture of demand, and generated artificially inflated earnings.

18.    Defendants used a variety of improper business practices and fraudulent accounting techniques to conceal these circumstances from investors, including by failing to disclose the extent of its bulk orders, improperly booking revenues on bulk orders which Powerwave had agreed to take back if they could not be resold, in violation of Generally Accepted Accounting Principles ("GAAP"), and failing to account for the bulk orders consistent with the Company's stated accounting policies.

19.    And, the bulk orders were material to Powerwave's business. According to a former employee directly involved, the last-minute bulk orders were at least $15 million in 3Q10, 4Q10, and 1Q11 and at least $25 million in 2Q11. And, according to former employees, the undisclosed inducements increased during the Class Period. According to former employees, the 3Q10 and 4Q10 bulk orders granted the customer a right of return if the product could not be resold, the 1Q11 bulk order was made up of defective product that would be replaced in a later quarter, and in 2Q11, Powerwave explicitly waived payment.

1    20.    These allegations are independently corroborated by at least five former

2    employees and a customer.  In addition, the former employees state that the large last-

3    minute bulk orders were approved by defendants Buschur and Michaels.  And, Team

4    Alliance was the Company's largest customer during the Class Period and Buschur

5    himself set quarterly sales quotas for Powerwave's head of sales.

6    21.    The allegations are also confirmed by defendants' admissions.  Accounts

7    receivable measures the amount of money owed by a customer.  It is a red flag when

8    accounts receivable increases significantly faster than sales.  Powerwave's accounts

9    receivable attributed to Team Alliance ballooned to over 2000% greater than sales in

10    3Q11.  In fact, despite sales to Team Alliance in 3Q11 of just $2 million, accounts

11    receivable attributed to Team Alliance stood at over $50 million.  This admission by

12    the Company confirms what former employees have stated – that Powerwave was not

13    making Team Alliance pay.

14    22.·    Similarly, the Company's Days Sales Outstanding ("DSO") – which

15    measures how long it takes to get paid – grew by 92% during the Class Period to 175

16    days.  By comparison, the median DSO for Powerwave's competitors was 69 days

17    during the Class Period – and remained flat while Powerwave's spiked.  As the "Big

18    4" auditing firm Ernst & Young has noted, this DSO spike is a red flag: "The higher

19    the number, the greater should be the concern over customers not paying their bills."

20    **VI.    SOURCES OF ALLEGATIONS**

21    23.    Plaintiffs' allegations are based upon the investigation of plaintiffs'

22    counsel, including information contained in SEC filings by Powerwave, regulatory

23    filings and reports, securities analysts' reports and advisories about the Company,

24    press releases, conference call transcripts and other public statements issued by the

25    Company, as well as media reports and other sources of information about the

26    Company, including information obtained from more than 15 former employees of

27    Powerwave.  Information provided by the former employees of Powerwave are

28    reliable and credible because: (a) each of the witnesses worked at Powerwave during

1   or immediately prior to the Class Period; (b) each witness stated that they had personal

2   knowledge of the information provided; (c) the witnesses' job titles and

3   responsibilities show that they had personal knowledge of the information provided;

4   (d) the witness accounts corroborate one another; and (e) the witness accounts are

5   corroborated by other information alleged herein.

6          24.     CW1 was a Senior Demand Planner at Powerwave from 2008 until

7   November 2011, when CW1 was laid off. CW1's duties included analyzing the sales

8   forecasts for Powerwave's North and South American network operator customers for

9   all of Powerwave's products. CW1's network operator customers included AT&T,

10  Verizon, T-Mobile and several others. During 2011, CW1 reported to Materials

11  Manager Alain Ducharme ("Ducharme"). Ducharme reported to Senior Director of

12  Supply Chain Operations Mike Ryberg ("Ryberg") who reported to Chief Operating

13  Officer ("COO") Marv MaGee ("MaGee"). CW1 was involved in determining how

14  and when Powerwave could realize revenues on product sales to North and South

