1    109.   Following the issuance of the press release, on August 4, 2011,
2    Powerwave held a conference call with analysts and investors to discuss the
3    Company's earnings and operations.  During the conference call, defendants Michaels
4    and Buschur made positive statements about the Company and its operations.
5    Michaels and Buschur both reiterated that defendants "*continue to believe that we will*
6    *achieve our 2011 annual revenue guidance of $650 million to $680 million.*"
7    Analysts questioned whether the revenue guidance range could be achieved but,
8    Buschur emphasized that "we're pretty confident still that we should be able to
9    achieve the guidance that we had given for the full year."  Given that *just three weeks*
10   *earlier*, on July 12, 2011, defendants had stated that they expected to hit the "bottom"
11   of the range, analysts questioned whether defendants' statements on August 4, 2011,
12   that 2011 would be within the $650 million to $680 million range was a case of
13   defendants being more positive.  Buschur agreed that it was, stating: "*we're well*
14   *positioned*, and we're going to continue to focus on taking advantage of the
15   opportunities in North America and in Europe, as well as the APac region."

16   110.   During the August 4, 2011 conference call, defendants also commented
17   on present demand:

18       No.  What I was saying is *the view that we're seeing right now*,
19       the questions is, what's the view that we're seeing in the global market?
20       We're seeing a better anticipated view in Western Europe, than what we
21       had anticipated.  And Eastern Europe has always been pretty strong and
22       continues to be strong for us.

23   111.   Defendants were also specifically asked about North American carrier
24   spending for the second half of the year – and whether any of the "dynamic"
25   macroeconomic factors – including the AT&T/T-Mobile merger – were impacting
26   Powerwave's business.  Buschur was unequivocal that this was not impacting
27   demand:

28       **Matt Ramsay** – *Canaccord Genuity – Analyst*

- 47 -

1    First I'd like, Ron, to ask for your thoughts on the very dynamic

2    macro environment, I guess that's to say the least.  With Clearwire's

3    well-publicized funding issues and their discussion of both LTE and

4    WiMAX network plans, plus Verizon and AT&T giving somewhat

5    different directional back half wireless CapEx guidance, *could you*

6    *discuss your overall views of the carrier spending in North America*

7    *and effects on your business for the back half?*

8    **Ron Buschur** – *Powerwave Technologies Inc - President and CEO*

9    Well, Matt, *we're pretty confident still that we should be able to*

10    *achieve the guidance that we had given for the full year*.  Obviously,

11    the clarity of the market that we see with the uncertainty of Clearwire,

12    some of the uncertainty that exists since AT&T and T-Mobile have

13    combined, has made it little more difficult to predict exact time of some

14    of the build out and the expenditures, but *we do believe that we're going*

15    *to continue to see some growth in North America and it's going to be*

16    *strong*.

17    112.   In the August 4, 2011 press release Powerwave also noted that, "[i]n the

18    second quarter of 2011; Powerwave's largest customer was one of our North

19    American resellers, which accounted for approximately 28 percent of revenue." This

20    huge percentage of revenue to a "North American reseller" did not go unnoticed by

21    financial analysts, but defendants continued to conceal that this huge percentage of

22    revenue was being achieved through end-of-quarter bulk orders to Team Alliance that

23    included rights to return the product if Team Alliance could not re-sell it and explicitly

24    waived payment.

25    **Larry Harris** – *CL King & Associates – Analyst*

26    *         *         *

27    And I noticed you had several distributors or resellers show up as

28    greater than 10% customers this quarter.  Do you think this could be, you

- 48 -

1  know, a trend here over the next few quarters, and is there any impact on

2  margins, if you have more sales through distributors?

3  **Kevin Michaels** – *Powerwave Technologies Inc – CFO*

4  Larry, this is Kevin.

5  They're not distributors, they're direct resellers. And actually,

6  they've been showing up for a while. You're just seeing more business

7  there in certain markets. I think, as Ron mentioned, really if you look in

8  Europe, it's Eastern Europe where we are really seeing strength in

9  Eastern Europe. Western Europe has been kind of flat, but we deal with

10  a reseller over there, a couple of them, but one of them has been seeing

11  the strength for us there. ***And in the North American market, some of***

12  ***the large operators want to bring stuff more through some of these***

13  ***resellers that qualify for certain business conditions. So we have seen***

14  ***an increase of that and that's just really driven by the operators***

15  ***decision***. So it's not really affecting – they're not distributors in that

16  type of sense, so it's not having a big impact there.

17  So to answer your question overall, yes we expect to continue to

18  see that in certain markets.

19  113.  On August 5, 2011, WJB Capital published an analyst report and

20  specifically noted the increase in the Company's accounts receivable.  The report

21  highlighted the fact that Powerwave's accounts receivable had "increased by $39

22  million" during 2Q11 to $214 million.  According to WJB Capital, "[t]he rise in

23  accounts receivable is related to lengthening payment terms by PWAV customers

24  globally."

