1       Well, I think the five to six weeks is generous, as we've always

2   talked about, as far as visibility going forward. I don't think anyone in

3   this space, at least at our level of supply, has much better visibility than

4   that. So we don't see that improving, even as we go through with the

5   total economic slowdown improves tomorrow morning to where we're

6   going to have better visibility than that. That's part of the business and

7   the challenges. And that's the reason that we think it's very critical for

8   the long-term of the Company to have diversification in other vertical

9   markets, so we're not so dependent on this market that doesn't seem to

10  have that great a visibility, and can't forecast its demands very well.

11  **Kevin Michaels** – *Powerwave Technologies, Inc. – CFO and Secretary*

12      And let me just add onto that. And *just to be a little clearer, I*

13  *think when we're discussing visibility, we're talking booked orders*.

14  And as we've discussed many times, that orders – people are not placing

15  long lead-time orders out there.

16      155.   The market understood defendants to be saying that they could see

17  confirmed orders 5-6 weeks in advance. The next day, November 2, 2011, a financial

18  analyst from Brigantine Advisors stated in an analyst report that Powerwave's

19  visibility was "5-6 weeks."

20      156.   Aside from defendants statements on visibility, a former employee and a

21  former customer of Powerwave's have confirmed that visibility was typically at least

22  six weeks. Given CW1's position, CW1 also has experience with Powerwave's

23  visibility – or how far out it could see confirmed orders – during the Class Period.

24  CW1 said that in CW1's experience with the customers CW1 dealt with, (North

25  American customers that made up over 40% of Powerwave's revenue), Powerwave

26  typically had *at least six weeks of visibility on orders initiated by customers*.

27  Similarly, CW3 also stated that typical lead time between when an order was placed

28

1  with Powerwave and when it was received by Goodman was around *six to eight*
2  *weeks*.

3       157.   Consistent with their claims of active involvement in and knowledge of
4  Powerwave's business and demand, former employees of Powerwave have confirmed
5  that defendants were directly involved in the operations of the businesses and that they
6  knew or had access to internal information identifying the known, but not timely
7  disclosed, declining demand.

8       158.   Concurrent with their claims of personal knowledge and active
9  involvement in monitoring Powerwave's business, the defendants publicly certified
10  with each of the Company's SEC filings that each report "does not contain any untrue
11  statement of a material fact or omit to state a material fact necessary to make the
12  statements made, in light of the circumstances under which such statements were
13  made, not misleading with respect to the period covered by this report." This is
14  discussed more fully below.

15  **XII.   FRAUDULENT SCHEME AND COURSE OF BUSINESS**

16       159.   Defendants are liable for: (i) making false statements; or (ii) failing to
17  disclose adverse facts known to them about Powerwave.  Defendants' fraudulent
18  scheme and course of business that operated as a fraud or deceit on purchasers of
19  Powerwave securities was a success, as it: (i) deceived the investing public regarding
20  Powerwave's prospects and business; (ii) artificially inflated the price of Powerwave
21  securities; and (iii) caused plaintiffs and other members of the class to purchase
22  Powerwave securities at inflated prices.

23  **XIII.  ADDITIONAL SCIENTER ALLEGATIONS**

24       160.   As alleged herein, defendants acted with scienter in that defendants either
25  knew or recklessly disregarded that the public documents and statements issued or
26  disseminated in the name of the Company were materially false and misleading; that
27  such statements or documents would be issued or disseminated to the investing public;
28  and substantially participated or acquiesced in the issuance or dissemination of such

811515_2

1   statements or documents as primary violations of the federal securities laws.  As set
2   forth elsewhere herein in detail, defendants, by virtue of their receipt of information
3   reflecting the true facts regarding Powerwave, their control over, and/or receipt and/or
4   modification of Powerwave's allegedly materially misleading misstatements and/or
5   their associations with the Company which made them privy to confidential
6   proprietary information concerning Powerwave, participated in the fraudulent scheme
7   alleged herein.

