ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS (168593)
ROBERT R. HENSSLER JR. (216165)
MATTHEW I. ALPERT (238024)
M. ALEXANDRA ROYAL (292757)
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
aroyal@rgrdlaw.com

Lead Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| PAWEL I. KMIEC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> POWERWAVE TECHNOLOGIES INC., et al., <br><br> Defendants. | No. 8:12-cv-00222-CJC(JPRx) <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION/JUDGMENT ON THE PLEADINGS <br><br> Date: February 24, 2014 <br> Time: 1:30 p.m. <br> Courtroom: 9B <br> Judge: Hon. Cormac J. Carney |

904951_1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   FACTUAL SUMMARY ........................................................ 4

III.  ARGUMENT ..................................................................... 10

    A.    Defendants' Rehashed Arguments Are Insufficient Grounds for This Court to Reconsider Its October 23, 2013 Order Denying Defendants' Motion to Dismiss ......................................... 10

    B.    Even if Defendants' Motion for Judgment on the Pleadings Was Considered by This Court on the Merits, Defendants' Motion Fails as a Matter of Law.................................................... 14

        1.    The Relevant Legal Standards for a Fed. R. Civ. P. 12(c) Motion.................................................................. 14

        2.    Defendants Fail to Meet the Fed. R. Civ. P. 12(c) Legal Standards.............................................................. 16

    C.    The Court Rightly Found that Plaintiffs' Detailed and Particular Allegations Satisfied the Pleading Requirements ............................... 18

        1.    Plaintiffs Sufficiently Plead Loss Causation ........................... 18

        2.    Viewed Holistically, the SAC Alleges False or Materially Misleading Statements and a Strong Inference of Scienter...... 20

IV.   CONCLUSION .................................................................. 25

1

# TABLE OF AUTHORITIES

2
**Page**

3
**CASES**

4
*Alaska Elec. Pension Fund v. Flowserve Corp.*,
5
 572 F.3d 221 (5th Cir. 2009) ................................................................ 19

6
*Alstom Caribe, Inc. v. Geo. P. Reintjes Co.*,
7
 484 F.3d 106 (1st Cir. 2007) ............................................................... 10

8
*Backe v. Novatel Wireless, Inc.*,
 642 F. Supp. 2d 1169 (S.D. Cal. 2009) ............................................... 19
9

10
*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ............................................................... 22
11

12
*Bonanno v. Thomas*,
 309 F.2d 320 (9th Cir. 1962) ............................................................... 13

13
*Brown v. China Integrated Energy, Inc.*,
14
 875 F. Supp. 2d 1096 (C.D. Cal. 2012) ............................................... 22

15
*Buttonwood Tree Value Partners, LP v. Sweeney*,
16
 No. SACV10-00537-CJC(MLGx), 2012 U.S. Dist. LEXIS 183438
 (C.D. Cal. Dec. 10, 2012) ........................................................... 17, 24
17

18
*Cardoza v. United States*,
 No. CV-94-5539-REC, 1995 U.S. Dist. LEXIS 17778
19
 (E.D. Cal. Nov. 17, 1995) ................................................................. 16

20
*Clerk v. Telesis Cmty. Credit Union*,
21
 No. 12-01152-CJC(DTBx), 2013 U.S. Dist. LEXIS 85782
 (C.D. Cal. Jan. 18, 2013) .................................................................. 12
22

23
*Doleman v. Meiji Mut. Life Ins. Co.*,
 727 F.2d 1480 (9th Cir. 1984) ............................................................. 15
24

25
*Dura Pharm., Inc. v. Broudo*,
 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) ......................... *passim*
26

27
*Fuschak v. Dickinson*,
 No. C 11-3790 SI(pr), 2012 U.S. Dist. LEXIS 14775
28
 (N.D. Cal. Feb. 7, 2012) ................................................................. 13

904951_1

# TABLE OF AUTHORITIES

**Page**

*Futuredontics, Inc. v. Applied Anagramics*,
    No. 97-6991 ABC, 1998 U.S. Dist. LEXIS 2265
    (C.D. Cal. Jan. 30, 1998) ...................................................................... 16

*Gen. Conference Corp. of Seventh-Day Adventists v.*
*Seventh-Day Adventists Congregational Church*,
    887 F.2d 228 (9th Cir. 1989) .............................................................. 16

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
    896 F.2d 1542 (9th Cir. 1989) ............................................................ 15

*Holton v. City of Thomasville Sch. Dist.*,
    425 F.3d 1325 (11th Cir. 2005) .......................................................... 13

*In re Accredo Health, Inc. Sec. Litig.*,
    No. 03-2216 BBD, 2005 U.S. Dist. LEXIS 46923
    (W.D. Tenn. Apr. 11, 2005) ............................................................... 24

*In re Commtouch Software Ltd.*,
    No. C 01-00719 WHA, 2002 U.S. Dist. LEXIS 13742
    (N.D. Cal. July 24, 2002) ................................................................... 21

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................. 20

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) ................................................ 18, 19, 20

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...................................................... 18, 20

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................. 14

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................. 19

*In re Nuvelo, Inc. Sec. Litig.*,
    No. C 07-4056 VRW, 2008 U.S. Dist. LEXIS 98441
    (N.D. Cal. Dec. 4, 2008) .................................................................... 20

- iii -

904951_1

**TABLE OF AUTHORITIES**

**Page**

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ...................................................................... 20

*In re St. Jude Med. Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ......................................................... 20

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005) ....................................................................... 22

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ................................................................. 4, 22

*Ingle v. Circuit City*,
    408 F.3d 592 (9th Cir. 2005) ....................................................................... 12

*James Miller Maine Servs. v. V.I.P. Yacht Cruises, Inc.*,
    No. 01-CV-2938 (ILG), 2002 U.S. Dist. LEXIS 13530
    (E.D.N.Y. Apr. 30, 2002) ............................................................................. 14

*Lefkoe v. Clothiers*,
    No. WMN-06-1892, 2007 U.S. Dist. LEXIS 98777
    (D. Md. Sept. 10, 2007) ............................................................................... 20

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ................................................................. 15, 16

*Lockwood v. Comm'r SSA*,
    616 F.3d 1068 (9th Cir. 2010) ..................................................................... 14

*Lower Elwha Band of S'Klallams v. Lummi Indian Tribe*,
    235 F.3d 443 (9th Cir. 2000) ....................................................................... 12

*Malbon v. Pa. Millers Mut. Ins. Co.*,
    636 F.2d 936 (4th Cir. 1980) ....................................................................... 13

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013) ....................................................................... 19

*McGann v. Ernst & Young*,
    102 F.3d 390 (9th Cir. 1996) ................................................................. 15, 17

- iv -

# TABLE OF AUTHORITIES

**Page**

*McIntire v. China Mediaexpress Holdings, Inc.*,
 927 F. Supp. 2d 105 (S.D.N.Y. 2013) ............................................................. 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
 540 F.3d 1049 (9th Cir. 2008) .................................................................. 13, 20

*Motown Record Corp. v. George A. Hormel & Co.*,
 657 F. Supp. 1236 (C.D. Cal. 1987) ................................................................ 16

*N.M. State Inv. Council v. Ernst & Young LLP*,
 641 F.3d 1089 (9th Cir. 2011) ......................................................................... 24

*Negrete v. Allianz Life Ins. Co.*,
 927 F. Supp. 2d 870 (C.D. Cal. 2013) ....................................................... 15, 17

*New York v. Micron Tech., Inc.*,
 No. C 06-6436 PJH, 2009 U.S. Dist. LEXIS 1624
 (N.D. Cal. Jan. 5, 2009) .................................................................................. 16

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ............................................................................ 24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ......................................................................... 22

*Obendorf v. Wash. Mut. Bank*,
 No. 06-475-S-MHW, 2007 U.S. Dist. LEXIS 61835
 (D. Idaho Aug. 22, 2007) ................................................................................ 17

*South Ferry LP # 2 v. Killinger*,
 687 F. Supp. 2d 1248 (W.D. Wash. 2009) ...................................................... 22