15  American customers. To that end CW1 participated in weekly Sales Operations

16  meetings held every Monday morning in which CW1 assessed just how confident the

17  sales personnel were that projected orders were going to materialize. After those

18  meetings, on Monday afternoons, CW1 met with Powerwave's corporate planning

19  group as part of the larger objective of determining how many orders had already been

20  invoiced in a given quarter (and thereby revenue already recognized), how many

21  orders were "in backlog" (i.e., orders that had been received, but had yet to be

22  fulfilled), and how many orders were projected to come in during the quarter, as well

23  as how many orders needed to come in to meet projected revenue targets for a given

24  quarter. CW1 prepared a Sales and Operations Planning Report – known internally as

25  an "S&OP Report" – that was discussed in the Monday meetings. CW1 also

26  performed a "risk analysis" so that executives could closely monitor the Company's

27  progress in achieving its projected revenues over a given quarter. As part of the risk

28  analysis, CW1 prepared a "Gap Report" which showed Powerwave's present

811515_2

forecasted revenue vs. actual revenue. Specifically, the Gap Report showed actual sales that had been recorded already in the quarter (by part number) and compared that sales figure to forecasted sales so that senior executives knew exactly what was needed to make the numbers. CW1 stated that this difference between forecasted sales and actual sales was the genesis for the bulk orders

25.     CW2 was a Director of Financial Planning at Powerwave from January 2007 until November 2011, when CW2 was laid off. As Director of Financial Planning, CW2 was responsible for "developing and executing" a forecasting process that began with a "bottoms-up" sales forecast from the Company's sales force and then forecasting expenses and costs to derive forecasts of margins and profits. This forecasting process was undertaken annually and then updated on a quarterly basis. CW2 reported directly to Michaels, but once Treasurer Tom Spaeth ("Spaeth") was hired, CW2 reported to Spaeth, who reported to Michaels. At the end of quarters, CW2 met with Michaels and Spaeth in Michaels' office to discuss end of quarter margins.

26.     CW3 was a Senior Manager of Strategic Sourcing with Goodman Networks ("Goodman") (an AT&T "Turf Partner" and Powerwave customer), from November 2009 until February 2012 when he was laid off. CW3's role included ordering equipment and products from three primary vendors that Goodman used to build cell-sites on behalf of AT&T. These vendors included Andrews/CommScope, Powerwave, and a German firm – Kathrein. According to CW3, the primary products purchased from Powerwave were antennas, diplexers and TMIs. Goodman's activity on behalf of AT&T covered the entire U.S.

27.     CW4 worked at Powerwave as a Senior Inside Sales Rep on Powerwave's Customer Relationship Management ("CRM") team from 1994 until March, 2012 when CW4 was laid off. CW4 was the CRM team member assigned to AT&T. As an Inside Sales Rep, CW4 dealt directly with the Powerwave sales team assigned to AT&T as well as with AT&T personnel. The AT&T personnel CW4 most

811515_2

- 10 -

often dealt with were members of AT&T's supply chain management group which was located in Seattle. As an Inside Sales Rep CW4 was essentially responsible for receiving AT&T orders and ensuring that the order terms were not only entered into Powerwave's Oracle system, but also that the orders were fulfilled according to AT&T's delivery requirements. This entailed dealing with Powerwave's supply chain organization to ensure that the products necessary to fulfill orders were being manufactured.

28. CW5 started at the Company in 2004 and worked as National Sales Manager for Powerwave's Tier 2 accounts in the U.S. and Canada. These Tier 2 accounts included US Cellular, Cricket and MetroPCS. As part of his job, CW5 participated in regular sales calls with the various Account Managers, MaGee, and the V.P. of Sales. CW5 left Powerwave of his own volition in June 2011.