25  114.  By virtue of the facts alleged in §§VI, VII and X-XIII, and the other facts

26  set forth herein, it may be strongly inferred that defendants knew or recklessly

27  disregarded that the statements in the July 12, 2011 press release and August 4, 2011

28  press release and conference call, and the financial information discussed therein,

1   would be, and were, misleading to and operated as a fraud upon investors.  Considered
2   as a whole, defendants' representations about the Company's revenue and the
3   purported continuing strength of Powerwave's performance along with its prospects
4   for driving further growth, continued to mislead investors by presenting an overly-
5   optimistic picture of Powerwave's results, while failing to disclose, and actively
6   concealing or recklessly ignoring, conditions which created material and significant
7   risks to the Company.  Together, these facts and the other allegations herein give rise
8   to a strong inference that defendants knew or recklessly disregarded the actual
9   condition of the Company at the time they delivered their statements.  In particular,
10  the foregoing statements were false and recklessly misleading in at least the following
11  respects:

12          (a)     Defendants concealed the extent to which the Company's revenues
13  had been achieved through improper and unsustainable sales practices, including the
14  last-minute 3Q10 and 4Q10 $15 million bulk orders to Team Alliance that included a
15  right of return if Team Alliance could not re-sell the product, the last minute 1Q11
16  $15 million bulk order to Team Alliance of defective product that would be replaced
17  in a later quarter, and the last-minute 2Q11 $25 million bulk order that explicitly
18  waived payment, were unconnected to actual demand.  *See* §§VI, VII and X-XIII.

19          (b)     Defendants omitted disclosure of the true nature and substance of
20  the 3Q10, 4Q10, 1Q11, and 2Q11 end-of-quarter bulk orders with Team Alliance in
21  the July 12, 2011 press release and August 4, 2011 press release and conference call
22  and statements detailed above, or the material risks those practices created to
23  Powerwave's future financial results. *See* §§VI, VII and X-XIII.

24          (c)     Powerwave's reported financial results were the result of an
25  accounting scheme employing improper accounting practices in violation of GAAP
26  and SEC revenue recognition requirements. *See* §§VI, VII and X-XIII.

27          (d)     At the time the statements were made, internal forecasting data and
28  sales reports that were circulated among the Company's executives and management

- 50 -

811515_2

1    contradicted the positive outlook the defendants' public statements were intended to

2    create. *See* §§VI, VII and X-XIII.

3              (e)     The financial results created a false and misleading appearance of

4    demand for Powerwave's products because the reported revenues had been artificially

5    inflated. *See* §§VI, VII and X-XIII.

6              (f)     Powerwave's purported demand was a result of unsustainable

7    business practices of forcing more products through its sales channels with the 3Q10,

8    4Q10, 1Q11, and 2Q11 end-of-quarter bulk orders to Team Alliance than

9    Powerwave's customers could reasonably expect to absorb, thereby cannibalizing

10   sales from future periods. *See* §§VI, VII and X-XIII.

11             (g)     Powerwave's financial guidance for full year 2011 was false and

12   misleading and lacked a reasonable basis, because it failed to disclose the 3Q10,

13   4Q10, 1Q11, and 2Q11 bulk orders to Team Alliance or the effect those bulk orders

14   could have on fiscal year 2011 sales. *See* §§VI, VII and X-XIII.

15   **B.    August 9, 2011 Canaccord Genuity Global Growth**
          **Conference and 2Q11 Report on Form 10-Q**
16

17   115.   On August 9, 2011, Powerwave participated in the Canaccord Genuity

18   Global Growth Conference.  Michaels discussed current demand at Powerwave and

19   emphasized that "*[w]ireless demand is very healthy*."

20   116.   During the August 9, 2011 Canaccord Genuity Global Growth

21   Conference, Michaels also took specific questions from financial analysts.  Michaels

22   was asked about Powerwave's outlook for the second half of 2011 – "better or worse

23   than the first half and do the recent events change anything on that?"  Just six weeks

24   before the end of 3Q11, Michaels again maintained that demand was strong:

25        *I would say our outlook is better*.  The first quarter was really kind of

26        slow for us so the second half a better outlook from the first half

27        because clearly what our view is and the events of the last week and a

28        half haven't changed that.

811515_2

117.    Powerwave reported $307.2 million in revenue for the first half of 2011. In other words, Michaels was telling investors that Powerwave expected revenues greater than that in the second half of 2011.  To meet the low-end of the $650 million to $680 million revenue guidance, Powerwave would need to record approximately $350 million in the second half of 2011 – or approximately $175 million in each quarter.

118.    During the August 9, 2011 Canaccord Genuity Global Growth Conference, Michaels was also specifically asked about current demand: "Maybe you could walk us through – *obviously there is a lot of worry about demand trends out there*.  Maybe if you could walk us through what you are seeing on a regional basis in different parts of the world." Michaels again reiterated that North American demand was strong: "*North American operators we believe from what they said, they are all committed to going forward, don't have any reason to not believe that even with the events we have had this last week*."

119.    On August 10, 2011, Powerwave filed its quarterly report on Form 10-Q for the quarterly period ending July 3, 2011.  In the 2Q11 Form 10-Q defendants again emphasized that Powerwave has "maintained [its] overall market share within the wireless communications infrastructure equipment market," and that its "proprietary design technology is a further differentiator for our products."