8   **A.   Each of Defendants' False Statements and Omissions**
    **Involved One of Powerwave's Core Operations**
9

10  161.   Each of the defendants was a top executive involved in Powerwave's

11  daily operations and with access to all material information regarding the Company's

12  core operations.   Therefore, each of the defendants is presumed to have had

13  knowledge of all material facts regarding Powerwave's core operations.

14  162.   Each of the false statements alleged herein involved a core operation of

15  Powerwave.

16  163.   Powerwave sold a relatively few products to a handful of customers.

17  Powerwave's sale of its products, antennas and base stations, represented 90% of

18  Powerwave's business during the Class Period.  In addition, sales to North American

19  customers represented over 40% of Powerwave's business during the Class Period.

20  And, during the Class Period Powerwave's North American sales were highly

21  concentrated.  According to the Company, for the first half of 2011, total sales to

22  Team Alliance accounted for approximately 22% of sales.  In addition, according to

23  the Company, for the second quarter of 2011, sales to Team Alliance "accounted for

24  approximately 28% of our total sales."  And, according to the Company, sales to

25  Team Alliance accounted for 14% of total sales in 1Q11 and 11% of total sales in

26  3Q10. And, according to the Company's SEC filings sales to Team Alliance made up

27  approximately 37% and 67% of North American sales for 2Q11 and 3Q11.

28

811515_2

- 74 -

**B.** **Powerwave's Incentive Compensation Structure Created an Incentive for Fraud and Strongly Supports an Inference of Scienter**

164. Defendants were also motivated to engage in the fraud alleged herein due to the nature of the compensation system in place at Powerwave. Indeed, although defendants knew, or recklessly disregarded, that the bulk sales strategy resulted in inflated earnings and was vulnerable to worsening economic conditions, they were motivated to keep the truth secret so as to avoid losing their jobs and lucrative performance-based executive compensation.

165. Defendants, as well as other senior Powerwave executives, received incentive compensation, and such compensation was a significant part of their compensation packages. The Company states that it intends to tie a "significant portion of [executive officers] total annual compensation to our financial performance as measured by certain factors measured during the fiscal year." The Company's "executive compensation program" includes a "mix of base salary, annual performance based cash incentives and long-term equity incentive awards."

166. Under the Company's "Performance Based Cash Incentive Plan," Powerwave executives had "incentives . . . in the form of cash payments for achieving certain objective performance goals based on quarterly [EBITDA]." According to Powerwave: "For 2010, earned incentives were paid out quarterly with twenty-five percent (25%) of each executives officer's earned quarterly incentive held back until the end of the year and is payable following the end of the year. This is done to give the Compensation Committee the discretion to adjust payouts based on company performance for the entire fiscal year."

167. Defendants were eligible for – and received – massive payouts under the Company's executive compensation policy. In 2010 Michaels and Buschur each received incentive compensation that more than quadrupled their total compensation. In addition, defendants were eligible for and received massive stock awards and option awards.

- 75 -

811515_2

168.  As detailed in the Company's SEC filings, defendants Michaels and Buschur received the following pay-outs during 2009 and 2010:

| Defendant | Year | Salary | Bonus | Annual Equity Awards | Total Equity and Cash Compensation |
|-----------|------|--------|-------|----------------------|------------------------------------|
| Buschur | 2010 | $600,058 | $525,000 | $2,808,763 | $3,958,075 |
| | 2009 | $611,641[17] | – | $204,820 | $840,923 |
| | | | | – | |
| Michaels | 2010 | $450,058 | $354,375 | $968,133 | $1,802,005 |
| | 2009 | $458,767 | – | $102,410 | $593,416 |

169.  The Company's compensation policies created an incentive for fraud. It allowed executives to receive massive incentive compensation based on achieving Company performance targets with no consequence to the executives if the financial results were later determined to be achieved through fraud.  In fact, had defendants properly accounted for the 3Q10 and 4Q10 "bulk orders," their performance-based compensation would have been substantially reduced.  Defendants received incentive compensation under the "executive compensation program" based on 3Q10 and 4Q10 conduct that plaintiffs allege to be fraudulent. *See* §§VI-VII, X.  And, the Company's 25% "hold-back" policy gave them a huge incentive to engage in this conduct at that time.  Furthermore, as a result of the financial results from 2010, "the Compensation Committee decided to increase the base salary of Mr. Buschur from $600,000 to $700,000."