*South Fork Band v. United States DOI*,
 643 F. Supp. 2d 1192 (D. Nev. 2009),
 *aff'd in part and rev'd in part on other grounds*,
 588 F.3d 718 (9th Cir. 2009) ........................................................................... 15

*Stanwood v. Mary Kay, Inc.*,
 941 F. Supp. 2d 1212 (C.D. Cal. 2012) ........................................................... 11

1

**TABLE OF AUTHORITIES**

2
                                                        **Page**

3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
4    551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ................................ 22

5

*United States v. 2366 San Pablo Ave.*,
6    No. 13-cv-02027-JST, 2013 U.S. Dist. LEXIS 180236
7    (N.D. Cal. Dec. 23, 2013) .................................................................................. 15

8 *United States v. Alexander*,
   106 F.3d 874 (9th Cir. 1997) ............................................................................ 13
9

10 *United States v. Cuddy*,
   147 F.3d 1111 (9th Cir. 1998) .......................................................................... 13
11

12 *United States v. Reyes*,
   660 F.3d 454 (9th Cir. 2011) ............................................................................ 21
13

14 *Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
   No. 11-9495 PSG(JCGx), 2013 U.S. Dist. LEXIS 72683
15    (C.D. Cal. May 9, 2013) .................................................................................... 13

16 *Walton v. Arizona*,
   497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990),
17    *overruled on other grounds by*,
18    *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) ...... 14

19 *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
   No. 5:10-cv-02604 EJD, 2012 U.S. Dist. LEXIS 125314
20    (N.D. Cal. Sept. 4, 2012) .................................................................................. 23
21

22 *Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ................................................................ 20

23

**STATUTES, RULES AND REGULATIONS**

24

Federal Rules of Civil Procedure
25    Rule 8............................................................................................................ 18
26    Rule 12(b)(6) ................................................................................................ 12
   Rule 12(c) ............................................................................................*passim*
27

28

- vi -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

Local Civil Rules for the Central District of California
  L.R. 7-18...........................................................................*passim*

**SECONDARY AUTHORITIES**

5C Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure, Civil 3d* (3d ed. 2004)
  §1368 ............................................................................... 14
  §1369 ............................................................................... 16

18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper
*Federal Practice and Procedure*: *Jurisdiction and
Related Matters 2d* (2d ed. 2002)
  §4478 ............................................................................... 12

904951_1

## I.     INTRODUCTION

Defendants Ronald J. Buschur ("Buschur") and Kevin Michaels ("Michaels") (collectively "defendants"), disagree with the Court's decision denying their motion to dismiss (Dkt. No 74) and argue that the Court: (1) overlooked their argument that the Second Amended Consolidated Complaint for Violation of Federal Securities Laws (Dkt. No. 72) ("SAC") failed to adequately plead loss causation; and (2) committed error by holding that the elements of falsity and scienter were adequately pled.  *See* Defendants' Motion for Judgment on the Pleadings; and Memorandum of Points and Authorities in Support Thereof (Dkt. No. 98) ("Motion").  But defendants' Motion simply rehashes the identical arguments that they made previously.  *Id*.  Moreover, in its Order, the Court expressly noted that it had "read and considered the papers presented by the parties."  Order Denying Defendants' Motion to Dismiss Second Amended Consolidated Complaint (Dkt. No. 90) ("Order") at 1.  It is disingenuous for defendants to suggest that the Court somehow neglected to consider their loss causation arguments – which consumed the majority of their motion to dismiss.  Defendants simply want another bite at the proverbial apple.  As discussed below, each of the purported errors raised by defendants only serves to emphasize the point that the Court's decision should stand.

First, while clearly requesting reconsideration, defendants style their motion as a "motion for judgment on the pleadings."  Regardless of the title, the substance is unmistakable.  But, when moving for reconsideration a party is bound by L.R. 7-18.  Tellingly, defendants do not even attempt to explain how their Motion satisfies L.R. 7-18's strictures.  As detailed below, this is for good reason – they cannot.  *See* §III.A, *infra*.

Second, even if the Court were to consider defendants' Motion on the merits, it fails as a matter of law.  A motion for judgment on the pleadings is only appropriate when all material allegations of fact are admitted and it is evident on the face of the pleadings that the only disputed question is a question of law.  *See* §III.B, *infra*.  But,

904951_1

in their Motion (and Answer to Plaintiff's Second Amended Class Action Complaint for Violation of Federal Securities Laws (Dkt. No. 93) ("Answer")), defendants dispute nearly every fact alleged.  Defendants detailed factual arguments alone demonstrate that their Motion should be denied.

Finally, even if the Court were to reconsider the Order (which it should not), the SAC's detailed factual allegations satisfy the pleading standards for securities fraud. During October 28, 2010 to October 28, 2011 (the "Class Period"), Powerwave Technologies, Inc. ("Powerwave" or the "Company") shipped unneeded and sometimes unusable products at the end of each quarter to Team Alliance. ¶¶17-49.[1] In violation of Generally Accepted Accounting Principles ("GAAP"), Powerwave would immediately recognize revenue for these products upon shipment, knowing full well that many of these products would be returned, replaced, or never actually paid for.  *Id.*; *see also* ¶¶105-106, 111.  In other words, Powerwave stuffed its largest customer with fictitious orders to create a misleading impression in the market of the Company's financial health.  And, these last-minute bulk orders were material, between $15 million and $25 million per quarter.  ¶¶28-47, 103-104.  But Powerwave's scheme had its limit because Team Alliance could only take on so much unneeded product.  Powerwave disclosed that this happened in third quarter 2011 ("3Q11"), and admitted that there was a "couple of quarters" of inventory at North American customers "that is sitting there." ¶¶71-73. Shortly thereafter the Company went bankrupt.

Through all of this, defendants were adamant that they knew that revenue numbers were "on track" because demand was "extremely strong" and "increasing." *See* §II, *infra*.  They made these false and misleading statements with full-knowledge that the exact opposite was true – and never mentioned the bulk orders to Team Alliance.  *Id.*  Numerous former employees directly involved with the customer and

---

[1]   All "¶__" and "¶¶__" references are to the SAC.

1   products at issue have confirmed this.  ¶¶17-49.  According to the former Director of

2   Financial Planning, who reported directly to Michaels and met with him at least

3   quarterly in his office, "the approval for the large end-of-quarter deals came from

4   [defendants]."   ¶¶25, 53.   Four other former employees each confirmed that

5   Powerwave engaged in the last-minute transactions with Team Alliance during the

6   Class Period.  ¶¶28-47.  And, a former customer of Powerwave's also corroborated

7   these allegations adding that Powerwave would extend these special concessions

8   through "verbal side agreements."  ¶48.  The former Senior Demand Planner for

9   customers that made up over 40% of Powerwave's sales (*including Team Alliance*),

10  explained that in order to meet revenue goals, in the days before the quarter closed,

11  the Company would grant Team Alliance rights of return, waive payment, and delay

12  delivery in order to induce the "sale" that the customer did not need.  ¶¶17, 30-31, 38,

13  40-41, 44-46, 105-106, 111.

14       These allegations are confirmed by defendants' admissions regarding accounts

15  receivable and days-sales-outstanding ("DSO").  As detailed in the SAC, accounts

16  receivable attributed to Team Alliance exploded to over *2000% greater* than sales in

17  3Q11.  ¶¶60-64.  In fact, despite sales to Team Alliance in 3Q11 of just $2 million,

18  accounts receivable attributed to Team Alliance stood at over $50 million – which

19  confirms that *during second quarter 2011 ("2Q11")* Powerwave's single largest

20  customer stopped paying its bills.  *Id*.  According to PricewaterhouseCoopers

21  ("PWC"), the accounts receivable admission is indicative of "*[f]inancial statement

22  manipulation*."  ¶62.[2]  The SAC's allegations concerning defendants' revenue

23  recognition scheme is further strengthened by Powerwave's ballooning DSO – which

24  spiked 54% from 2Q11 to 3Q11.  *See, e.g.*, ¶¶65-69.