29. CW6 worked at Powerwave from around February 2007 through November 2011 when CW6, and numerous other employees, were laid off. During CW6's time at the Company CW6 had been Global Inventory Manager. Initially, CW6 reported to Ryberg, but at some point, began reporting to Martin Cooper ("Cooper"). Both Ryberg and Cooper reported to current COO MaGee. CW6 continued having dealings with Ryberg even after he began reporting to Cooper. As Global Inventory Manager, CW6 had been primarily responsible for monitoring the levels of component/raw material inventory held by Powerwave facilities around the world. CW6 ensured that Powerwave had adequate quantities of such materials to meet production demands and would also facilitate the movement of component inventory from one location to another depending on the respective needs of the locations. Another function of CW6's job was to dispose of Excess and Obsolete component inventory. In addition, as part of CW6's job duties, CW6 had insight to the forecasted demand for Powerwave's products. In this regard, CW6 worked with Powerwave's Planners to determine the component and raw material inventory that would be needed to fulfill expected demand.

811515_2

- 11 -

1       30.   CW7 worked at Powerwave from January 2007 until CW7 quit in June

2   2012; CW7 had several positions during that time. CW7 was initially in the

3   Purchasing Department, but from 2008 - 2010, CW7 worked in a Demand Planning

4   role. Then, from some time in 2010 until CW7's departure, CW7 was involved with

5   Production Planning for new products and also did cost and material analysis. In this

6   latter role, CW7 reported to Gus Gomez, who reported to Cooper, who reported to

7   MaGee.

8   **VII.   FACTUAL BACKGROUND TO DEFENDANTS' SCHEME**

9       **A.   Nature of Powerwave's Business**

10       31.   Powerwave was founded in 1985 and became a public company through

11   an initial public offering ("IPO") in 1996. The Company sells its products through its

12   direct sales force, independent sales representatives, and resellers to wireless original

13   equipment manufacturers ("OEM's") and individual wireless network operators.

14   Powerwave's customers include the OEM's: Alcatel-Lucent, Ericsson, Huawei,

15   Motorola, Nokia Siemens and Samsung. Powerwave's network operator customers

16   include AT&T, Bouygues, Orange, Sprint, T-Mobile, Verizon Wireless and

17   Vodafone. While defendants repeatedly claimed to have technically superior

18   products, there were other companies competing for the same business – including

19   CommScope, Comba Telecom, Fujitsu Limited, Hitachi Kokusai, Japan Radio and

20   Tyco Electronics. In addition, Powerwave also competes with the OEM's – who are

21   also customers – Alcatel-Lucent, Ericsson, Huawei, Motorola, Nokia Siemens and

22   Samsung.

23       32.   During the Class Period, Powerwave sold a relatively few products to a

24   handful of customers. In fact, according to the Company, Powerwave's sale of its

25   antennas and base stations represented 90% of Powerwave's business during the Class

26   Period. In addition, according to the Company, sales to North American customers

27   represented over 40% of Powerwave's business during the Class Period.

28

33.     During the Class Period, a substantial portion of Powerwave's sales were made through resellers or various "Turf Partners."[2]  Powerwave's major reseller for AT&T was Team Alliance.  Turf Partners typically purchased Powerwave product through resellers such as Team Alliance.  The Turf Partner would then use the product as part of building segments or elements of a network building the wireless cell site or infrastructure for AT&T.  Powerwave's sales to Team Alliance were as follows:

| ($000's) | 3Q10 | 1Q11 | 2Q11 | 3Q11 | 4Q11 |
|---|---|---|---|---|---|
| Net Sales to Team Alliance | $ 17,249 | $ 19,127 | $ 47,779 | $ 2,275 | $ 1,930 |
| As a percent of total Powerwave sales | 11% | 14% | 28% | 3% | 3% |

34.     The North American wireless carrier AT&T was one of Powerwave's largest customers during the Class Period.  But, as discussed above, Powerwave did not sell directly to AT&T, but sold to the Turf Partner – through Team Alliance.  The role of AT&T Turf Partners was acknowledged and explained by Michaels in an August 2, 2010 earnings conference call:

> One other thing just to note for you.  I think on customers, I'm sure from an operator basis in North America, our overall largest relationship there is AT&T.  We don't necessarily sell everything directly there.  So, it doesn't count as a 10% customer, but we sell through their Turf Partners and such.  So, I think in this relationship it would be over a 10% customer.  It just doesn't show up that way [sic] technically.