120.    By virtue of the facts alleged in §§VI, VII and X-XIII, and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in the August 9, 2011 Canaccord Genuity Global Growth Conference and August 10, 2011 Report on Form 10-Q, and the financial information discussed therein, would be, and were, misleading to and operated as a fraud upon investors.  Considered as a whole, defendants' representations about the Company's revenue and the purported continuing strength of Powerwave's performance along with its prospects for driving further growth, continued to mislead investors by presenting an overly-optimistic picture of Powerwave's results, while

1   failing to disclose, and actively concealing or recklessly ignoring, conditions which
2   created material and significant risks to the Company. Together, these facts and the
3   other allegations herein give rise to a strong inference that defendants knew or
4   recklessly disregarded the actual condition of the Company at the time they delivered
5   their statements. In particular, the foregoing statements were false and recklessly
6   misleading in at least the following respects:

7          (a)    Defendants concealed the extent to which the Company's revenues
8   had been achieved through improper and unsustainable sales practices, including the
9   last-minute 3Q10 and 4Q10 $15 million bulk orders to Team Alliance that included a
10  right of return if Team Alliance could not re-sell the product, the last minute 1Q11
11  $15 million bulk order to Team Alliance of defective product that would be replaced
12  in a later quarter, and the last-minute 2Q11 $25 million bulk order that explicitly
13  waived payment, were unconnected to actual demand. *See* §§VI, VII and X-XIII.

14         (b)    Defendants omitted disclosure of the true nature and substance of
15  the 3Q10, 4Q10, 1Q11, and 2Q11 end-of-quarter bulk orders with Team Alliance in
16  the August 10, 2011 Report on Form 10-Q and statements detailed above, or the
17  material risks those practices created to Powerwave's future financial results. *See*
18  §§VI, VII and X.

19         (c)    Powerwave's reported financial results were the result of an
20  accounting scheme employing improper accounting practices in violation of GAAP
21  and SEC revenue recognition requirements. *See* §§VI, VII and X-XIII.

22         (d)    At the time the statements were made, internal forecasting data and
23  sales reports that were circulated among the Company's executives and management
24  contradicted the positive outlook the defendants' public statements were intended to
25  create. *See* §§VI, VII and X-XIII.

26         (e)    The financial results created a false and misleading appearance of
27  demand for Powerwave's products because the reported revenues had been artificially
28  inflated. §§VI, VII and X-XIII.

811515_2

1        (f)    Powerwave's purported demand was a result of unsustainable

2 business practices of forcing more products through its sales channels with the 3Q10,

3 4Q10, 1Q11, and 2Q11 end-of-quarter bulk orders to Team Alliance than

4 Powerwave's customers could reasonably expect to absorb, thereby cannibalizing

5 sales from future periods. *See* §§VI, VII and X-XIII.

6        (g)    Powerwave's financial guidance for full year 2011 was false and

7 misleading and lacked a reasonable basis, because it failed to disclose the 3Q10,

8 4Q10, 1Q11, and 2Q11 bulk orders to Team Alliance or the effect those bulk orders

9 could have on fiscal year 2011 sales. *See* §§VI, VII and X-XIII.

10 **C.    3Q11 Press Releases and Conference Calls**

11      121.   On October 18, 2011, Powerwave issued a press release that shocked

12 investors and revealed that contrary to defendants' repeated claims, demand had fallen

13 off a cliff. The Company announced that "it anticipates that revenues for its fiscal

14 third quarter ended October 2, 2011 will be in the range of $75 million to $79

15 million." Defendant Buschur commented on the announcement, stating, in pertinent

16 part, as follows:

17      Our third quarter revenues were impacted by several factors, which

18         included a significant slowdown in spending by North American

19         network operators, a significant reduction in activity with our original

20         equipment manufacturing customers, coupled with further weakness in

21         several international markets, including Western and Eastern Europe,

22         and the Middle East[.] From a global perspective, we believe that the

23         current economic environment has caused operators to reduce or

24         postpone their spending plans for the near term while they evaluate the

25         macro-economic pressures in each individual market. The Middle East

26         market has been significantly impacted by the political unrest throughout

27         the region. In addition, in the North American market we believe that

28         the uncertainty arising from the government's recent opposition to the

811515_2

1   proposed merger of AT&T and T-Mobile, has led to delays in spending
2   as these operators re-evaluate their capital spending plans.  All of these
3   factors, combined together, have had a significant impact on our third
4   quarter revenues.  While near term visibility remains difficult in our
5   markets, we continue to believe that the long-term demand for
6   improvements in wireless infrastructure remain strong, as global demand
7   for data continues and wireless network operators continue to promote
8   their plans to improve existing coverage and add additional capacity, in
9   the form of 4G capabilities, to wireless networks across the globe.  We
10  believe that Powerwave remains positioned to build upon and capture the
11  long-term growth opportunities that are in the wireless infrastructure
12  marketplace.

13      122.   Following the issuance of the press release, Powerwave held a conference
14  call to discuss the announcement.  During the conference call, defendants Michaels
15  and Buschur admitted that the Company was performing poorly and burning through a
16  substantial amount of free cash.  Given how positive defendants were just weeks
17  earlier, financial analysts were stunned by the huge decline in demand and actually
18  questioned whether Buschur was fit to run the Company:

19      **James Basch** – *Dialectic Capital Management – Analyst*
20          Okay.  And then my second question.  ***This is going to be the***
21      ***worst revenue quarter that you guys have had since 2004***.  And then,
22      Ron, if I look at your tenure as CEO, sales have declined dramatically.
23      The Company really has not been profitable in any way, consistently.
24      And now you are coming up with a quarter like this.  ***And what I've***
25      ***always heard about the Company, is that there is great technology, but***
26      ***it's mismanaged.  What should give us confidence at this point, that***
27      ***you should still be managing this business?***

28

123.   During the same October 18, 2011 conference call several analysts questioned defendants about the huge decline in demand and specifically whether it indicated "market share losses" or customer "inventory buildup."  Buschur admitted that "inventory buildup" – or customers having too much of Powerwave's product – was a cause of the huge decline in demand.