170.  As detailed above, the incentive compensation at Powerwave played an unusually large part of the defendants' total compensation.    Collectively,

---

[17]    "The 2009 salaries include an extra week of compensation based on the fact that 2009 was a 53-week fiscal year. 2010 and 2008 were 52-week fiscal years."

- 76 -

811515_2

performance-based compensation comprised nearly 75% of the value of the defendants total compensation for 2010.

171.   Thus, the compensation culture at Powerwave, which guaranteed massive incentive compensation based on fraudulent financial results, provided no mechanism to recoup such improvidently paid bonuses, provided a strong motivation for fraud and supports a strong inference of scienter.

**C.    Defendants' Fraudulent Conduct Allowed Defendants to Preserve Powerwave's Credit and Debt Ratings and Raise $100 Million in the July 20, 2011 Offering Thus Delaying a Bankruptcy Filing**

172.   The defendants were further motivated to obfuscate the problems with Powerwave's business, inflate the Company's reported financial results, and keep Powerwave's stock trading at artificially inflated levels in order to maintain positive credit and debt ratings.

173.   On February 1, 2011, the Company disclosed that it had amended its $50 million credit revolver with Wells Fargo to significantly more favorable terms to Powerwave.  According to the Company: "The Amendment extends the maturity date and the term of the Credit Agreement from August 15, 2011 to August 15, 2014.  The Amendment also reduces the interest rate under the Credit Agreement by reducing the Base Rate Margin by 1.50% and the LIBOR Base Rate Margin by 0.75%."

174.   After the truth was revealed that Powerwave's business was not nearly as strong as it had claimed, Wells Fargo acted to amend the Credit Agreement.  On December 29, 2011, the Company announced that the Wells Fargo Credit Agreement was amended and most significantly, Wells Fargo reduced the maximum amount that can be borrowed from $50 million to $30 million.

175.   Defendants were also motivated to carry out the scheme to raise critically needed capital through the July 20, 2011 offering.

176.   On July 20, 2011, Powerwave issued a press release announcing that it had entered into a purchase agreement to which it would issue an aggregate of $100

- 77 -

1  million of 2.75% Convertible Senior Subordinated Notes due 2041.  According to
2  Powerwave, the offering allowed the Company to repurchase $42.6 million in
3  aggregate principal amount of its outstanding 1.875% Convertible Subordinated Notes
4  due 2024, leaving approximately $15.3 million in principal amount of its 1.875%
5  Notes outstanding.  In addition, the Company stated that it was using approximately
6  $25 million from the offering to repurchase 11.2 million shares of its common stock
7  and would use the remaining net proceeds – over $30 million – to pay down additional
8  indebtedness and for working capital purposes.

9      177.  The July 20, 2011 $100 million bond offering was critical to
10  Powerwave's ability to continue its operations.  In fact, without this cash infusion the
11  Company would have wound up in bankruptcy even faster than it did.  The timing of
12  this $100 million bond offering is also a red flag as it occurred just after defendants
13  last minute $25 million 2Q11 bulk order but before the October 18, 2011 disclosure of
14  figures reflecting the Company's true financial condition.  And, in selling the bonds,
15  defendants failed to disclose any of the bulk orders, including the 1Q11 bulk order of
16  defective product where Powerwave explicitly waived payment.

17      178.  The July 20, 2011 $100 million bond offering allowed the Company to
18  avoid bankruptcy until January 2013.  Without this critical financing the Company
19  could not have lasted even the 15 months it did.  And this allowed Buschur to gain
20  another $700,000 during 2012 and Michaels over $450,000 each during 2012.