25       Viewed holistically with the detailed allegations from the former employees to

26  establish that defendants' statements regarding current demand were deliberately

27  _____

    [2]   All citations and footnotes are omitted and emphasis is added unless otherwise

28  noted.

reckless because they omitted the bulk orders (¶¶24-59), in conjunction with defendants' admissions that they had actual access to the disputed information (*e.g.*, ¶¶93-96), the importance of Team Alliance to Powerwave's business (¶¶135-136, 163), the simplicity of the accounting violations (¶¶134-151), the admission that Team Alliance stopped paying its bills during 2Q11 (¶¶60-64), the fact that analysts suggested that defendants were not truthful (¶¶179-181), the temporal proximity of the misleading statements and subsequent disclosures (*see* Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint (Dkt. No. 76) at §II.3.), and the reality that the Company was actually on the verge of bankruptcy, the allegations overwhelmingly support an inference of deliberate recklessness. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (reversing district court because it was "'difficult to grasp the thought'" that the top two executives who reported "'gangbuster earnings'" "'really had no idea'" that their company was headed towards bankruptcy given their knowledge of operational problems and industry difficulties). Likewise, plaintiffs' loss causation allegations clearly "provide [the] defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005); §III.C.1., *infra*. The Court should deny defendants' Motion.

## II.    FACTUAL SUMMARY

Until its bankruptcy, Powerwave was in the business of manufacturing and selling wireless infrastructure equipment. ¶¶31-34. In particular, Powerwave sold its products to North American wireless carriers – which made up over 40% of the Company's business during the Class Period. *Id.* At the beginning of the Class Period, Powerwave reported strong financial results for third quarter 2010 ("3Q10"), which defendants emphasized demonstrated "growth of 12.8% over the same period last year." ¶¶75-77. And, defendants boasted that they saw "signs of improvement in overall demand." *Id.* But, each of these statements was false and misleading when

- 4 -

1  made.  ¶¶75, 79.  Defendants failed to disclose that Powerwave's 3Q10 results were

2  only achieved because of the $15 million (at least) bulk order to North American

3  wireless customer Team Alliance that included a right of return if Team Alliance

4  could not sell the product.  ¶¶35, 40, 46, 49, 51, 138.  And, while defendants boasted

5  about strong and improving demand, they failed to disclose that the 3Q10 bulk order

6  was not connected to actual demand.  ¶¶35-36, 38, 40, 44, 46, 49, 51-52, 137-138.

7       At the end of fourth quarter 2010 ("4Q10"), Powerwave again relied on a $15

8  million bulk order from Team Alliance – that included a right of return if Team

9  Alliance could not sell the products – to close the gap between forecasted sales and

10  actual sales for the quarter.  ¶80.  But, again, defendants failed to disclose the bulk

11  orders or the effect they were having on demand and reported financial results.  ¶¶80-

12  84.  To the contrary, defendants grew more upbeat about the Company, its prospects,

13  and present demand. ¶79.  On February 1, 2011, Powerwave reported extraordinary

14  full-year 2010 results and emphasized that 2010 was Powerwave's "first fully

15  profitable year on a GAAP basis since 2005," and boasted that the Company met its

16  2010 guidance.  *Id*.  Defendants also gave guidance for 2011 "of $650 million to $680

17  million," which they claimed was "conservative."  ¶¶82, 84  And, while financial

18  analysts projected "lackluster" growth (less than 4%) for the industry, defendants

19  highlighted that "[t]he midpoint of this range represents annual growth of 12%" "*we*

20  *obviously think that we're going to grow faster than the market in our segment*."

21  ¶¶82, 84, 89.  In addition, defendants boasted that they "continue to see signs of

22  improvement in overall demand."  ¶81.

23       Defendants' statements were false or materially misleading.  ¶¶80, 87.

24  Defendants gave purportedly "conservative" guidance for 2011, but failed to disclose

25  the 3Q10 and 4Q10 bulk orders to Team Alliance or the effect those bulk orders

26  (totaling at least $30 million) could have on 2011 sales. ¶87.  Similarly, in bragging

27  about 2010's results, defendants omitted disclosure of the true nature and substance of

28  the 3Q10 and 4Q10 bulk orders to Team Alliance.  *Id*.  And, while defendants

- 5 -

1    continued to claim that they saw "improvement in overall demand" for their products,

2    they concealed the material risks the bulk orders created to the Company's future

3    financial results and the fact that the bulk orders were done to try to meet quarterly

4    and yearly forecasts because actual orders had not been received.  ¶¶35-36, 38, 40, 44,

5    46, 49, 51-52, 137-138.

6         During first quarter 2011 ("1Q11"), defendants became even more aggressive

7    with their bulk orders – this time shipping Team Alliance defective product to be

8    replaced in a later quarter.  ¶¶35, 40, 46, 49, 51, 54-56, 137.  Even with this improper

9    bulk order, the Company missed analysts' expectations for 1Q11 reporting revenue of

10   $136 million.  ¶¶97-98.  To off-set this news, defendants became even more effusive

11   saying: "[t]here are signs of improving demand," there is "increased demand,"

12   demand is "extremely strong," and "we're seeing demand across the board."  ¶¶93-96.

13   Defendants also noted that Powerwave "typically do[es] not give quarterly guidance,

14   but due to the current results" – *i.e.*, to off-set the earnings miss – "and ***the fact*** that

15   we ***have been seeing an increase in demand*** for our products," defendants gave 2Q11

16   guidance of $170 million-$180 million.  ¶95.  And, despite the 1Q11 miss, defendants

17   emphasized that "we are on track for meeting our annual revenue guidance," and

18   boasted "we will achieve our fiscal 2011" revenue range.  ¶¶93-94.

19        Given all defendants' claims about demand during the 1Q11 call, analysts

20   described the situation Powerwave was facing as a "surge in demand," and questioned

21   whether Powerwave's manufacturing capacity could handle "the surge."   ¶96.

22   Financial analysts also caught on to the large percentage of sales to Team Alliance in

23   1Q11 (14%) and stated, it "really seems like they're front-end loading their full-year."

24   *Id*.  Buschur disagreed with the analyst's assessment: "I see a pretty healthy growth in

25   North America across most of the operators the remainder of 2011 . . . ."  *Id*.

26        Defendants' May 5, 2011 statements were false or materially misleading.  ¶¶92,

27   100.  Defendants repeatedly emphasized increasing demand in the marketplace, but

28   concealed the 1Q11 bulk order of defective products that would be replaced in a later

- 6 -

1    quarter. *Id*. And, defendants concealed that the 1Q11 bulk order, was not connected

2    to actual demand, but was done to try to meet Powerwave's quarterly forecast because

3    actual orders had not been received. ¶¶35-36, 38, 40, 44, 46, 49, 51-52, 92, 100, 137-

4    138.

5         According to a former employee, during 2Q11 Powerwave got even more

6    desperate and in order to induce Team Alliance to take a $25 million bulk order,

7    waived payment. ¶¶35, 40, 46, 49, 51, 138, 143. Defendants later implicitly admitted

8    that they were not making Team Alliance pay when they disclosed 3Q11 accounts

9    receivable attributed to Team Alliance. ¶¶60-64. According to PWC, when a

10   company's accounts receivable growth is outpacing sales growth it is indicative of

11   "*[f]inancial statement manipulation*." ¶¶60-62. Incredibly, Powerwave's accounts

12   receivable attributed to Team Alliance sky-rocketed to over ***2000% greater*** than sales

13   in 3Q11. ¶¶60-64. That Powerwave did just $2 million in sales to Team Alliance in

14   3Q11 but was owed over $50 million by Team Alliance at the end of 3Q11

15   demonstrates that Powerwave was not making Team Alliance pay and indicates

16   "*[f]inancial statement manipulation*." ¶¶60-64.

17         The defendants' revenue recognition scheme is further corroborated by

18   Powerwave's ballooning DSO during the Class Period. DSO measures the average

19   number of days it takes a company to get paid. Ernst & Young LLP has explained the

20   importance of DSO: "***The higher the number, the greater should be the concern over***

21   ***customers not paying their bills***." ¶¶66-67. Powerwave's DSO spiked by ***92%***

22   during the Class Period to 175 days. ¶¶68-69. By comparison, the median DSO for

23   Powerwave's competitors was 69 days during the Class Period – ***and remained flat***

24   ***while Powerwave's spiked***. ¶68.