_____

[2]     These "Turf Partners" included: Goodman, Black & Veatch, NSORO and Bechtel.

- 13 -

**B.**   **During the Class Period Powerwave Relied on Bulk Orders that Were Contingent on Resale, Explicitly Waived Payment, and/or Were Defective Product to Inflate Revenues Beyond Legitimate Demand**

35.   Former employees of Powerwave have confirmed that contrary to defendants' claims of strong demand, demand was actually steeply declining during the Class Period.  According to former employees, to off-set the declining demand, and cloak the Company's deteriorating financial condition, defendants engaged in an accounting scheme to artificially inflate its revenue and earnings by: (1) shipping "bulk orders" of unsold and/or unsellable inventory to resellers on a contingent basis whereby Powerwave would *explicitly waive payment*, grant special extended payment terms, and/or *grant rights to return the product if it could not be sold*, and (2) knowingly and deliberately shipping product that Powerwave knew did not function with the promise to replace the defective products in a later quarter.  According to former employees with knowledge of the bulk orders, the last-minute bulk orders were done to try to meet Powerwave's quarterly and year-end forecasts because actual orders had not been received.  *In other words, according to former employees, the bulk orders were done to hide the fact that demand was not as strong as defendants claimed*.

36.   According to former employees, the bulk orders occurred in 3Q10, 4Q10, 1Q11, and 2Q11.  According to CW1, in 3Q10, 4Q10, 1Q11, and 2Q11 Powerwave needed the last-minute bulk orders (detailed below) to try "to make numbers" because a gap existed between revenue expectations and actual demand.  And, according to CW1, the last-minute bulk orders in each of these quarters (3Q10, 4Q10, 1Q11, and 2Q11), were made up of inventory that could not be sold because actual orders for the inventory had not been received.

37.   CW1, CW4, CW5, CW6, and CW7 explained that Powerwave's relationship with AT&T involved third-party "Turf Partners" that actually built different segments or elements of AT&T's network and a reseller – Team Alliance –

- 14 -

1  that also processed orders from the Turf Partners for Powerwave products. In essence,
2  according to CW1, CW4, CW5, CW6, and CW7 a Turf Partner would place its order
3  with Team Alliance, which would then issue an order to Powerwave and purchase the
4  products with instructions for Powerwave to drop ship the products directly to the
5  Turf Partner's premises. CW3 confirmed that the Turf Partner Goodman placed its
6  orders for Powerwave products through Team Alliance.

7      38.    But, according to CW1, the Team Alliance arrangement had another,
8  "shady benefit" for Powerwave because beginning in 3Q10 and then continuing every
9  quarter thereafter up until 3Q11, *Powerwave was able to ship unneeded product to*
10 *Team Alliance in order for Powerwave to try to make revenue goals*. As a quarter
11 drew to an end, CW1 explained that Powerwave personnel would look around at
12 whatever inventory was unsold and would then obtain "a bulk order" from Team
13 Alliance that permitted Powerwave to ship these items prior to the end of the quarter.
14 According to CW1, if Powerwave had "overbuilt" inventory *that could not be sold*
15 *because actual orders for the inventory had not been received*, Powerwave could
16 persuade Team Alliance to issue orders for a portion of the inventory. In other words,
17 *according to CW1, the bulk orders were done to hide the fact that demand was not*
18 *as strong as defendants claimed*.