**Umesh Mehta** – *Tenaya Capital – Analyst*

Okay.   And then if – and then in terms of, you talked about customer loses.  So how do we – and sort of a slow down with some of the large telcos.  *How do we – what is – how do we sort of view that versus actual market share losses?*  I mean, how do you get comfortable that, these are sort of a one-time things, versus more – these are more secular sort of situations?

\*        \*        \*

**Ted Moreau** – *WBJ Capital Group, Inc. – Analyst*

Okay.   Was there any possibility of an *inventory buildup* at any other customers in North America?

**Ron Buschur** – *Powerwave Technologies, Inc. – President and CEO*

Well, I certainly would believe based on some of the slowdown, and how abrupt it was after the August announcement, that there probably is some inventory that is sitting there.  We have a fairly good understanding of the inventory that we hold, based on the delay, so *I would anticipate there is some inventory sitting there being positioned for the next couple of quarters*.

124.   Michaels was also specifically asked where the biggest decline in revenue was and Michaels admitted it was the North American market.  "[D]id you give a break out between, which was the bigger decline? Was it North America or EMEA?"  Michaels responded: "The North America market was the largest."

811515_2

125.  The market understood Buschur's answer to the direct and specific question about an "inventory buildup" at North American customers as an admission that a cause of Powerwave's massive decline in demand was the fact that North American customers were sitting on a "couple of quarters" of inventory. For example, the next day, on October 19, 2011, financial analysts at Jefferies issued an analyst report that highlighted the fact that Buschur admitted to an "inventory buildup" on the previous days call.  In their report that day titled, "***Dramatic Pre-Announcement: Inventory Correction at AT&T Even Worse Than Feared,***" Jefferies specifically focused on the inventory buildup.  Based on Buschur's statements the day before, Jefferies stated that "***PWAV mgmt believes the AT&T inventory correction will last a couple Qs.***"

126.  On October 19, 2011 Brigantine Advisors issued a report on Powerwave. In the report, Brigantine Advisors noted that Powerwave's revenue range of $75-59M for 3Q11 "has the makings of a nightmare," given that their previous estimate for the quarter was $162M.  The report also noted the Company's cash-crunch:

> At the end of 2Q11, Powerwave was carrying about $206M in debt and $50M in cash, and through 3Q11, raised a net of $25M, but burned roughly $28M implying a gross margin in the 10% range.  In attempting to meet ends going forward, Powerwave sold its Santa Ana, CA headquarters for about $50M in cash.

127.  That same day, October 19, 2011, J.P. Morgan issued a report on Powerwave. J.P. Morgan noted that Powerwave's preannounced revenue of $75-59M "fell 54% against our prior $168M estimate."  The report also stated that Powerwave's "[c]ash burn is troubling."

128.  Also, on October 19, 2011, WJB Capital Group issued a report on Powerwave and bluntly stated that the "Q3 Pre-Announcement: Fell Off a Cliff."  The report noted that consensus estimates for the quarter were $168 million.

811515_2

129.   On October 24, 2011, Imperial Capital issued a report on Powerwave bluntly stating that "3Q11 Revenue Shocks Market."

130.   On October 18, 2011, Powerwave disclosed that because of the Company's precarious financial health it was forced to enter a sale and lease-back transaction involving its corporate headquarters. The Company sold its headquarters including the land and an adjacent vacant 2.87 acre lot for $49.55 million and simultaneously entered into a 15 year lease. The lease payments start at $3.964 million/year and increase 2% per year. Under the lease, the Company would also be required to pay insurance, real estate taxes, maintenance and repair expenses.

131.   On October 28, 2011, Powerwave issued a press release announcing that its Board had approved a 1-for-5 reverse stock split and a reduction in the number of authorized shares of its common stock. The 1-for-5 reverse stock split reduced the number of authorized shares of common stock from 250,000,000 to 100,000,000.

132.   On November 1, 2011, Powerwave issued a press release announcing its financial results for its third fiscal quarter, the period ending October 2, 2011. The Company reported a net loss of $35.1 million, or a basic loss per share of $1.09. Defendant Buschur commented on the results, stating, in pertinent part, as follows:

> "As we have previously reported, our third quarter revenues were
> impacted by several factors, which included significant slowdowns in
> several of our markets, including North America, Western and Eastern
> Europe and the Middle East, as well as our original equipment
> manufacturing customers[.] From a global perspective, we believe that
> the current economic environment has caused operators to reduce or
> postpone their spending plans for the near term while they evaluate the
> macro-economic pressures in each individual market. While near term
> visibility remains difficult in our markets, we continue to believe that the
> long-term demand for improvements in wireless infrastructure remain
> strong, as global demand for data continues and wireless network

- 58 -

811515_2

operators continue to promote their plans to improve existing coverage and add additional capacity, in the form of 4G capabilities, to wireless networks across the globe. We are currently finalizing our restructuring plans in order to take the steps we believe necessary to maintain Powerwave's competitive position and continue to position Powerwave for long-term success."