21      **D.    Defendants' Misleading Statements About the Reasons for**
       **the 3Q11 "Nightmare" Support a Strong Inference of**
22      **Scienter**

23      179.  When they were forced to disclose the truth defendants acted to off-set
24  the bad news by claiming that it was caused by an unexpected reduction in capital
25  expenditures by North American carriers.  For example, defendants claimed there had
26  been "a significant slowdown in spending by North American network operators," and
27  that "the uncertainty arising from the government's recent opposition to the proposed
28  merger of AT&T and T-Mobile has led to delays in spending as these operators re-

1   evaluate their capital spending plans." Given defendants' repeated claims of strong
2   demand from North American network operators, analysts were bewildered by
3   defendants' explanation for the massive decline in demand – that AT&T and other
4   North American carriers were suddenly reducing capital expenditures – first, because
5   they were not aware of it, and second, because none of Powerwave's competitors
6   mentioned it when they reported their earnings. Indeed, financial analysts who follow
7   Powerwave's industry questioned the honesty of the defendants, pointedly challenging
8   defendants during Powerwave's November 1, 2011 conference call:

9       **Tim Rebinoff** – *Fore Research and Management – Analyst*
10                              *            *            *

11          And lastly, just kind of thinking about your announcements last
12      week in terms of AT&T and some of the other telcos slowing down, a
13      couple of tower companies actually reported today. ***And the message***
14      ***that came from them was pretty much the exact opposite. They said***
15      ***there was no slowdown whatsoever.*** So I'm just trying to understand –
16      how do you think about that? Is there – I mean, what is it that I'm
17      missing in terms of what's happening with your Company versus some
18      of the other companies that are basically selling to the same end
19      customers? Thank you.

20          180.   That defendants misled investors about the reasons for the 3Q11 miss
21   was further confirmed by financial analysts from Credit Suisse who closely monitor
22   AT&T's capital expenditures due to the impact it has on so many communications
23   infrastructure companies like Powerwave. In its October 21, 2011 report, Credit
24   Suisse bluntly noted that "of those communication equipment suppliers that have
25   reported or have 'preannounced' calendar third quarter operating results, we believe
26   that *only Powerwave has specifically cited weak capital expenditure by AT&T as*
27   *being a significant contributor to its disappointing third-quarter results*."

28

811515_2

181.   The truth was that there was no sudden slowdown but, that Powerwave's customers – particularly Team Alliance – would not (and could not) take on any more inventory. *See* §§VI-VII, IX-X.

### E.   SOX Certification

#### 1.   Defendants Signed False Statements Regarding Powerwave's Internal Controls and Procedures

182.   Defendants Buschur and Michaels signed Sarbanes-Oxley ("SOX") certifications accompanying Powerwave's 2010 Form 10-K, filed on February 17, 2011, Form 10-Q for 1Q11, filed on May 9, 2011, and Form 10-Q for 2Q11 filed on August 10, 2011.  Each certification stated in pertinent part:

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.   The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us

- 80 -

811515_2

1    by others within those entities, particularly during the period in which

2    this report is being prepared;

3         (b)    Designed such internal control over financial reporting, or

4    caused such internal control over financial reporting to be designed

5    under our supervision, to provide reasonable assurance regarding the

6    reliability of financial reporting and the preparation of financial

7    statements for external purposes in accordance with generally accepted

8    accounting principles; [and]

9         (c)    Evaluated the effectiveness of the Registrant's disclosure

10   controls and procedures and presented in this report our conclusions

11   about the effectiveness of the disclosure controls and procedures, as of

12   the end of the period covered by this report based on such evaluation[.]

13   183.   Defendants Buschur and Michaels also signed the 2010 Form 10-K filed

14   with the SEC on February 17, 2011, that included the additional following assurances

15   concerning Powerwave's controls.