25         Defendants' scheme to inflate revenues started to unravel on July 12, 2011,

26   when the Company reduced the 2Q11 guidance and full-year 2011 guidance it had

27   given on May 5, 2011 due to "slowness in several of our markets." ¶104. The

28   reduced guidance due to declining demand "in several" markets caught investors off

1   guard given that with just five weeks to go in 2Q11, on May 24, 2011, defendants
2   claimed that demand was "improving and strong" and "certainly has improved now"
3   over 1Q11.    ¶¶101-102.    Powerwave's stock price dropped nearly 25% after
4   defendants' disclosures. ¶199.  Notably, on July 20, 2011, the Company announced it
5   had completed a critical ***$100 million*** bond offering.  ¶107.  The timing of the offering
6   is a red flag as it occurred shortly after the 2Q11 bulk order, but failed to disclose any
7   of the improper bulk orders.  ¶¶172-178.

8         On August 4, 2011, Powerwave held its 2Q11 conference call and defendants
9   continued to conceal the Company's true financial condition. ¶¶108-112.  Defendants
10  noted that Team Alliance accounted for 28% of 2Q11 sales, but failed to disclose the
11  $25 million 2Q11 bulk order that waived payment (or any of the previous bulk
12  orders). ¶112.  In addition, Michaels and Buschur both reiterated that they "***continue***
13  ***to believe that we will achieve our 2011 annual revenue guidance of $650 million to***
14  ***$680 million***." ¶109.  Analysts questioned whether the revenue guidance range could
15  be achieved but, Buschur emphasized that "we're pretty confident still that we should
16  be able to achieve the guidance that we had given for the full year." *Id*.  Given that
17  ***just three weeks earlier***, on July 12, 2011, defendants had stated that they expected to
18  hit the "bottom" of the range, analysts questioned whether defendants' statements on
19  August 4, 2011, that 2011 would be within the $650 million to $680 million range was
20  a case of defendants being more positive. *Id*.  Buschur agreed that it was. *Id*.
21  Analysts also specifically asked about North American carrier spending for the "back
22  half" of 2011 and Buschur was adamant: "we're going to continue to see some growth
23  in North America and it's going to be strong."  ¶111.

24        The August 4, 2011 statements were false or materially misleading.  ¶114.
25  Defendants answered specific questions about Team Alliance and North American
26  carrier spending, but concealed the bulk orders. *Id*.  And, defendants' statements
27  increasing full-year 2011 guidance were also false or misleading and lacked a
28

- 8 -

1   reasonable basis because they failed to disclose the bulk orders or the material risks

2   the bulk orders presented to Powerwave's future financial results.  *Id.*

3        On August 9, 2011, Michaels said that "*[w]ireless demand is very healthy*."

4   ¶115.  Michaels was asked about Powerwave's outlook for the second half of 2011 –

5   "better or worse than the first half  and do the recent events change anything on that?"

6   ¶116.  Just six weeks before the end of 3Q11, Michaels again maintained that demand

7   was strong: "I would say our outlook is better."  *Id.*  An analyst pointed out that,

8   "*obviously there is a lot of worry about demand trends out there*."  ¶118.  Michaels

9   again said that North American demand was strong.  *Id.*  But, these statements were

10  misleading because defendants continued to conceal the bulk orders, the fact that the

11  bulk orders were unconnected to actual demand, and the material risks the bulk orders

12  created to future financial results.  ¶120.

13       According to former employees, in 3Q11, the repeated bulk orders to Team

14  Alliance caught up to Powerwave and Team Alliance "drew the line" and "said 'no

15  more.'"  ¶57.  This is confirmed by 3Q11 sales to Team Alliance which *declined by*

16  *96%*.  ¶136.  On October 18, 2011, defendants shocked investors when they revealed

17  figures reflecting the Company's true financial condition disclosing that demand was

18  not nearly as strong as defendants claimed – *revenues less than 50% of estimates* –

19  and that there was an "inventory buildup" of a couple of quarters at North American

20  customers.  ¶¶70-73; 196-201.  Analysts immediately recognized the significance of

21  Buschur's answer to a specific question about whether an "inventory buildup" at

22  North American customers was a cause of the dramatic decline in demand.  ¶¶70-73.

23  For example, on October 19, 2011, Jefferies published a report titled, "Dramatic Pre-

24  announcement: Inventory Correction at AT&T Even Worse Than Feared," which

25  noted that, "PWAV mgmt believes the AT&T inventory correction will last a couple

26  Qs."  ¶73.

27       Given defendants' repeated claims of strong demand (at North American

28  customers) – as recently as six weeks before the end of 3Q11 – financial analysts were

- 9 -

1  stunned by the October 18, 2011 disclosures and specifically questioned whether
2  Buschur "should still be managing" the Company.  ¶122.  And, on the second 3Q11
3  conference call, analysts even questioned defendants' honesty in their claim that there
4  was a sudden slow-down at AT&T and other carriers.  ¶¶179-181.  For example, Fore
5  Research and Management LP pointed out that other companies that sell to "the same
6  end customers," "said there was no slowdown whatsoever," at AT&T, "*[a]nd the*
7  *message that came from them was pretty much the exact opposite*."  ¶179.  Similarly,
8  an analyst from Credit Suisse who covers AT&T noted that – far from a sudden
9  industry-wide slow-down – "only Powerwave has specifically cited weak capital
10  expenditure by AT&T as being a significant contributor to its disappointing third-
11  quarter results." ¶180.  The truth was – as former employees have stated, the accounts
12  receivable attributed to Team Alliance confirms, and Buschur conceded – that there
13  was an "inventory buildup" at Team Alliance.  ¶¶70-73, 181.  Powerwave never
14  recovered and just 15 months later declared bankruptcy.  ¶6.

## III.  ARGUMENT

### A.  Defendants' Rehashed Arguments Are Insufficient Grounds for This Court to Reconsider Its October 23, 2013 Order Denying Defendants' Motion to Dismiss

18      "Wise men have recognized for more than twenty-five centuries that
19  appearances sometimes can be deceiving, *see* Aesop, *The Wolf in Sheep's Clothing*
20  (*circa* 550 B.C.), and that is the case here."  *Alstom Caribe, Inc. v. Geo. P. Reintjes*
21  *Co.*, 484 F.3d 106, 114 (1st Cir. 2007).  Although formally styled as a motion for
22  judgment on the pleadings, there can be little doubt that defendants' Motion, despite
23  resurrecting previously rejected arguments, is a request for the Court to reconsider its
24  prior Order and dismiss plaintiffs' allegations; and an attempt to avoid the strict
25  requirements of L.R. 7-18 concerning motions for reconsideration.  Yet, as plaintiffs
26  demonstrate below, regardless of the Federal or Local Rules of Civil Procedure
27  defendants' Motion is filed pursuant to, the underlying arguments nonetheless warrant
28  denial by this Court.

- 10 -

Under this District's L.R. 7-18:

A motion for reconsideration . . . may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

*See Stanwood v. Mary Kay, Inc.*, 941 F. Supp. 2d 1212, 1226-27 (C.D. Cal. 2012) (Carney, J.).

In the time since the Court denied defendants' motion to dismiss on October 23, 2013, no new facts have arisen that warrant dismissal of plaintiffs' SAC. In the less than three months since the Court's Order, neither the Supreme Court nor the Ninth Circuit have issued opinions altering the pleading standards or judicial scrutiny applied to securities fraud complaints filed pursuant to the Securities Exchange Act of 1934. And finally, there is no evidence that the Court failed to consider material facts when it denied defendants' Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) motion on October 23, 2013. Thus, if defendants' Motion, which simply regurgitates previously made and rejected arguments, was seen for what it truly is – *i.e.*, a request for reconsideration – then it would unequivocally fail under L.R. 7-18; *see also Stanwood*, 941 F. Supp. at 1227 ("***No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion***.").