19     39.    According to CW1, Powerwave would purposely ship the inventory to
20 Team Alliance by boat rather than air from China so as to ensure that the products had
21 shipped and were in transit while delaying delivery by three to four weeks. When
22 CW1 first started at Powerwave, the Company had tended to ship almost all of its
23 products from China to customers by air. The delayed delivery was important to
24 Team Alliance because it did not need the product.

25     40.    According to CW1, Powerwave granted Team Alliance special extended
26 payment terms and rights of return in order to get Team Alliance to accept delivery of
27 the last-minute quarter-end bulk orders – products Team Alliance did not need –
28 without having to assume the full responsibility of paying for the products.

811515_2

- 15 -

1    Specifically, according to CW1, to encourage Team Alliance to place these large bulk
2    orders, *if the products could not be re-sold, Powerwave would take them back and*
3    *Team Alliance would not have to pay*. CW1 also stated that the 4Q10 bulk order
4    included "legacy parts" – which were old parts that no one was buying. CW2, CW5,
5    CW6, and CW7 confirmed that Powerwave shipped the bulk orders to Team Alliance
6    at the end-of-quarters during the Class Period.

7         41.    According to CW1, Powerwave's quarters always ended on a Sunday.
8    CW1 knew that CW1 would be working that weekend because the bulk orders would
9    be arranged on the Saturday – the day before the last day of the quarter. CW1 stated
10   that Ducharme would complain to CW1 about the bulk orders because Ducharme
11   would also be required to work that weekend.

12        42.    CW5 stated that from CW5's participation in sales calls, CW5 knew that
13   Powerwave routinely shipped large volumes of inventory to Team Alliance at the ends
14   of quarters. CW5 confirmed that in 3Q10, 4Q10, and 1Q11, Powerwave was "pulling
15   in orders" from future periods into the quarter that was about to end. CW5 left the
16   Company in June 2011 so could not speak to the practices in 2Q11. CW5's
17   impression from what CW5 heard on the sales calls he was on was that Powerwave
18   was typically trying to make a deal by informing Team Alliance of the inventory
19   Powerwave had on hand and asking what Team Alliance was willing to order of that
20   inventory.

21        43.    In addition, CW5 stated that the end-of-quarter orders required the
22   extension of discounts and incentives to the customer. *It was CW5's understanding*
23   *that such discounts and incentives had to be approved by Buschur*. CW5 based this
24   perception on what CW5 heard during various sales calls that he was required to
25   attend as part of his job in which the Account Managers working on a particular deal
26   discussed the terms of the transaction. In those calls, MaGee and the VP of Sales
27   (CW5 could not recall this person's name) would make comments to the effect that a
28

811515_2

- 16 -

1   proposed discount or incentive needed Buschur's approval and/or that a particular
2   discount or incentive had received Buschur's approval.

3     44. According to CW6, "Team Alliance was our best friend at the end of the
4   quarter" and Powerwave was "***dependent on Team Alliance to meet numbers***," in
5   1Q11 and 2Q11.  In other words, the bulk orders hid the lack of real demand.  CW6
6   said it was definitely the case that Powerwave made large shipments to Team Alliance
7   at the ends of 1Q11 and 2Q11.  CW6 knew about the large, end-of-quarter shipments
8   to Team Alliance from CW6's regular meetings and discussions with Planning
9   personnel where it would be discussed that Team Alliance would be taking a
10  particular amount of product from Powerwave.  CW6 stated that MaGee knew about
11  the bulk orders to Team Alliance, but it was Ryberg who seemed to deal directly with
12  Team Alliance so far as getting the orders.  CW7 confirmed that the key individual
13  who was involved with Team Alliance on behalf of Powerwave was Ryberg.
14  According to CW1, ***Ryberg communicated directly with his boss, MaGee, about the***
15  ***bulk orders***.

16    45. Once CW6 found out about the Team Alliance shipments at the ends of
17  quarters CW6 began to consider them problematic.  CW6 could not recall the exact
18  size of the end-of-quarter shipments to Team Alliance, but believed they were
19  typically worth millions of dollars.