133. That same day, November 1, 2011, defendants also hosted a conference call with financial analysts. During the November 1, 2011 conference call, an analyst from Fore Research and Management got Buschur to confirm what he did on the October 18, 2011 call – that a cause of the huge decline in North American demand was the "inventory correction" at North American customers. Specifically, the analyst asked: *"So basically what you're saying is this is more of an inventory correction more so than a revenue that is going to be lost going forward, basically?" Buschur was unequivocal in his response: "Yes*."

## X. DEFENDANTS' MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING AND GAAP VIOLATIONS DURING THE CLASS PERIOD

134. To disguise the declining demand and attempt to meet its revenue goals, Powerwave improperly inflated its publicly reported revenue, gross profit, income from operations, net income and net income per share. As detailed herein, defendants and the Company reported false financial results in Powerwave's publicly issued financial statements and related earnings releases during the Class Period.[13] These financial results were materially false and misleading and in violation of GAAP[14] and

---

[13]   Powerwave's Class Period financial statements and earnings releases issued to the public and filed with the SEC include: SEC Form 10-Ks for full fiscal year ended January 2, 2011; SEC Form 10-Qs for periods ended October 3, 2010, April 3, 2011, July 3, 2011 and October 2, 2011; SEC Form 8-Ks issued on February 1, 2011, May 5, 2011 and August 4, 2011.

[14]   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at

811515_2

1    SEC guidance by improperly recognizing revenue on purported sales to resellers –

2    particularly one North American reseller called Team Alliance.  During the Class

3    Period, Powerwave engaged in a revenue recognition scheme of improperly reporting

4    material amounts of revenue in violation of GAAP for consignment sales where:

5            (a)     Powerwave knowingly and deliberately shipped defective product

6    to Team Alliance in 1Q11 with an agreement to swap these out with functional

7    products in future periods; and

8            (b)     Powerwave shipped to Team Alliance "bulk orders" of unsold

9    and/or unsellable inventory with rights to return product if it could not be resold in

10   3Q10 and 4Q10 and, in 2Q11 explicitly waived payment.  *See* §§VI and VII.

11       135.  As a result of these improper revenue recognition schemes, Powerwave

12   materially overstated revenue and earnings in each of its quarterly and annual public

13   financial statements filed with the SEC during the Class Period.  In total, Powerwave

14   overstated revenue reported during the Class Period by at least $70 million, over 11%

15   and earnings by at least 46%, as depicted in the following table:

16

17

18

19

20

21   a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that

    financial statements filed with the SEC that are not prepared in compliance with

22   GAAP are presumed to be misleading and inaccurate, despite footnotes and other

    disclosure.  Regulation S-X requires that interim financial statements must also

23   comply with GAAP, with the exception that interim financial statements need not

    include disclosure that would be duplicative of disclosures accompanying annual

24   disclosures, per 17 C.F.R. §210.10-01(a).  On June 30, 2009, the Financial Accounting

    Standards Board ("FASB") issued SFAS No. 168, *The FASB Accounting Standards*

25   *Codification and the Hierarchy of Generally Accepted Accounting Principles – a*

    *replacement of FASB Statement No. 162*.  FASB *Accounting Standards Codification*

26   ("ASC") became the source of authoritative U.S. accounting and reporting standards

    for nongovernmental entities, in addition to guidance issued by the SEC, effective for

27   financial statements issued for reporting periods that ended after September 15, 2009.

    The ASC did not change existing U.S. GAAP.

28

811515_2

| (Dollars in thousands) | 3Q10 | 4Q10 | FY10 | 1Q11 | 2Q11 | 3Q11 | Total Class Period |
|---|---|---|---|---|---|---|---|
| Net Sales as Reported | $156,813 | $175,595 | $591,461 | $ 136,624 | $170,641 | $ 77,078 | $716,751 |
| Net Sales as Adjusted | $141,813 | $160,595 | $561,461 | $ 121,624 | $145,641 | $ 77,078 | $646,751 |
| Overstatement | 10% | 9% | 5% | 11% | 15% | - | 10% |
| Net Income as Reported | $ 7,934 | $ 6,372 | $ 3,713 | $ (6,975) | $ 7,021 | $ (35,084) | $ (20,732) |
| Net Income as Adjusted | $ 6,525 | $ 4,963 | $ 894 | $ (8,384) | $ 4,672 | $ (35,084) | $ (27,308) |
| Overstatement | 18% | 22% | 76% | -20% | 20% | - | -32% |

### A. Powerwave Improperly Recognized Revenue on Contingent Sales with Team Alliance, in Violation of GAAP

136.   Sales to Team Alliance were material throughout the Class Period. Powerwave disclosed the following amounts of revenue recorded with Team Alliance:

| ($000's) | 3Q10 | 1Q11 | 2Q11 | 3Q11 | 4Q11 |
|---|---|---|---|---|---|
| Net Sales to Team Alliance | $ 17,249 | $ 19,127 | $ 47,779 | $ 2,275 | $ 1,930 |
| As a percent of total Powerwave sales | 11% | 14% | 28% | 3% | 3% |

### Sales of Defective Product

137.   According to CW1, in 1Q11, Powerwave knowingly and deliberately shipped at least $15 million of defective product – mostly LTE antennas – to Team Alliance in the last few days of the first fiscal quarter of 2011.  According to CW1, this was explicitly done in an effort to meet its quarterly sales forecast because actual demand was declining.   According to CW1, one of the major problems with Powerwave's antennas during this period was that the computer motherboards installed in the antennas were defective.   Powerwave did not have functional motherboards and was waiting for new motherboards from its supplier. CW1 clearly recalled being in a meeting at the end of 1Q11 in which the Senior Director of Supply Chain Operations, Ryberg, spoke by phone to the Powerwave factory in China,