16        Our management, with the participation of our principal executive

17   officer and principal financial officer, evaluated the effectiveness of our

18   disclosure controls and procedures (as such term is defined in Rules 13a-

19   15(e) and 15d-15(e) under the Exchange Act). . . .   We maintain

20   disclosure controls and procedures that are designed to provide a

21   reasonable assurance level that information required to be disclosed in

22   our reports filed or submitted under the Exchange Act is recorded,

23   processed, summarized and reported within the time periods specified in

24   the SEC's rules and forms and that such information is accumulated and

25   communicated to our management, including our principal executive

26   officer and principal financial officer, as appropriate, to allow for timely

27   decisions regarding required disclosure. . . . Based upon the evaluation

28   of our disclosure controls and procedures . . . our principal executive

811515_2

1   officer and principal financial officer concluded that . . . our disclosure

2   controls and procedures were effective at the reasonable assurance level.

3        *   *   *

4     Our management is responsible for establishing and maintaining

5   adequate internal control over our financial reporting (as defined in Rule

6   13a-15(f) and Rule 15d-15(f) under the Exchange Act). Our

7   management assessed the effectiveness of our internal controls over

8   financial reporting as of January 2, 2011. In making its assessment of

9   the effectiveness of our internal controls over financial reporting, our

10  management used the criteria set forth by the Committee of Sponsoring

11  Organizations of the Treadway Commission ("COSO") in Internal

12  Control–Integrated Framework. Based on these criteria, our

13  management has concluded that, as of January 2, 2011, our internal

14  controls over financial reporting are effective.

15    184. Additionally, defendants Buschur and Michaels signed Powerwave's

16  Form 10-Q for 1Q11, filed on May 5, 2011, and Form 10-Q for 2Q11 filed on July 3,

17  2011. Both filings adopted the previous internal controls assurances set forth in ¶183

18  by repeating the assurances regarding disclosure controls and by stating there had

19  been no change to internal controls over financial reporting that occurred during the

20  reporting period that materially affected, or were reasonably likely to materially

21  affect, Powerwave's internal controls over financial reporting.

22      **2. Reasons Why Defendants' Internal Controls and**

23        **Procedure Statements Were Materially False and Misleading**

24    185. Defendants' statements concerning Powerwave's internal controls and

25  procedures and SOX certifications were false and misleading. As detailed herein,

26  Powerwave's management circumvented internal controls and procedures, causing

27  Powerwave to falsely report its financial results included in publicly issued financial

28

811515_2

1   statements, press releases and conference calls, which improperly inflated the
2   Company's revenue and earnings.

3       186.   Management of any public company is responsible for establishing and
4   maintaining adequate internal control over financial reporting as defined in 15 U.S.C.
5   §78m-o under the 1934 Act.  AU 319.06, Internal Control in a Financial Statement
6   Audit, defines internal control as "a process – effected by an entity's board of
7   directors, management, and other personnel – designed to provide reasonable
8   assurance regarding the achievement of objectives in the following categories: (a)
9   reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c)
10  compliance with applicable laws and regulations."

11      187.   Section 13(b)(2) of the 1934 Act states, in pertinent part, that every
12  reporting company must: "(A) make and keep books, records, and accounts, which, in
13  reasonable detail, accurately and fairly reflect the transactions and dispositions of the
14  assets of the issuer; [and] (B) devise and maintain a system of internal accounting
15  controls sufficient to provide reasonable assurances that . . . transactions are recorded
16  as necessary . . . to permit preparation of financial statements in conformity with
17  [GAAP]."  15 U.S.C. §78m(b)(2)(A)(B).  These provisions require an issuer to
18  employ and supervise reliable personnel to maintain reasonable assurances that
19  transactions are executed as authorized, to properly record transactions on an issuer's
20  books and, at reasonable intervals, to compare accounting records with physical
21  assets.