And it is for these same reasons that, even if viewed under the rubric of Fed. R. Civ. P. 12(c), defendants' Motion is unpersuasive. Defendants' Motion is nothing more than another motion to dismiss; a duplicative motion containing no new facts, no citations to intervening mandatory authority and no evidence of material information

- 11 -

904951_1

1    this Court previously overlooked.  *See Clerk v. Telesis Cmty. Credit Union*, No. 12-
2    01152-CJC(DTBx), 2013 U.S. Dist. LEXIS 85782, at *4 (C.D. Cal. Jan. 18, 2013)
3    (Carney, J) ("A motion for judgment on the pleadings is substantially identical to a
4    motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure
5    12(b)(6) . . . .").  The crux of defendants' argument is rooted in the unsupported
6    assertion that because the Court's Order did not specifically address loss causation,
7    this must mean the Court failed to scrutinize the sufficiency of plaintiffs' loss
8    causation allegations.  Motion at 1.  This assumption by defendants is not only
9    meritless, but, more importantly, is directly contradicted by the Court's Order.  As the
10   first sentence of this Court's Order reads: "***Having read and considered the papers***
11   ***presented by the parties***, the Court finds this matter appropriate for disposition
12   without a hearing."  Order at 1.  Therefore,  it is clear that the Court's Order, at the
13   very least, implicitly considered and rejected defendants' arguments concerning loss
14   causation, and as a result, under the law of the case doctrine, should not reconsider
15   ***identical issues*** it previously decided.  *See Lower Elwha Band of S'Klallams v. Lummi*
16   *Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000) ("For the [law of the case] doctrine to
17   apply, the issue in question must have been 'decided explicitly ***or by necessary***
18   ***implication*** in [the] previous disposition.'"); *Ingle v. Circuit City*, 408 F.3d 592, 594
19   (9th Cir. 2005) ("[The law of the case] doctrine has developed to 'maintain
20   consistency and avoid reconsideration of matters once decided during the course of a
21   single continuing lawsuit.'") (quoting 18B Charles Alan Wright, Arthur R. Miller &
22   Edward H. Cooper, *Federal Practice and Procedure*: *Jurisdiction and Related*
23   *Matters 2d* §4478, at 637-38 (2d ed. 2002)).
24          As another court in this District noted when denying a successive attempt to
25   dismiss a securities fraud complaint, the Ninth Circuit holds that a court may exercise
26   its discretion to depart from the law of the case doctrine only if one of the five
27   circumstances exist:
28

- 12 -

1   (1) the first decision was clearly erroneous; (2) there has been an

2   intervening change in law; (3) the evidence before the court when

3   reconsidering the issue is substantially different; (4) there are other

4   changed circumstances; or (5) a manifest injustice would result from

5   applying the doctrine.

6   *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 11-9495 PSG(JCGx), 2013 U.S.

7   Dist. LEXIS 72683, at *20 (C.D. Cal. May 9, 2013) (citing *United States v. Cuddy*,

8   147 F.3d 1111, 1114 (9th Cir. 1998)).[3]  And as discussed above, none of these factors

9   – which are nearly identical to those listed in L.R. 7-18 (motions of reconsideration) –

10   are present here.

11   Moreover, defendants cite no authority (because there is none) requiring a

12   district court to issue an order explicitly delineating each and every reason that

13   supports its ruling.  *See Fuschak v. Dickinson*, No. C 11-3790 SI(pr), 2012 U.S. Dist.

14   LEXIS 14775, at *2 (N.D. Cal. Feb. 7, 2012) ("***The court has neither the obligation***

15   ***nor the resources to discuss every authority litigants cite in their briefs***. The salient

16   arguments were considered and discussed in the order of dismissal.  ***Anything not***

17   ***discussed was implicitly rejected***."); *see also Malbon v. Pa. Millers Mut. Ins. Co.*, 636

18   F.2d 936, 939 n.8 (4th Cir. 1980) ("It is, of course, not absolutely necessary, that a

19   judge, in disposing of a motion, specifically recite or otherwise discuss each

20   contention advanced by the parties."); *Holton v. City of Thomasville Sch. Dist.*, 425

21   F.3d 1325, 1353 (11th Cir. 2005) ("The district court was not obliged to recite and

22   analyze individually each and every piece of evidence presented by the parties.").[4]

23   ---

[3]   *See also Keyuan Petrochemicals*, 2013 U.S. Dist. LEXIS 72683, at *20 (quoting

24   *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997)) ("'[f]ailure to apply the

25   doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion'").

26   [4]   In fact, the Ninth Circuit urges district courts ***when dismissing a complaint*** to issue

27   an order that informs "'the plaintiff of the reason for dismissal so that he can make an intelligent choice as to amending.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 n.5 (9th Cir. 2008) (quoting *Bonanno v. Thomas*, 309 F.2d 320,

28   322 (9th Cir. 1962)).

- 13 -

1    Indeed, as both the Supreme Court and Ninth Circuit recognize, "'***[t]rial judges are***
2    ***presumed to know the law and to apply it in making their decisions***.'"  *Lockwood v.*
3    *Comm'r SSA*, 616 F.3d 1068, 1072 n.3 (9th Cir. 2010) (quoting *Walton v. Arizona*,
4    497 U.S. 639, 653, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), *overruled on other*
5    *grounds by*, *Ring v. Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556
6    (2002)).

7         Finally, granting defendants' Motion which contains substantive arguments that
8    mirror those made in their previous motion to dismiss – which the Court denied in its
9    Order – would, for all intents and purposes, turn "FRCP 12 into a trial-type, papers-
10   only proceeding." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal.
11   2008) (denying defendants' "largely frivolous" motion to reconsider and noting that
12   the "motion did not warrant the time it has taken away from the consideration of the
13   hundreds of other actions pending in the Court's docket").

**B.    Even if Defendants' Motion for Judgment on the Pleadings Was Considered by This Court on the Merits, Defendants' Motion Fails as a Matter of Law**

**1.    The Relevant Legal Standards for a Fed. R. Civ. P. 12(c) Motion**

17        Because of the strict standards imposed by Fed. R. Civ. P. 12(c), "[j]udgment
18   on the pleadings is rarely granted." *James Miller Maine Servs. v. V.I.P. Yacht*
19   *Cruises, Inc.*, No. 01-CV-2938 (ILG), 2002 U.S. Dist. LEXIS 13530, at *5 (E.D.N.Y.
20   Apr. 30, 2002) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice*
21   *and Procedure, Civil 3d* §1368 (3d ed. 2004)).[5]  As the Ninth Circuit and numerous

---

[5]    As commentators Wright and Miller have noted:

> The federal courts have followed a fairly restrictive standard in ruling on motions for judgment on the pleadings.  Although the motion may be helpful in disposing of cases in which there is no substantive dispute that warrants the litigants and the court proceeding further, thereby easing crowded trial dockets in the federal district courts, hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense.

904951_1

other courts have made clear, "[j]udgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co*., 896 F.2d 1542, 1550 (9th Cir. 1989) (citing *Doleman v. Meiji Mut. Life Ins. Co*., 727 F.2d 1480, 1482 (9th Cir. 1984)); *see also Living Designs, Inc. v. E.I. DuPont de Nemours & Co*., 431 F.3d 353, 363 n.9 (9th Cir. 2005) ("If the district court considers matters outside the pleadings, the district court treats the Rule 12(c) motion as one for summary judgment and must give all parties a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'").

Indeed, the "Rule 12(c) motion is little more than a relic of the common law and code eras.  Its preservation in the original federal rules undoubtedly was due to the undeveloped character of the summary judgment procedure . . . ."  *United States v. 2366 San Pablo Ave.*, No. 13-cv-02027-JST, 2013 U.S. Dist. LEXIS 180236, at *5 n.2 (N.D. Cal. Dec. 23, 2013).  A motion for judgment on the pleadings has utility when all material allegations of fact are admitted and "only questions of law remain to be decided by the district court."  *South Fork Band v. United States DOI*, 643 F. Supp. 2d 1192, 1197 (D. Nev. 2009), *aff'd in part and rev'd in part on other grounds*, 588 F.3d 718 (9th Cir. 2009); *see also Negrete v. Allianz Life Ins. Co.*, 927 F. Supp. 2d 870, 874 (C.D. Cal. 2013) ("A motion for judgment on the pleadings brought pursuant to Fed. R. Civ. P. 12(c) provides a means of disposing of cases when all material allegations of fact are admitted in the pleadings and only questions of law remain.") (citing *McGann v. Ernst & Young*, 102 F.3d 390, 392 (9th Cir. 1996)).  Therefore, a motion for judgment on the pleadings must be denied unless it appears to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved.