20    46. According to CW7 Powerwave shipped a great deal of product to Team
21  Alliance during the Class Period, but ***if Team Alliance could not sell it, then***
22  ***Powerwave would take the product back***.  CW7 also confirmed that in early 2012,
23  Team Alliance returned a large amount of product that Powerwave had previously
24  shipped.  CW7 gained this knowledge while doing a cost and material analysis for
25  Powerwave's Team Alliance sales personnel in early 2012.  In performing the cost
26  and material analysis, at the Powerwave warehouse in Carson, CA, CW7 became
27  aware that the products CW7 was reviewing were parts that had been previously
28  shipped to Team Alliance.  The products at issue were called PAS Systems.

811515_2

- 17 -

47.     Similarly, CW6 observed on a number of occasions during the Class Period that the finished goods inventory accounts would increase shortly after the fifth or sixth day of the new quarter.  In essence, at the end of a quarter CW6 would see the finished goods inventory levels go down as goods were shipped and then go back up shortly after the new quarter got underway.  Although CW6 did not handle product returns – returns were handled by Cooper and MaGee – CW6 strongly suspected that these increases in finished goods reflected returns from Team Alliance.

48.     CW3 confirmed that in order to get Goodman to accept Powerwave inventory for which AT&T did not order, Powerwave would extend special concessions *that were not reflected in the formal documentation for the transactions* (*e.g.*, purchase order and invoice).  CW3 stated that concessions, made through verbal side agreements, were extended to Goodman by Powerwave in order to get Goodman to issue Purchase Orders and accept delivery.  These sales were often authorized by Powerwave employee Ryberg and Powerwave's District Manager assigned to Goodman, Isaac Bustamante ("Bustamante").

49.     Thus, these special contingent arrangements with reseller Team Alliance and Turf Partner, Goodman, allowed Powerwave to artificially inflate and manipulate its revenues and hide the fact that demand was declining.  According to CW1, Powerwave was well aware of the inventory levels at Team Alliance and how much product was needed to fulfill true customer requirements.  CW1 stated that Team Alliance sent their inventory report to Powerwave on an regular basis.  According to CW1, Powerwave had to keep track of the inventory being held by Team Alliance because there were times when Powerwave received orders from other customers and Powerwave would use Team Alliance's inventory to fill those other customer orders.  In other words, the product was not really sold to Team Alliance, it was essentially just parked with Team Alliance in order for Powerwave to book revenue and try to meet the quarterly revenue expectations.

811515_2

50.    CW1 knew about the "shady" end-of-quarter "orders" from Team Alliance and the terms of these "orders" through "countless conversations" with CW1's manager Ducharme – who dealt directly by phone with Team Alliance – in which they would discuss how much unsold inventory was on-hand. CW1 added that Ducharme was clearly following directives from Ducharme's boss, Ryberg. In addition, according to CW1, CW1 received e-mails where the last-minute, end-of-quarter Team Alliance orders were discussed. According to CW1, once the amount of unsold inventory was determined "we'd have Team Alliance cut a Purchase Order" for that amount of product. CW2 also confirmed that large end-of-quarter "orders" were obtained from Team Alliance during the Class Period.

51.    According to CW1, the "last minute" "orders" that Powerwave got from Team Alliance in 3Q10, 4Q10, 1Q11 and 2Q11 were very big – at least $15 million each quarter and as high as $25 million in a quarter. CW1 confirmed that the 2Q11 bulk order was the biggest and at least $25 million. *CW1 stated that the last-minute bulk orders to Team Alliance were done to close the gap between forecasted sales and actual sales for the quarter*. In other words, the last-minute bulk orders were done because actual demand for these products was not there. CW1 explained that the "Gap Report" – which as noted above was prepared by CW1 for senior executives – measured the difference between realized revenues and forecasted revenues throughout the quarter. CW1 stated that the Gap Report was ultimately used to determine the amount of the last-minute Team Alliance bulk orders during 3Q10 - 2Q11.