- 61 -

1   directing them to ship the defective product to Team Alliance.  CW1 also recalls that
2   in a later meeting in the beginning of April 2011, Ryberg told the Chinese factory the
3   specific products that needed to be replaced.  CW1 explained that at least $15 million
4   of this bulk order was made up of defective antennas.  CW1 further explained that
5   even though Team Alliance was unaware they would receive a massive shipment of
6   defective goods, Powerwave deliberately shipped them with the plan to replace them
7   in later periods.   As detailed in §VI and VII, CW7 confirmed the shipment of
8   defective product to Team Alliance.  Like other end of quarter bulk orders, CW1
9   explained that the defective goods were transported by boat[15] rather than air from
10  China so as to ensure that the products had shipped and were in transit, while delaying
11  delivery by three to four weeks.  Powerwave also granted special payment terms from
12  the usual 30 days to at least 60 days.  CW1 explained that as a result of the repeated
13  bulk shipments beginning in 3Q10, Team Alliance had fallen behind on their
14  payments, and yet they were never put on credit hold.  According to CW1, under no
15  circumstances could Team Alliance ever be put on credit hold because if they were
16  then Powerwave would be unable to make additional shipments to Team Alliance.
17  According to CW1, throughout 2011 and as of November 2011, Powerwave was still
18  "working on swapping out" the defective products.  As described below, recording
19  revenue on these shipments was improper and violated GAAP and SEC revenue
20  recognition requirements.

21  **Bulk Orders that Included a Right of Return if the Product Could Not be
    Resold or Explicitly Waived Payment**

22
23      138.   Beginning in 3Q10 and continuing every quarter thereafter up until 3Q11,
24  Powerwave began shipping significant amounts of product to Team Alliance with
25  contingent payment terms.   According to CW1, as the quarter drew to an end,
26  Powerwave would look around at whatever inventory was unsold and then obtain "a

27  [15]   Transportation costs were paid by Powerwave.

28

811515_2

- 62 -

1   bulk order" from Team Alliance.  These bulk orders were done on the very last days
2   of each quarter during the Class Period and were done so that Powerwave could try to
3   meet its revenue targets.  As detailed in §VI and VII, according to former employees,
4   the bulk orders were done to hide the fact that demand was not as strong as defendants
5   claimed.  According to CW1, these bulk orders consisted of inventory that Powerwave
6   had overbuilt and customers had not ordered.  In order to get Team Alliance to issue a
7   bulk purchase order and accept delivery of Powerwave's overbuilt inventory, in 3Q10,
8   4Q10, and 1Q11, Powerwave granted Team Alliance special extended payment terms
9   and rights to return the product if it could not be resold.  *See* §VII.  Both CW1 and
10  CW7 confirmed that the inducements to Team Alliance included the right to return the
11  product if it could not be resold.  *Id.*  For these orders, Team Alliance did not accept
12  full responsibility for these products and Powerwave, retained the risk of ownership of
13  the product.  *Id.*  Because the payment terms on these deals were such that Team
14  Alliance did not have to pay for the product until it was resold, the goods were sold on
15  a consignment basis.  These deals, by their very nature, had no assurance of
16  collectibility.  In 2Q11, Powerwave went even further and, according to CW1,
17  explicitly waived payment.  According to numerous former employees (*see* §§VI and
18  VII), these bulk orders were done so Powerwave could try meet its revenue goals.
19  Recording revenue on these contingent sales was improper and violated GAAP.
20  According to a former employee, in 3Q10, 4Q10, 1Q11 and 2Q11 these orders were at
21  least ***$15 million*** each quarter and ***$25 million in 2Q11***.  *See* §§VI and VII.

22   **B.    Powerwave Recorded Premature and Inflated Revenue in**
23   **Violation of GAAP and the SEC's Revenue Recognition**
     **Requirements**

24           139.    ASC 605-10-25-1 clearly and concisely states that revenue should not be
25  recognized until it is both realized (or realizable) and earned.  The SEC has further
26  reiterated revenue recognition rules under GAAP, which FASB has codified as ASC
27  605-10-S25 and ASC 605-10-S99, by requiring that revenue can be recognized only
28  when ***all*** of the following criteria are met:

(a)    Persuasive evidence of an arrangement exists;

(b)    Delivery has occurred or services have been rendered;

(c)    **The seller's price to the buyer is fixed or determinable**; and

(d)    **Collectibility is reasonably assured**.

140.   ASC 605-15-25-1 clearly and concisely states:

If an entity sells its product but **gives the buyer the right to return the product**, revenue from the sales transaction shall be recognized at time of sale **only if all of the following conditions are met**:

a.    The seller's price to the buyer is substantially fixed or determinable at the date of sale. . . .

b.    The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product. . . .

c.    The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

d.    The buyer acquiring the product for resale has economic substance apart from that provided by the seller. . . .

e.    The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

f.    The amount of future returns can be reasonably estimated . . . .

141.   ASC 605-10-S99-1 clearly states that if a sales transaction fails to meet all of the conditions of ASC 605-15-25-1, as outlined above, **"no revenue may be recognized until those conditions are subsequently met or the return privilege has substantially expired."**

142.   Recognizing revenue from Powerwave's bulk orders, including shipment of defective products to Team Alliance was improper, as the sales did not meet these criteria listed in ASC 605-10-S99-1 and ASC 605-15-25-1.