22      188.   Here, defendants claimed Powerwave's internal control procedures
23  complied with the standards adopted by the Committee of Sponsoring Organizations
24  of the Treadway Commission ("COSO").  The COSO standards constitute a specific
25  internal control model, and require adopting entities to have: (i) a disciplined and
26  structured control environment; (ii) direct involvement by management in identifying
27  and analyzing internal control risks, rather than reliance on auditors; (iii) formal
28  policies, procedures and practices that ensure control activities are being properly

811515_2

- 83 -

1   carried out; (iv) accurate and timely communication of control responsibilities to
2   employees; and (v) continual monitoring by management of the controls through
3   formalized procedures or checklists.   Had defendants followed these control
4   guidelines as they represented, the falsity of Powerwave's revenue, income and
5   earnings pled herein would have been apparent.   Rather, defendants circumvented
6   controls to improperly inflate the Company's revenue and earnings.

7       189.   As detailed in §§VI-X, Powerwave's financial statements contained
8   untrue statements and omitted material facts as alleged herein. Defendants' attestation
9   to the sufficiency of disclosure controls and procedures and internal controls over
10  financial reporting misled investors into believing that Powerwave's Class Period
11  financials fairly represented the financial condition of the Company when, in fact,
12  they materially overstated Powerwave's revenues and bottom-line.

13      190.   Defendants' "review" of Powerwave's financial statements, "evaluation"
14  of Powerwave's disclosure controls, and "evaluation" of Powerwave's internal control
15  over financial reporting that defendants certified they had personally performed in the
16  above SOX certifications, would clearly have alerted defendants to the presence of the
17  accounting misstatements described herein and to weaknesses in internal controls.
18  Therefore, defendants either knew of the misstatements in the financial statements, the
19  ineffectiveness of the disclosure controls and the weaknesses in internal controls or
20  defendants knowingly failed to carry out the required review of the financial
21  statements, evaluation of internal controls, and evaluation of disclosure controls (as
22  they stated they had done in the certifications).   In either case, defendants knew or
23  recklessly disregarded that the SOX certifications they signed were false.

24  **XIV.  LOSS CAUSATION/ECONOMIC LOSS**

25      191.   During the Class Period, as detailed herein, the defendants made false
26  and misleading statements and engaged in a scheme to deceive the market and a
27  course of conduct that artificially inflated the prices of Powerwave securities and
28  operated as a fraud or deceit on Class Period purchasers of Powerwave securities by

1  misrepresenting the Company's business and prospects. Later, when the defendants'
2  prior misrepresentations and fraudulent conduct became apparent to the market, the
3  price of Powerwave securities fell precipitously, as the prior artificial inflation came
4  out of the price over time. As a result of their purchases of Powerwave securities
5  during the Class Period, plaintiffs and other members of the class suffered economic
6  loss, *i.e.*, damages, under the federal securities laws.

7      192. At all relevant times, the material misrepresentations and omissions
8  particularized in this Complaint directly or proximately caused or were a substantial
9  contributing cause of the damages sustained by plaintiffs and other members of the
10  class. As described herein, during the Class Period, defendants made or caused to be
11  made a series of materially false or misleading statements about Powerwave's
12  business, prospects and operations. These material misstatements and omissions had
13  the cause and effect of creating in the market an unrealistically positive assessment of
14  Powerwave and its business, prospects, and operations, thus causing the Company's
15  common stock to be overvalued and artificially inflated at all relevant times.
16  Defendants' materially false and misleading statements during the Class Period
17  resulted in plaintiffs and other members of the class purchasing the Company's
18  common stock at artificially inflated prices, thus causing the damages complained of
19  herein, upon defendants' revelations of the truth and resulting collapse of
20  Powerwave's stock price.

21      193. The inflation in Powerwave stock was dissipated through a series of
22  partial disclosures of the truth that revealed that, contrary to its representations, its
23  statements were false and the Company was not nearly as successful as it had claimed.
24  As a direct result of disclosures on July 12, 2011 and October 18, 2011, Powerwave's
25  stock price suffered statistically significant declines. The significant stock price
26  declines upon release of information reflecting the Company's true financial condition
27  were due to firm-specific information, and not a result of market or industry. The
28

811515_2

1  following examples are not exhaustive because fact and expert discovery have yet to
2  commence.