---

*Id.* at 222-23.

1 | *Futuredontics, Inc. v. Applied Anagramics*, No. 97-6991 ABC (MANx), 1998 U.S.
2 | Dist. LEXIS 2265, at *6 (C.D. Cal. Jan. 30, 1998).

3 | The "legal standard to be applied in either a motion for summary judgment or
4 | judgment on the pleadings is 'identical,'" meaning that the court is not resolving
5 | factual disputes or weighing evidence, but determining whether any genuine issue of
6 | material fact remains for trial. *Motown Record Corp. v. George A. Hormel & Co.*,
7 | 657 F. Supp. 1236, 1238 (C.D. Cal. 1987) (citing 5C Charles Alan Wright & Arthur
8 | R. Miller, *Federal Practice and Procedure Civil 3d* §1369, at 258 (3d ed. 2004)). For
9 | the purposes of the Court's consideration of this Motion, "all of the well pleaded
10 | factual allegations in the adversary's pleadings are taken to be true, and all
11 | contravening assertions in the movant's pleadings are taken to be false." *Cardoza v.*
12 | *United States*, No. CV-94-5539-REC, 1995 U.S. Dist. LEXIS 17778, at *4 (E.D. Cal.
13 | Nov. 17, 1995). Defendant is "not entitled to judgment on the pleadings if the answer
14 | raises issues of fact or an affirmative defense which, if proved, would defeat
15 | plaintiff's recovery." *New York v. Micron Tech., Inc*., No. C 06-6436 PJH, 2009 U.S.
16 | Dist. LEXIS 1624, at *10 (N.D. Cal. Jan. 5, 2009) (citing *Gen. Conference Corp. of*
17 | *Seventh-Day Adventists v. Seventh-Day Adventists Congregational Church*, 887 F.2d
18 | 228, 230 (9th Cir. 1989)). Thus, since virtually every fact asserted by plaintiffs is
19 | denied or disputed in defendants' Answer, judgment on the pleadings is improper.

20 | **2.    Defendants Fail to Meet the Fed. R. Civ. P. 12(c)
       Legal Standards**

21 |
22 | Defendants utterly fail to meet these standards. It is obvious here that there are
23 | numerous issues of material fact that cannot be resolved on the pleadings alone, many
24 | of which defendants have themselves raised and, if proved, support plaintiffs' claims.
25 | *See Living Designs, Inc.*, 431 F.3d at 360 ("Judgment on the pleadings is proper when,
26 | taking all the allegations in the pleadings as true and construed in the light most
27 | favorable to the nonmoving party, the moving party is entitled to judgment as a matter
28 | of law."). Such issues of fact include, *inter alia*:

- 16 -

- whether Powerwave granted rights of return to Team Alliance on bulk orders;

- whether Powerwave waived payment on the 2Q11 bulk order;

- whether Powerwave shipped defective product in the 1Q11 bulk order;

- whether Team Alliance returned product during the Class Period;

- whether the astronomical accounts receivable attributed to Team Alliance at the end of the Class Period confirms that Powerwave waived payment on the 2Q11 bulk order;

- whether defendants were aware of (or deliberately reckless to) the bulk orders; and

- whether defendants owned any Powerwave stock (or vested and "in the money" options) that could be sold during the Class Period.[6]

Furthermore, it is evident that defendants here did not admit to all material allegations of fact in their Answer and, therefore, under Ninth Circuit law, judgment on the pleadings is clearly inappropriate. *Negrete*, 927 F. Supp. 2d at 874 ("A motion for judgment on the pleadings brought pursuant to Fed. R. Civ. P. 12(c) provides a means of disposing of cases when all material allegations of fact are admitted in the pleadings and only questions of law remain.") (citing *McGann*, 102 F.3d at 392); *see* Answer. ***In fact, Defendants have denied nearly every single factual allegation in the SAC***. *Id*. Where, as here, the defendant denies any of the essential facts of a plaintiffs' SAC, then motion for judgment on the pleadings, on a strict summary judgment standard, is inappropriate. *Obendorf v. Wash. Mut. Bank*, No. 06-475-S-MHW, 2007 U.S. Dist. LEXIS 61835, at *20 (D. Idaho Aug. 22, 2007) (finding

---

[6]   In their Motion defendants raise this issue of fact, that is nowhere in the pleadings, and argue that their purported stock ownership negates any inference of scienter. Motion at 14-15.  But, even if defendants did own any stock that could be sold, as the Court has previously noted, a strong inference of scienter is ***not*** "negated by the fact that [Defendants] retained . . . stock during the class period." *Buttonwood Tree Value Partners, LP v. Sweeney*, No. SACV10-00537-CJC(MLGx), 2012 U.S. Dist. LEXIS 183438, at *5-*6 (C.D. Cal. Dec. 10, 2012).

- 17 -

904951_1

judgment on the pleadings inappropriate where the defendant denied an allegation in the plaintiffs' SAC because such a denial created a disputed issue of fact).  Because defendants affirmatively denied the essential allegations of plaintiffs' SAC, judgment on the pleadings is plainly inappropriate and should be denied by the Court.

### C.   The Court Rightly Found that Plaintiffs' Detailed and Particular Allegations Satisfied the Pleading Requirements

#### 1.   Plaintiffs Sufficiently Plead Loss Causation

To allege loss causation, a plaintiff need only meet the standards of Rule 8 of the Federal Rules of Civil Procedure notice pleading, and provide "some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347.  Loss causation is adequately pled where plaintiffs provide "some indication that the drop in [Defendant's] stock price was causally related to [Defendant's] financial misstatements."  *In re Daou Sys.*, 411 F.3d 1006, 1026 (9th Cir. 2005).  "[I]t is normally inappropriate to rule on loss causation at the pleading stage."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  Pleading loss causation "should not prove burdensome for a plaintiff."  *Dura*, 544 U.S. at 347.

The SAC easily satisfies these minimal pleading requirements.  Plaintiffs allege that defendants' misstatements and omissions inflated Powerwave's stock.  ¶¶6, 91, 159, 196-201.  The inflation was dissipated from Powerwave's stock through two partial disclosures that revealed the falsity of defendants' statements and disclosed the material information and risks that Powerwave hid.  ¶¶70-73, 104, 121-125, 196-201.  These disclosures are: (1) the July 12, 2011 disclosure that demand was not as strong as defendants had claimed, that there was "slowness in several of our markets," and that Powerwave was reducing 2Q11 and full-year 2011 guidance; and (2) the October 18, 2011 disclosure that demand was not as strong as defendants had claimed, that 3Q11 revenues would be less than 50% of estimates (the worst revenue quarter since 2004), that there was an "inventory buildup" of a couple of quarters at North American customers, and that the biggest decline in demand was at North American

1  customers.  *Id*.  These disclosures – which directly undermined their statements about

2  increasing demand and revealed previously concealed risks – are alleged to have

3  caused significant Company-specific stock price declines.  ¶¶196-201.  The SAC also

4  alleges how the fraud-induced inflation in Powerwave's stock price was not

5  completely eliminated by the partial disclosure on July 12, 2011.  ¶¶104-119, 196-

6  201.  These allegations more than adequately provide defendants with the requisite

7  "indication" of the causal connection that plaintiffs "ha[ve] in mind."  *Dura*, 544 U.S.

8  at 347.