52.    CW2 corroborated CW1, explaining that the large end-of-quarter deals made up a large portion of quarterly revenue during this time. CW2 stated that the large end-of-quarter bulk orders during the Class Period were done to make revenue goals in the current quarter. Stated differently, because real demand was down, the bulk orders were used to hide this fact and try to meet revenue goals at the end of a quarter. CW2 added that this practice had the effect of loading up the customer with

- 19 -

1  large volumes of product.  CW2 and other personnel often wondered "why we were
2  operating this way" and concluded that "management was not competent."

3       53.   According to CW2, *the approval for the large end-of-quarter deals*
4  *came from defendants Buschur and Michaels*.  CW2 knew that Buschur and
5  Michaels were directly involved in approving the end-of-quarter deals and terms
6  because the internal controls at Powerwave required that deals above a certain
7  threshold – say, several million dollars – and involving discounts and other
8  concessions had to be approved by Buschur and Michaels.  And "culturally" CW2
9  said that Powerwave was tightly controlled and managed by Buschur and Michaels.
10 As the last-minute end-of-quarter bulk orders to Team Alliance in 3Q10 – 2Q11 were
11 each between $15 and $25 million, and contained rights of return and extended
12 payment terms, they each would have required approval by Buschur and Michaels.

13      54.   One particularly egregious shipment of product to Team Alliance
14 occurred at the very end of 1Q11.  At that time, CW1 said that *Powerwave knowingly*
15 *and deliberately shipped product that it knew did not function and which had been*
16 *"put aside by quality" because it was "bad product."*[3]  CW7 confirmed that
17 Powerwave knowingly shipped defective products to Team Alliance.  According to
18 CW1, Powerwave shipped the product – which were a new type of LTE Antenna – to
19 Team Alliance as part of the end-of-quarter bulk order "with the promise to replace"
20 the defective products once Powerwave had functional products available in a later
21 quarter.  CW1 recalled being in a meeting in which Ryberg spoke by phone to the
22 Powerwave factory in China directing them to ship the defective products and in a
23 later meeting hearing Ryberg tell the Chinese factory the specific products that needed
24 to be replaced.

25
26 _____
27 [3]     All citations are omitted and emphasis is added unless otherwise noted.
28

55. CW7 confirmed that the defective product involved was a type of antenna. CW7 knows about the shipment of these defective units because CW7 was aware that Powerwave personnel were tasked with having to re-work the antennas.

56. CW1 could not recall exactly how many of the defective products went out in the 1Q11 shipment, but estimated that many thousands of the products were shipped; the selling price of the products ranged from $700-$13,000 so the aggregate amount was significant and at least $15 million. Throughout 2011, "we were working on swapping out" the defective products, but the situation had not been resolved as of CW1's lay-off in November 2011 at which time "we were still trying to get [the products] built correctly" and Powerwave "still owed Team Alliance good" replacements.

57. During 3Q11 Team Alliance balked at accepting anymore of the Powerwave inventory and, according to CW1, "said 'no more.'" In essence, according to CW1, Team Alliance "wouldn't allow us" to ship any more product and "drew the line." By 3Q11, Team Alliance was holding very large quantities of Powerwave product for which there was no identified or confirmed end-user demand – CW1 estimated there was as much as $40 million of such inventory (per its "retail value").

58. CW2 confirmed that because of the large end-of-quarter bulk orders in 1Q11 and 2Q11, Powerwave was unable to duplicate such deals in 3Q11. During the Class Period, CW2 heard from co-workers at Powerwave that "we had filled the channels in 1Q and 2Q" 2011.

59. The last-minute bulk orders from Team Alliance were critical to Powerwave during the Class Period. As detailed in §X, the bulk orders allowed the Company to overstate revenue by at least $70 million – over 10% – during the Class Period.