143.   Powerwave's end of quarter sales deals were consignment sales. Powerwave had established a business practice whereby sales to Team Alliance were

- 64 -

811515_2

1  contingent upon resale.  According to CW1, Powerwave granted Team Alliance the
2  right to return product if it could not be resold and extended their payment terms
3  beyond the ordinary due dates.  According to CW1, *Powerwave never put Team*
4  *Alliance on credit hold despite their lack of payment* and explicitly waived payment
5  during 2Q11.  In 2Q11, Ducharme told CW1 that Powerwave was "not going to ask
6  them [Team Alliance] to pay."  Powerwave had deliberately shipped Team Alliance
7  bulk orders and bulk orders of defective product as part of their scheme to inflate
8  revenue.  Bulk orders were shipped to Team Alliance even though Powerwave knew
9  there was no end user and that Team Alliance did not need the product based on
10  known bulging inventory levels.  Accordingly, revenue could not be recognized
11  because collectibility was not reasonably assured (as required by ASC 605-10-S99-1);
12  the price to the buyer was not fixed or determinable[16] (as required by ASC 605-10-
13  S99-1); the buyer did not pay the seller at the time of sale and the buyer's obligation
14  to pay was contractually or implicitly excused until the buyer resells the product (as
15  required by ASC 605-10-S99-1 and ASC 605-15-25-1(b)).  *See* ASC 605-10-S99-1
16  ("*The arrangement may not specify that payment is contingent upon subsequent*
17  *resale or consumption.  However, if the seller has an established business practice*
18  *permitting customers to defer payment beyond the specified due date(s) until the*
19  *products are resold or consumed, then . . . the . . . right to receive cash representing*
20  *the sales price is contingent*.").  As a result of defendants' improper accounting
21  practices, Powerwave's financial statements were materially inflated.

22      144.  As further evidence that collectibility was not assured on these sales (as
23  required   by   ASC-605-S99-1),   Powerwave's   accounts   receivable   grew
24  disproportionately to its sales.  *See* §VII.C.1.  More specifically, Team Alliance's
25  accounts receivable balance disproportionately grew to 34% of the Company's *total*

26

27  [16]     ASC 605-10-S99-1 defines a "'fixed fee'" as a "'fee required to be paid at a set amount that is not subject to refund or adjustment.'"

28

811515_2

1   accounts receivable by 3Q11 even though Team Alliance made up only 3% of

2   Powerwave's total sales.  Furthermore, Powerwave's DSO ballooned to 175 days at

3   the end of the Class Period, which was three times the median industry average, two

4   and a half times that of its competitors, and nearly double the Company's own DSO

5   heading into 2011.

6       145.   Additionally, ASC 605-10-S99-1 precludes revenue recognition when the

7   *"the seller retains the risks and rewards of ownership of the product*."  According to

8   former employees (*see* §VII), Team Alliance did not accept full responsibility for the

9   products due to the special terms underlying the sale which made the sale risk free to

10  Team Alliance.  Accordingly, Team alliance did not assume the risks and rewards of

11  ownership of the product.  Therefore, ASC 605-10-S99-1 criterion requiring that "the

12  seller retains the risks and rewards of ownership of the product" before revenue can be

13  recognized was violated.

14      146.   Powerwave ignored these well established accounting rules, and

15  improperly recognized revenue on contingent sales to Team Alliance anyway.

16      **C.    Powerwave's Disclosures Regarding Revenue Recognition
            Were False and Misleading and in Violation of GAAP and**

17           **SEC Guidance**

18      147.   Powerwave was required by GAAP and SEC rules, including ASC 605-

19  10-S99-1 and ASC 235-10, to disclose in detail its significant accounting policies,

20  including its revenue recognition policy, in the  footnotes to its financial statements in

21  each of its publicly issued Forms 10-K and 10-Q.  ASC 605-10-S99-1 clearly and

22  concisely states this requirement, as follows:

23          A registrant should disclose its accounting policy for the recognition of

24          revenue pursuant to APB Opinion No. 22 [Subtopic 235-10].  Paragraph

25          12 [paragraph 235-10-50-3] thereof states that "the disclosure should

26          encompass important judgments as to appropriateness of principles

27          relating to recognition of revenue . . . ."

28

811515_2

148.   With regard to its revenue recognition policy, Powerwave made the following disclosures during the Class Period:

*Revenue Recognition*

The majority of our revenue is derived from the sale of products. We recognize revenue from product sales at the time of shipment or delivery and passage of title depending upon the terms of the sale, provided that persuasive evidence of an arrangement exists, the fee is fixed or determinable and collectibility is reasonably assured. We offer certain customers the right to return products within a limited time after delivery under specified circumstances, generally related to product defects. We monitor and track product returns and record a provision for the estimated amount of future returns based on historical experience and any notification we receive of pending returns. While returns have historically been within our expectations and the provisions established, we cannot guarantee that we will continue to experience the same return rates that we have in the past. Any significant increase in product returns could have a material adverse effect on our operating results for the period or periods in which these returns materialize. A portion of our sales involve contracts that may include the design, customization, implementation and installation of wireless coverage applications utilizing our coverage solution products. We recognize revenue using the percentage-of-completion method for these types of arrangements. We measure progress towards completion by comparing actual costs incurred to total planned project costs. Such sales have not historically been a significant amount of our total sales.