3      194.  On July 12, 2011, Powerwave disclosed that demand was not as strong as
4  it had claimed, that there was "slowness in several of our markets," that it was
5  reducing 2Q11 guidance, and reducing full-year 2011 guidance.  These partial
6  revelations regarding the truth about demand for Powerwave's products caused
7  Powerwave's stock to drop from $2.77 per share on July 11, 2011, to $2.10 per share
8  on July 13, 2011, a decline of nearly 25%, on unusually high volume. But defendants
9  continued to conceal the scope of the problems facing the Company, repeatedly
10  issuing false glowing statements about present demand – and, on August 4, 2011, even
11  increased full year 2011 guidance.

12      195.  Then, on October 18, 2011, defendants disclosed figures reflecting the
13  Company's true financial condition revealing that 3Q11 revenues would be less than
14  50% of estimates (the worst revenue quarter since 2004), that there was "some
15  inventory sitting there being positioned for the next couple of quarters," at North
16  American customers, and that the biggest decline in demand was at North American
17  customers.  As a direct result of defendants' revelations regarding previously
18  concealed risks and the truth about Powerwave's previous representations regarding
19  the demand for Powerwave's products, Powerwave's stock price plummeted from
20  $1.46 per share to a low of $0.68 per share, or over 40%, on extremely heavy trading
21  volume of over four million shares. *See also* §VII.C.3.  On that day the NASDAQ fell
22  2%.   Individually and collectively, these drops removed the inflation from
23  Powerwave's stock price, causing real economic loss to investors who had purchased
24  the stock during the Class Period.

25      196.  In sum, the significant decline in Powerwave's stock price was a direct
26  result of the nature and extent of defendants' fraud finally being revealed to investors
27  and the market.   The timing and magnitude of Powerwave's stock price decline
28  negates any inference that the loss suffered by plaintiffs and other class members was

811515_2

- 86 -

1   caused by changed market conditions, macroeconomic or industry factors, or
2   Company-specific facts unrelated to the defendants' fraudulent conduct. The
3   economic loss, *i.e.*, damages, suffered by plaintiffs and other class members was a
4   direct result of defendants' fraudulent scheme to artificially inflate Powerwave's stock
5   price and the subsequent significant decline in the value of Powerwave's stock when
6   defendants' prior misrepresentations and other fraudulent conduct was revealed.

**XV.   ANY PURPORTED RISK WARNING WERE INADEQUATE OR MATERIALLY FALSE AND MISLEADING**

197.   Even though the Company's earnings press releases, conferences calls and other Class Period statements may have been accompanied by purported risk warnings or warnings that certain statements may be forward-looking, they did not adequately warn investors about the materially false and misleading statements alleged herein. These risk warning: (i) were false or misleading as a matter of current or historical fact; and/or (ii) were not meaningful because among other things, they were vague, boilerplate and did not adequately warn of the true risks of investing in Powerwave.

**XVI. NO SAFE HARBOR**

198.   Powerwave's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

199.   The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Powerwave who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made

811515_2

1  by defendants expressly related to or stated to be dependent on those historic or

2  present tense statements when made.

3  **XVII. APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET**

4

5      200.   Plaintiffs will rely upon the presumption of reliance established by the

6  fraud-on-the-market doctrine in that, among other things:

7          (a)     defendants made public misrepresentations or failed to disclose

8  material facts during the Class Period;

9          (b)     the omissions and misrepresentations were material;

10          (c)     the Company's stock traded in an efficient market;

11          (d)     the misrepresentations alleged would tend to induce a reasonable

12  investor to misjudge the value of the Company's stock; and

13          (e)     plaintiffs and other members of the class purchased Powerwave

14  stock between the time defendants misrepresented or failed to disclose material facts

15  and the time the true facts were disclosed, without knowledge of the misrepresented or

16  omitted facts.