9          Defendants argue that pleading loss causation requires a fact-for-fact disclosure.

10  Motion at 6-10.  But, the Ninth Circuit has rejected this argument.  *See Daou*, 411

11  F.3d at 1026-27.  In *Daou*, plaintiffs alleged an accounting fraud of prematurely

12  recognizing revenue in violation of GAAP.  *Id*. at 1012.  Because there was never

13  "*any*" disclosure of *any* "'improper accounting practices,'" the district court dismissed

14  for failure to plead loss causation.  *Id*. at 1025-26.  But, the Ninth Circuit reversed,

15  holding that pleading loss causation does not require that any accounting issues be

16  disclosed.  *Id*. at 1026 ("the price of Daou's stock fell precipitously after defendants

17  began to reveal figures showing the company's true financial condition").  Notably, in

18  *Daou* there was no *disclosure* of "fraud," instead, plaintiffs "*allege[d]*" that Daou's

19  "'unbilled receivables'" were "'the direct result of prematurely recognizing revenue.'"

20  *Daou*, 411 F.3d at 1026 (some emphasis omitted).  Like *Daou*, other courts

21  consistently reject defendants' argument.  *See Mass. Ret. Sys. v. CVS Caremark Corp.*,

22  716 F.3d 229, 240 (1st Cir. 2013) ("[A] corrective disclosure need not be a 'mirror-

23  image' disclosure – a direct admission that a previous statement is untrue."); *Alaska*

24  *Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("[i]f a

25  fact-for-fact disclosure were required to establish loss causation, a defendant could

26  defeat liability by refusing to admit the falsity of its prior misstatements"); *In re New*

27  *Century*, 588 F. Supp. 2d 1206, 1236-38 (C.D. Cal. 2008) (rejecting "a fact-for-fact

28  corrective disclosure" requirement); *Backe v. Novatel Wireless, Inc*., 642 F. Supp. 2d

- 19 -

1   1169, 1188 (S.D. Cal. 2009) (disclosure "which undermined [company's] statements

2   concerning product demand" pled loss causation); *Lefkoe v. Clothiers*, No. WMN-06-

3   1892, 2007 U.S. Dist. LEXIS 98777, at *26 (D. Md. Sept. 10, 2007) (loss causation

4   adequately pled where "alleged GAAP violations . . . were never corrected or

5   disclosed to the public"); *In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 910

6   (D. Minn. 2011) (same).

7       And, the SAC is meaningfully different from that in *Dura* where plaintiffs

8   merely alleged "that share prices on the date of purchase were inflated." *See Gilead*,

9   536 F.3d at 1056. Similarly, defendants' reliance on *Metzler*, 540 F.3d at 1064, which

10  observed that "neither *Daou* nor *Dura* require an admission or finding of fraud before

11  loss causation can be properly pled," is misplaced. *See* Motion at 8. In *Metzler*,

12  unlike here, plaintiff improperly "plead loss causation through 'euphemism'" and thus

13  failed to allege "the necessary connection between defendant's fraud and the actual

14  loss." *Metzler*, 540 F.3d 1064.[7] Plaintiffs have more than sufficiently pled loss

15  causation.

16           **2.    Viewed Holistically, the SAC Alleges False or
                     Materially Misleading Statements and a Strong
17                   Inference of Scienter**

18      "False or misleading statements or omissions (collectively, 'falsity') often help

19  lead to an inference of scienter." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.

20  Supp. 2d 1132, 1185 (C.D. Cal. 2008); *Daou*, 411 F.3d at 1015. Here, the statements

21  at issue are false or materially misleading and support a strong inference of scienter.

22      As detailed in the SAC, defendants: (i) failed to disclose the extent to which

23  Powerwave's business was reliant upon end-of-quarter bulk orders that explicitly

24  waived payment and/or granted the customer a right of return if the product could not

25  ─────────────────
    [7]   Defendants' other cases are inapposite. *See* Motion at 6-9 (citing *In re Oracle*
26  *Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010)) (a summary judgment decision on a
    full evidentiary record); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 947 (D.
27  Ariz. 2007) (unlike here, loss causation not pled because, "alleged loss could be the
    result of . . . other events"); *In re Nuvelo, Inc. Sec. Litig.*, No. C 07-4056 VRW, 2008
28  U.S. Dist. LEXIS 98441, at *4, *20 (N.D. Cal. Dec. 4, 2008) (same).

- 20 -

1  be resold, to try to meet forecast expectations for its performance; (ii) issued

2  materially false and misleading financial statements that failed to properly account for

3  revenues from bulk orders that waived payment and/or granted the customer a right of

4  return if the product could not be resold; (iii) issued financial guidance to investors

5  that failed to disclose the improper bulk orders; and (iv) concealed the extent to which

6  the bulk orders presented a significant risk to demand for the Company's products.

7         After summarizing the detailed allegations, the Court correctly held that the

8  alleged "right of return coupled with delayed collection of payment effectively

9  rendered the bulk orders consignment sales." Order at 6 (citing ¶143.). Accordingly,

10  "[t]he allegations in the SAC, taken as true, support the reasonable inference that

11  Powerwave falsely inflated its revenue and created the appearance of demand for its

12  products by arranging end-of-quarter bulk orders to Team Alliance in which Team

13  Alliance had the right to return the products, and by subsequently delaying or failing

14  to collect payment from Team Alliance." Order at 6. *See United States v. Reyes*, 660

15  F.3d 454, 469 (9th Cir. 2011) ("'[A] statement is misleading if it would give a

16  reasonable investor the impression of a state of affairs that differs in a material way

17  from the one that actually exists.'").[8]

18         The Court also correctly noted that "[s]pecific additional allegations in the

19  SAC, taken as true and viewed holistically with the pleading as a whole, also

20  contribute to the strong inference that Defendants acted with scienter." Order at 6.

21  Importantly, "Team Alliance was Powerwave's single biggest customer, and net sales

22  to Team Alliance accounted for 11% to 28% of Powerwave's total sales from 3Q10 to

23  _____

[8]  *See also McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 126
24  (S.D.N.Y. 2013) ("'[C]ourts have recognized that accounting manipulations involving
premature revenue recognition . . . are especially indicative of conscious misbehavior
25  since such violations do not commonly occur inadvertently, but instead suggest a
conscious decision to improperly recognize revenue.'"); *In re Commtouch Software*
26  *Ltd.*, No. C 01-00719 WHA, 2002 U.S. Dist. LEXIS 13742, at *28 (N.D. Cal. July 24,
2002) ("In a company of [Powerwave's] modest size, it is unlikely that transactions of
27  this scope would fly below the radar of top management, particularly the CEO and
CFO. To the contrary, these are exactly the sort of transactions one would expect
28  these officers to scrutinize closely from Day One.").

1   2Q11." *Id.* (citing ¶¶20, 136.)  Thus, the Court recognized that "[t]he size of the

2   contract and the prominence of the client raise a strong inference that defendants

3   would be aware of this order."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982,

4   988 n.5 (9th Cir. 2008).[9]  Moreover, defendants admitted ***on every conference call***

5   that they closely monitored demand (and in particular North American demand),

6   North American customers represented 40% of the Company's sales, sales to Team

7   Alliance accounted for 37% to 67% of North American sales, the bulk orders

8   happened on the last days of the quarter in four consecutive quarters, the bulk orders

9   were material ($15-$25 million), and the bulk orders were critical to the Company's

10  attempt to meet its earnings expectations. ¶¶24, 35-59, 135-138, 163.[10]  In disagreeing

11  with the Court, defendants say "the Court assumed too much." Motion at 13.  But, as

12  the Court noted, it simply assumed the allegations were true and viewed them

13  holistically, as required.  Order at 6; *see VeriFone*, 704 F.3d at 701 (citing *Tellabs,*

14  *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d

15  179 (2007)) ("a court must first accept all factual allegations in the complaint as

16  true").

---

19  [9]   *See also Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1123 (C.D. Cal. 2012) ("It strains credulity to believe that [Defendant's] directors and officers did not know that a factory that was purportedly so critical to the company's business that it generated 20% of total company sales was not functioning."); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("It is reasonable to infer that the Oracle executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude that the company would have missed its quarterly earnings projection but for the adjustments."); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211 (1st Cir. 2005) ("The financial strength of the Company was undoubtedly a matter of principal concern to its Chief Executive Officer and Chief Financial Officer.").

25  [10]   *See also South Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) ("[CEO and Chairman of the Board] maintained that he knew what he was talking about.  He displayed an intimate knowledge of WaMu's information delivery, risk-management structure, and hedging capacity, and he represented to investors that he had all of the information necessary to make accurate predictions about WaMu's risk.").