149.   These disclosures were materially false and misleading and in violation of the disclosure requirements included in ASC 605-10-S99-1 and ASC 235-10 because, as alleged in §VII.

(a)    Collection was not reasonably assured on sales to resellers;

(b)    Persuasive evidence of an arrangement did not in fact exist; and

(c)    The criteria for revenue recognition under ASC 605-10-S99-1 were *not* generally met upon shipment of the Company's products.

150.   In addition to disclosing its revenue recognition accounting policy, ASC 605-10-S99-1 requires additional revenue disclosures for the following types of revenue transactions or events:

- Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.

- Granting of extended payment terms that will result in a longer collection period for accounts receivable (regardless of whether revenue has been recognized) . . . .

- Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.

- An increasing trend toward sales to a different class of customer, such as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users.

As described herein, Powerwave was subject to several transactions and events that are covered by the disclosure requirements described above including sales transactions with Team Alliance. Despite these revenue transactions and events, Powerwave failed to make the revenue disclosures required under GAAP.

811515_2

- 68 -

**D.  Powerwave's Financial Statements Violated Fundamental Accounting Concepts**

151.        In addition to the above-referenced departures from GAAP and SEC guidance, as a result of the defendants' accounting improprieties, Powerwave presented its financial results in a manner that violated the following fundamental accounting principles:

(a)    The principle that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users [of the financial reports] in making rational investment, credit, and similar decisions." (FASB Statement of Concepts No. 1, ¶34);

(b)    The principle that "[f]inancial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources." (*Id.*, ¶40);

(c)    The principle that "[f]inancial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (*Id.*, ¶42);

(d)    The principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. . . .  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general." (*Id.*, ¶50);

1        (e)    The principle that financial reporting should be reliable in that "it

2    represents what it purports to represent." That information should be reliable as well

3    as relevant is a notion that is central to accounting. (FASB Statement of Concepts No.

4    2, ¶¶58-59);

5        (f)    The principle of completeness, which means that "nothing material

6    is left out of the information that may be necessary to insure that it validly represents

7    the underlying events and conditions." (*Id.*, ¶79);

8        (g)    The principle that conservatism be used as a "prudent reaction to

9    uncertainty to try to ensure that uncertainties and risks inherent in business situations

10   are adequately considered." (*Id.*, ¶95);

11       (h)    The principle that that revenues and gains should not be recognized

12   until they are both earned and realizable (FASB Statement of Concepts No. 5, ¶83);

13       (i)    The principle that if "***collectibility*** of assets received for product,

14   services, or other assets is doubtful, revenues may be recognized on the basis of cash

15   received." (*Id.*, ¶84);

16       (j)    The principle that financial statements shall contain all data

17   necessary for a fair presentation of financial position and results of operations as set

18   forth in U.S. GAAP, including compliance with the requirements of the SEC's rules

19   and regulations by SEC registrants (ASC 205-10);

20       (k)    The principle that interim financial reporting should be based upon

21   the same accounting principles and practices used to prepare annual financial

22   statements (ASC-270-10-45-2); and

23       (l)    The principle that interim financial information provide investors

24   and others with timely information as to the progress of the entity (ASC 270-10-45-1).

25   **XI.  DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD
     OF THE TRUTH ABOUT POWERWAVE'S BUSINESS**

26

27       152.   As detailed above (*see* §§VI-VII), throughout the Class Period,

28   defendants knew, or recklessly disregarded, the true facts about Powerwave's

811515_2

1    business.  Defendants Buschur and Michaels held themselves out to investors and the
2    market as the persons most knowledgeable at Powerwave about demand.  As detailed
3    in §§V-IX, each of these defendants communicated with investors and analysts during
4    the Class Period and represented that they were informed of and knowledgeable about
5    demand.  At no time during their communications with investors on these matters did
6    any of these defendants assert that they were uninformed about any material aspect of
7    Powerwave's business.

8        153.   The defendants did not merely hold themselves out as knowledgeable
9    about Powerwave's business, but specifically described how they personally
10   monitored and kept apprised of sales and demand at Powerwave.   For  example,
11   according to Powerwave's SEC filings Buschur carefully monitored the Company's
12   sales activity.   On May 11, 2011, Powerwave disclosed that the Company had
13   established a Sales Incentive Program ("SIP") effective January 10, 2011.  Under the
14   SIP, the Company's Vice President of Worldwide Sales, Basem Anshasi ("Anshasi"),
15   would receive quarterly cash bonus payments in 2011 based on quarterly sales quotas
16   established by Buschur.

17       154.   In addition, defendants implied that they are able to see "booked orders"
18   five to six weeks in advance.  On the November 1, 2011 conference call, a financial
19   analyst asked about Powerwave's "visibility" – or how far out defendants can see
20   confirmed orders.

21       **Arun Seshadri** – *Credit Suisse – Analyst*

22           Got it.  Okay.  And then, finally, just wanted to get a sense as far
23       as your visibility goes, I mean, you answered a few questions about it,
24       but generally speaking, is it about five to six weeks normally?  And can
25       you talk about when you will have some view into what Q1 could look
26       like?

27       **Ron Buschur** – *Powerwave Technologies, Inc. – President and CEO*

28

811515_2

- 71 -