17      201.   At all relevant times, the market for Powerwave stock was efficient for

18  the following reasons, among others:

19          (a)     since well before the Class Period, Powerwave's stock has been

20  listed and actively traded on the NASDAQ National Market, a highly efficient and

21  automated market;

22          (b)     as a regulated issuer, Powerwave filed periodic public reports with

23  the SEC; and

24          (c)     Powerwave regularly communicated with public investors via

25  established market communication mechanisms, including through regular

26  disseminations of press releases on the major news wire services and through other

27  wide-ranging public disclosures, such as communications with the financial press,

28  securities analysts and other similar reporting services.

- 88 -

811515_2

## XVIII.   CLASS ACTION ALLEGATIONS

202.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Powerwave securities during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

203.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Powerwave has 100,000,000 shares of stock outstanding, owned by hundreds of persons.[18]

204.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   whether the 1934 Act was violated by defendants;

(b)   whether defendants omitted and/or misrepresented material facts;

(c)   whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   whether defendants knew or deliberately disregarded that their statements were false and misleading;

---

[18]   As noted, on October 28, 2011, Powerwave announced a 1-for-5 reverse stock split of its outstanding shares of common stock and a reduction in the number of authorized shares of its common stock, each of which were effective as of October 28, 2011. The 1-for-5 reverse stock split reduced the number of authorized shares of common stock from 250,000,000 to 100,000,000.

- 89 -

(e)     whether the prices of Powerwave securities were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

205.   Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

206.   Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

207.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

208.   Plaintiffs incorporate ¶¶1-207 by reference.

209.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

210.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

811515_2

- 90 -

(c)  engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Powerwave securities during the Class Period.

211.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Powerwave securities. Plaintiffs and the Class would not have purchased Powerwave securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

212.   Plaintiffs incorporate ¶¶1-211 by reference.

213.   The defendants acted as controlling persons of Powerwave within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Powerwave securities, the defendants had the power and authority to cause Powerwave to engage in the wrongful conduct complained of herein. Powerwave controlled the defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.  Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.  Awarding plaintiffs and the members of the Class damages, including interest;

C.  Awarding plaintiffs reasonable costs and attorneys' fees; and

D.  Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

811515_2

1

**JURY DEMAND**

2       Plaintiffs demand a trial by jury.

3    DATED: February 14, 2013              ROBBINS GELLER RUDMAN
                                              & DOWD LLP
4                                          DARREN J. ROBBINS
                                           ROBERT R. HENSSLER JR.
5                                          ROBERT K. LU

6

7                                          ROBERT R. HENSSLER JR.

8
                                           655 West Broadway, Suite 1900
9                                          San Diego, CA  92101-3301
                                           Telephone:  619/231-1058
10                                         619/231-7423 (fax)

11                                         Lead Counsel Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

811515_2

- 92 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on February 14, 2013, declarant served the FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 14, 2013, at San Diego, California.

_____
SUSAN L. HAMILTON

811515_2

- 93 -

POWERWAVE 12

Service List - 2/14/2013   (12-0024)

Page 1 of 1

**Counsel For Defendant(s)**

Seth A. Aronson
Katharine S. Mercer
O'Melveny & Myers LLP
400 South Hope Street, 10th Floor
Los Angeles, CA 90071-2899
   213/430-6000
   213/430-6407(Fax)

**Counsel For Plaintiff(s)**

Jeffrey A. Berens
Dyer & Berens LLP
303 East 17th Avenue, Suite 300
Denver, CO 80203
   303/861-1764
   303/395-0393(Fax)

Michael I. Fistel, Jr.
Holzer Holzer & Fistel, LLC
200 Ashford Center North, Suite 300
Atlanta, GA 30338
   770/392-0090
   770/392-0029(Fax)

Darren J. Robbins
Tricia L. McCormick
Robert R. Henssler Jr.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
   619/231-1058
   619/231-7423(Fax)