- 22 -

1    In addition, in holding that the SAC plausibly alleged falsity and a strong
2    inference of scienter, the Court noted that based on information provided by both the
3    former Director of Financial Planning at Powerwave and a former National Sales
4    Manager, each bulk order "would have required direct approval by defendants,"
5    "given the bulk orders' multi-million dollar value and the fact that they included
6    discounts and incentives." Order at 6 (citing ¶¶43, 53).  As such, "[c]onsidering all
7    the facts alleged in the SAC, the inference of scienter is strong and outweighs any
8    competing inference." *Id.*

9    Importantly, the Court also highlighted "[t]he second part of the scheme,"
10   which, as alleged, "involved Powerwave not collecting payments owed to it by Team
11   Alliance during the class period." Order at 5.  While defendants continue to disagree
12   with the allegations, they ignore the "second part of the scheme" alleged and offer no
13   plausible explanation for the astronomical accounts receivable attributed to Team
14   Alliance or the exploding DSO – both of which confirm that Powerwave was not
15   collecting payments owed to it by Team Alliance.  As the Court here recognized,
16   "Powerwave's accounts receivable balance attributable to Team Alliance grew
17   substantially during the class period." *Id.*   Accounts receivable is an important
18   financial metric that measures how much money a company is owed by a particular
19   customer.  ¶¶60-62.  Simply put, accounts receivable "should track sales."  ¶60.
20   Incredibly, accounts receivable attributed to Team Alliance exploded to over ***2000%***
21   ***greater*** than sales in 3Q11.  ¶¶60-64.  In fact, despite sales to Team Alliance in 3Q11
22   of just $2 million, accounts receivable attributed to Team Alliance stood at over $50
23   million.  *Id.*  The 3Q11 accounts receivable admission confirms that ***during 2Q11***
24   Powerwave's single largest customer stopped paying its bills.  *Id.*  "***It is unlikely that***
25   ***the fact that [Powerwave's] single largest source of cash income stopped sending***
26   ***payments altogether could have gone unnoticed by the CFO and CEO.***" *Washtenaw*
27
28

- 23 -

1  *Cnty. Emps. Ret. Sys. v. Celera Corp.*, No. 5:10-cv-02604 EJD, 2012 U.S. Dist.
2  LEXIS 125314, at *9 (N.D. Cal. Sept. 4, 2012).[11]

3      Moreover, as the Court noted, "Powerwave's days-sales-outstanding ('DSO'),
4  which is a financial metric that shows the average number of days it takes a company
5  to collect its receivables, increased from 91 days in 3Q10 to 175 days in 3Q11."
6  Order at 5.   The exploding accounts receivable attributed to Team Alliance
7  specifically connects the DSO spike to Team Alliance because it demonstrates that
8  Team Alliance was a customer that was not paying – and that Team Alliance stopped
9  paying in 2Q11.  ¶¶60-69.  Moreover, Powerwave's DSO was three times the industry
10  average – and, as the chart at ¶68 demonstrates, spiked while its competitors' DSO
11  stayed flat, belying defendants' claim that the DSO spike could have been caused by a
12  purported global economic crisis.  Defendants criticize the Court for crediting the
13  allegations regarding the incredible DSO and accounts receivable and argue that the
14  lack of "any write-offs or restatements," negates falsity.  Motion at 12.  But, this
15  argument inappropriately raises factual issues and is contrary to law.  *See Sweeney*,
16  2012 U.S. Dist. LEXIS 183438.  And, defendants' suggested inference – that accounts
17  receivable and DSO would have decreased as "accounts [were] written off" – raises
18  the factual issues of whether Powerwave would have properly taken a write-off (after
19  improperly recording revenue on sales where it waived payment).  Motion at 11-12.
20  Viewed holistically with the astronomical accounts receivable attributed to Team
21  Alliance after 3Q11 (indicating "financial statement manipulation"), the DSO spike

22

---

23  [11]   *See also* ¶62 (According to PWC, the accounts receivable admission is indicative
   of "***[f]inancial statement manipulation***."); *In re Accredo Health, Inc. Sec. Litig.*, No.
24  03-2216 BBD, 2005 U.S. Dist. LEXIS 46923, at *61-*62 (W.D. Tenn. Apr. 11, 2005)
   (denying defendants' motion to dismiss, the court noted that "[p]laintiffs have alleged
25  that there were 'red flags,' such as the 300 day DSO and $60 million worth of
   uncollectible accounts receivable, that should have been obvious to defendants, or that
26  defendants consciously disregarded"); *N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089, 1098 (9th Cir. 2011) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308-09
27  (2d Cir. 2000)) ("[A]llegations of recklessness have been sufficient where defendants
   'failed to review or check information that they had a duty to monitor, or ignored
28  obvious signs of fraud.'").

- 24 -

904951_1

1    after 3Q11, and the admission about the "inventory buildup," the inference that

2    Powerwave in fact waived payment is cogent and compelling.  ¶¶60-74.

3          As such, the SAC adequately alleges falsity and scienter and the Court's

4    decision should stand.

5    **IV.    CONCLUSION**

6          Defendants' Motion makes clear that they disagree with the Court's Order.  But,

7    their recycled arguments do not come close to meeting the strict requirements of L.R.

8    7-18 concerning motions for reconsideration.  In addition, defendants' detailed factual

9    arguments – disagreeing with nearly every fact alleged – completely undermine their

10   purported Motion.  More importantly, the SAC's detailed and specific allegations

11   adequately allege falsity, loss causation, and a strong inference of scienter.

12   "Defendants will have the opportunity to challenge the sufficiency of Plaintiffs'

13   evidence supporting these allegations on summary judgment."  Order at 6.  The Court

14   should deny defendants' Motion.

15   DATED:  January 16, 2014              Respectfully submitted,

16                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
17                                         DARREN J. ROBBINS
                                           ROBERT R. HENSSLER JR.
18                                         MATTHEW I. ALPERT
                                           M. ALEXANDRA ROYAL
19

20                                              s/ ROBERT R. HENSSLER JR.
                                           ──────────────────────────────
21                                              ROBERT R. HENSSLER JR.

22                                         655 West Broadway, Suite 1900
                                           San Diego, CA  92101-3301
23                                         Telephone:  619/231-1058
                                           619/231-7423 (fax)
24
                                           Lead Counsel for Plaintiffs
25

26

27

28

- 25 -

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on January 16, 2014, I authorized the electronic filing of

3 the foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the e-mail addresses denoted on the attached Electronic

5 Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6 document or paper via the United States Postal Service to the non-CM/ECF

7 participants indicated on the attached Manual Notice List.

8       I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct.  Executed on January 16, 2014.

10                             s/ ROBERT R. HENSSLER JR.

ROBERT R. HENSSLER JR.

11

12                            ROBBINS GELLER RUDMAN

  & DOWD LLP

13                            655 West Broadway, Suite 1900

San Diego, CA  92101-3301

Telephone:  619/231-1058

14                            619/231-7423 (fax)

15                            E-mail: bhenssler@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

904951_1

# Mailing Information for a Case  8:12-cv-00222-CJC-JPR Pawel I Kmiec v. Powerwave Technologies Inc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Seth A Aronson**
  saronson@omm.com,LitigationCalendar@omm.com

- **Michael Ira Fistel , Jr**
  mfistel@holzerlaw.com,cholzer@holzerlaw.com,cyoung@holzerlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Marc L Godino**
  mgodino@glancylaw.com,info@glancylaw.com

- **Robert Russell Henssler , Jr**
  bhenssler@rgrdlaw.com,e_file_sd@rgrdlaw.com,aroyal@rgrdlaw.com,lmix@rgrdlaw.com

- **Robert K Lu**
  rlu@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com

- **Eric Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Meghan Alexandra Royal**
  aroyal@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com

- **Abby F Rudzin**
  arudzin@omm.com

- **David C Walton**
  davew@rgrdlaw.com,e_file_sd@rgrdlaw.com,kstadelmann@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who
therefore require manual noticing). You may wish to use your mouse to select and copy this list into
your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)