# JS-5

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **PAWEL I. KMIEC, individually and on behalf of all others similarly situated,**<br><br>       **Plaintiff,**<br><br>   **v.**<br><br>**POWERWAVE TECHNOLOGIES, INC., et al.,**<br><br>       **Defendants.** | **Case No.: SACV 12-00222-CJC(JPRx)**<br><br><br>**ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |

## I.  INTRODUCTION

This is a consolidated securities class action brought on behalf of all persons who purchased or otherwise acquired Powerwave Technologies, Inc. ("Powerwave") securities between October 28, 2010 and October 18, 2011 (collectively, "Plaintiffs")

against Defendant Powerwave officers Ronald J. Buschur and Kevin T. Michaels. The operative Second Amended Consolidated complaint ("SACC") alleges violations of § 10(b) and § 20(a) of the 1934 Securities Exchange Act and Rule 10b-5 based on purportedly false and misleading statements related to demand for Powerwave's products, false and misleading statements regarding revenue forecasts, and improper revenue recognition. (Dkt. No. 72 ["SACC"].) The parties have reached a settlement, and Lead Plaintiff Government of Bermuda Contributory and Public Service Superannuation Pension Plans ("Lead Plaintiff" or "Bermuda") moves for an order (1) conditionally certifying the class for settlement purposes pursuant to Federal Rule of Civil Procedure 23(b)(3); (2) preliminarily approving the settlement; (3) appointing class counsel, a class representative, and a claims administrator[1]; (4) approving the proposed class notice procedures; and (5) setting a final fairness hearing date. Defendants have not opposed. For the following reason, Lead Plaintiff's motion is GRANTED.[2]

## II. BACKGROUND

According to the SACC, between 2010 and 2011, in a period when demand for Powerwave products was steeply declining, Defendants "engaged in an accounting scheme to artificially inflate [Powerwave's] revenue and earnings," and "hide the fact that demand was not as strong as [D]efendants claimed." (SACC ¶¶ 35–36.) Plaintiffs allege that this scheme involved "(1) shipping 'bulk orders' of unsold and/or unsellable inventory to resellers on a contingent basis whereby Powerwave would explicitly waive payment, grant special extended payment terms, and/or grant rights to return the product if it could not be sold, and (2) knowingly and deliberately shipping product that

---

[1] Proposed class counsel is current Lead Counsel: Robbins Geller Rudman & Down LLP. The proposed class representative is Lead Plaintiff. The proposed class administrator is Gilardi & Co. LLC.

[2] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for December 7, 2015 at 1:30 p.m. is hereby vacated and off calendar.

Powerwave knew did not function with the promise to replace the defective products in a later quarter." (SACC ¶ 35.) According to the allegations in the SACC, Powerwave's practice of shipping unneeded bulk orders was unsustainable and resulted in one of Powerwave's major costumers, AT&T,[3] accumulating too much inventory by the third quarter of 2011 ("3Q11"), whereupon it stopped placing new purchase orders. (SACC ¶ 57.) On October 18, 2011, Defendants "disclosed figures reflecting [Powerwave's] true financial condition." (SACC ¶ 200.) Powerwave's revenue for 3Q11 fell 50% short of projections. (SACC ¶ 50.) During a conference call with investors, Mr. Buschur, Powerwave's CEO, acknowledged that the revenue decline was due, at least in part, to an "inventory buildup" at North American customers. (SACC ¶ 71.) The following day, Powerwave stock fell 40%, from $1.46 per share to $0.68 per share, and the company eventually filed for bankruptcy on January 28, 2013. (SACC ¶ 6.)

This action was originally filed in February 9, 2012. (Dkt. 1.) Bermuda was appointed Lead Plaintiff on April 26, 2012, (Dkt. 35), and after motion practice, the SACC was filed on June 14, 2013. (Dkt. 72.) The parties reached a settlement in September 2015 and entered a stipulation to stay the case pending this motion. (Dkt. 193.)

## III.  ANALYSIS

### A.    Class Certification Requirements

Pursuant to Federal Rule of Civil Procedure 23, Lead Plaintiff seeks provisional certification of a class for settlement purposes only. The proposed class is defined as

---

[3] AT&T purchased parts through a reseller called Team Alliance. (SACC ¶¶ 33–34.)

[A]ll Persons who, between October 28, 2010 and October 18, 2011, inclusive, purchased or otherwise acquired the common stock of Powerwave.

(the "Class Members"). (Dkt. 196 ["Settlement Agreement"] at 4.) When a plaintiff seeks conditional class certification for purposes of settlement, the Court must ensure that the requirements of Rule 23 are met as if the case were going to be fully litigated. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003). Rule 23 contains two sets of requirements for certification of a class. First, under Rule 23(a), all proposed classes must have sufficient numerosity, commonality, typicality, and adequacy. Second, the party seeking certification must show that the action falls within one of the three "types" of classes described in the subsections of Rule 23(b). In this case, Lead Plaintiff seeks certification pursuant to Rule 23(b)(3). The Court concludes that Lead Plaintiff has presented sufficient evidence to show that the proposed class satisfies the requirements of Rule 23(a) and Rule 23(b)(3).

## 1. Rule 23(a) Requirements

Rule 23(a) contains four requirements applicable to all proposed classes: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative party are typical of the claims or defenses of the class (typicality); and (4) the representative party will fairly and adequately protect the interests of the absent class members (adequacy). Fed. R. Civ. P. 23(a).

### i. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  It is unnecessary to state the exact number of class members when the plaintiff's allegations "plainly suffice" to meet the numerosity requirement.  *Schwartz v. Harp*, 108 F.R.D. 279, 281–82 (C.D. Cal. 1985).  Here, Powerwave had between 133.1 and 158.4 million shares outstanding that were trading on the NASDAQ Stock Exchange during the Class Period.  (Dkt. 122-3 ¶ 29.)  It is essentially certain that thousands of individuals purchased and traded the stock.  The numerosity requirement is therefore easily satisfied.  *See In re Cooper Cos. Inc. Secur. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (finding the numerosity requirement met in a securities class action when 36 million shares were outstanding during the relevant time period).

### ii. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,' [which] does not mean merely that they have all suffered a violation of the same provision of law."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  The claims must depend upon a common contention that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*.  Even a single common question satisfies the commonality requirement.  *Id.* at 2556.  The Court finds that Lead Plaintiff has alleged a number of common questions of law and fact, including (1) whether Defendants' public representations violated the securities laws; (2) whether those representations were material, false, and misleading; (3) whether Defendants acted with the requisite mental state when making those statements; (4) whether the price of Powerwave's common stock was artificially inflated during the

Class Period; and (5) the amount of such inflation.  The answers to these common questions necessarily resolve all Class Members' claims in one stroke, so the commonality requirement is met.

### iii. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Representative claims are "typical" if they are "reasonably coextensive with those of the absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Here, Lead Plaintiff's claims are identical to those of other Class Members, who all suffered from the same course of conduct—Powerwave's alleged misleading statements and subsequent inflation of the price of its stock.   The typicality requirement is therefore satisfied.

### iv. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This factor requires (1) a lack of conflicts of interest between the proposed class and the proposed representative plaintiff, and (2) representation by qualified and competent counsel that will prosecute the action vigorously on behalf of the class.  *Staton*, 327 F.3d at 957.  The concern in the context of a class action settlement is to ensure that there is no collusion between the defendant, class counsel, and class representatives to pursue their own interests at the expense of the interests of the rest of the members of the class.  *Id*. at 958 n.12.

Counsel for Lead Plaintiff is experienced in litigating securities class actions and is familiar with the facts underlying this case.  *See Cooper*, 254 F.R.D. at 636 ("It is

undisputable that [current class counsel Robbins Geller] has extensive experience prosecuting suits of this nature.  Class counsel specializes in securities fraud actions and achieved success as lead counsel in one of the largest and highest-profile securities cases of the last decade, the *Enron* case."); *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2009) ("Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits.").  Additionally, counsel for Lead Plaintiff has managed more than three years of motion practice and discovery, leading to the current settlement. Every indication is that they have done so capably and adequately.

Additionally, there is no evidence that Lead Plaintiff has any conflicts of interest with other Class Members or that Lead Plaintiff has colluded with Defendants to produce a settlement.  Lead Plaintiff is a large, sophisticated institutional investor who has monitored this litigation and become familiar with the facts and theories underlying the class claims.  Moreover, the Court already made a preliminary finding of adequacy when it appointed Bermuda to be the Lead Plaintiff.  (*See* Dkt. 35.)  The adequacy requirement is therefore met.

## 2.  Rule 23(b) Requirements

In addition to the requirements of Rule 23(a), a proposed class must satisfy one of the three requirements under Rule 23(b).  Here, Lead Plaintiff seeks certification pursuant to 23(b)(3), which allows certification if:

> (3) the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance requirement overlaps with Rule 23(a)(2)'s commonality requirement, but is a more demanding inquiry.  *Hanlon*, 150 F.3d at 1019.  The "main concern in the predominance inquiry . . . [is] the balance between individual and common issues."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009).  Here, the common issues predominate over any individual questions.  Lead Plaintiff has allegedly been harmed in precisely the same way every Class Member was harmed: by purchasing Powerwave shares that were overvalued on account of certain representations made by Powerwave.  Indeed, the Supreme Court has observed that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud," such as this one.  *Amchem*, 521 U.S. at 625.

The Court also finds that proceeding as a class is superior to other methods of resolving the issues presented by this case.  A class action may be superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  It is also superior when "no realistic alternative" to a class action exists.  *Id.* at 1234–35.  "District courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action."  *Cooper*,

254 F.R.D. at 641; *see also Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 400 (D. Or. 1996) ("[C]ourts have consistently embraced the class action device as a superior method of adjudicating federal securities fraud claims.").  Given the common issues presented by all Class Members, adjudicating these claims on an individual basis for many thousands of potential Class Members is unrealistic.  Additionally, although the Court foresees no management problems from litigating this dispute as a class action, the Supreme Court has held that a district court "need not inquire whether the case, if tried, would present intractable management problems" in a "settlement-only class certification." *Amchem*, 521 U.S. at 620.  As a result, the superiority requirement is met.

## B.    Fairness of the Proposed Settlement

Plaintiff also seeks preliminary approval of the Settlement Agreement.  Rule 23(e) "'requires the district court to determine whether a proposed settlement is fundamentally fair, reasonable, and accurate.'" *Staton*, 327 F.3d at 959 (quoting *Hanlon*, 150 F.3d at 1026).  To determine whether this standard is met, a district court must consider a number of factors, including "'the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement.'" *Id.* (quoting *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003)).  At the preliminary approval stage, a full "fairness hearing" is not required; rather, the inquiry is whether the settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007).

Having reviewed the negotiation process and substantive terms of the Settlement
Agreement, the Court finds no obvious deficiencies or grounds to doubt its fairness.  The
parties did not settle until after more than three years of litigation, substantial discovery,
and a private mediation session before a neutral mediator.  (*See* Dkt. 195 at 8–9.)   There
is no evidence of collusion during the parties' settlement negotiations, and indeed, "[t]he
assistance of an experienced mediator in the settlement process confirms that the
settlement is non-collusive."  *Satchell v. Fed. Express Corp.*, No. C03-2659 SI, 2007 WL
1114010, at *4 (N.D. Cal. Apr. 13, 2007).

Moreover, the Court finds that the benefits provided to the proposed settlement
class appropriately balance the risks of continued litigation.  Lead Plaintiff and the Class
Members' path to recovery was not without significant obstacles.  Defendants vigorously
argued that the representations made by Powerwave were not false or did not otherwise
violate the Exchange Act.  Additionally, Lead Plaintiff and the class faced a difficult task
of proving up causation and damages given the uncertain effect on stock price of
corrective disclosures made by Defendants partway through the class period.  (Dkt. 194
at 12.)  Trial no doubt would have included a great deal of expert testimony on these
complex and difficult questions.  And an appeal would have been virtually certain,
whatever the result at trial.  Further litigation entails significant risks for all involved
parties, including the risk that Class Members would recover nothing at all.  *See In re
Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *3 (N.D.
Cal. Nov. 26, 2007) ("Additional consideration of increased expenses of fact and expert
discovery and the inherent risks of proceeding to summary judgment, trial and appeal
also support the settlement.").  Accordingly, the relative strength of the Class Members'
claims, combined with the risk of obtaining and maintaining class status and the likely
duration of further litigation, all weigh in favor of granting preliminary approval of the
Settlement Agreement.

In light of such risks, the substantive terms of the Settlement Agreement are reasonable.  The settlement provides for a Settlement Amount of $8,200,000.00.  (Settlement Agreement ¶ 1.21.)  The Settlement Agreement define the Net Settlement Fund ("NSF") as the Settlement Amount less any attorneys' fees (up to 30% of the Settlement Amount, or $2,460,000.00), attorneys' expenses (up to $1,500,000.00), interest, an incentive award to Lead Plaintiff ($5,500.00), notice and administration expenses, (up to $175,000.00), taxes, and other Court-approved deductions.  (*Id.* ¶ 1.15; 2.8; Exh. A-1 at 2.)  The parties have not provided the Court with a full estimate of what the NSF will be if their requests for deductions are granted, but the proposed notice documents indicate that the per-share award will drop from $0.06 to $0.03, (*Id.* Exh. A-1 at 8), and from this the Court deduces that the NSF will be approximately $4,100,000.00.  That fund will be distributed on a pro rata basis to Class Members who submit valid claims, based on the number of shares owned per Class Member and how long those shares were owned.  The parties estimate that the average distribution, pre-deductions, will be $0.06 per share.  (*Id.* Exh. A-1 at 8.)  No distributions of less than $10.00 will be made.  If there is a balance remaining in the NSF after an initial distribution, Lead Counsel will reallocate that balance among those Class Members who submitted a claim until the amount left in the NSF is *de minimis*, whereupon it will be given to an appropriate non-profit organization.  (*Id.* ¶ 5.10.)  The formula for distributing the NSF is fair, as it will compensate Class Members according to how many shares they owned and for how long—or, in other words, according to how much they were harmed by Defendants' alleged activities.

Lead Counsel apparently intends to seek a 30% fee.  Notably, this is more than the 25% that the Ninth Circuit has set as the benchmark for common fund cases.  *Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  Likewise, the desired incentive award of $5,500.00 for Lead Plaintiff may be excessive where the per-share recovery is so small.  *See In re Toys R Us-Delaware, Inc.—Fair & Accurate Credit*

*Transactions Act Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014) (explaining that California district courts typically approve incentive awards between $3,000.00 and $5,000.00). Furthermore, the actual amount awarded by the Court to Lead Counsel and Lead Plaintiff will affect the amount of relief afforded to the settlement class, as they directly detract from the NSF.  (*See* Settlement Agreement ¶ 1.15.)  The Court will expect Class Counsel to explain and provide detailed evidence as to why a 30% attorneys' fees award and $5,500.00 named plaintiff's incentive award is fair and just.  Additionally, the Court notes that Lead Counsel evidently expects to seek significant reimbursement for attorneys' expenses—as much as $1,500,000.00, or more than 18% of the total Settlement Amount.  This is an extremely high figure that significantly reduces the award to Class Members.   Accordingly, at the final approval stage, the Court will insist on a detailed explanation for why it should award Lead Counsel's proposed expenses (not to exceed $1,500,000.00), as well as whatever administration costs the parties ultimately seek (which they estimate to be as high as $175,000.00—another high figure).  Although the Court has serious concerns regarding the proposed attorneys' fees and expenses, it nonetheless finds that the Settlement Agreement is appropriate for preliminary approval, pending a full fairness hearing.  As discussed above, the settlement eliminates the significant risk of non-recovery in continuing litigation.  Moreover, none of the signs flagged by the Ninth Circuit—such as where the class receives no monetary distribution or where the fees not awarded revert to defendants—are present here. *See id.* at 947.  The Court will make its final decision on the fairness and adequacy of the settlement after the parties have addressed the Court's concerns identified herein and after Class Members have had an opportunity to object.


## C.  Approval of Class Counsel and Representative

Lead Plaintiff moves to appoint Lead Counsel as class counsel for the Class. When appointing class counsel, the Court must consider the work performed by counsel

thus far in the action, counsel's experience in handling class actions and complex litigation, counsel's knowledge of the applicable law, and the resources that counsel will commit to representing the class.  *See* Fed. R. Civ. P. 23(g)(1)(A).  Here, as the Court has already reviewed, Lead Counsel has significant experience litigating complex class actions, including in the securities context.  *See supra* at III.A.1.iv.  Additionally, Lead Counsel has capably managed this litigation since its appointment as Lead Counsel in 2012.  The Court is satisfied that Lead Counsel will continue to adequately represent the interests of the class.  Bermuda also seeks appointment as the representative of the proposed settlement class.  Representation is "adequate" where the representative's interests are not antagonistic to those of absent class members, there is a sharing of interests between representatives and absentees, and the action does not appear to be collusive.  *In re N. Dist. of Cal., Dalkon Shield IUD Liab. Prod. Litig.*, 693 F.2d 847, 855 (9th Cir. 1982).  "In addition, the class representative must have a sufficient interest in the outcome of the case to ensure vigorous advocacy."  *Ferrari v. Gisch*, 225 F.R.D. 599 (C.D. Cal. 2004) (*citing Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986)).  Here, the Court finds that the interests of the named plaintiff are aligned with those of the absent class members and the action does not appear to be collusive.  As explained above, Bermuda is an adequate representative of the class.  *See supra* at III.A.1.iv.  Accordingly, Lead Plaintiff will be appointed as the class representative.  Gilardi is appointed Claim Administrator.  *See In re Am. Apparel S'holder Litig.*, No. CV 10-06352 MMM, 2014 WL 10212865, at *6 (C.D. Cal. July 28, 2014) ("The court is satisfied that [Gilardi's] efforts were effective in providing notice of the settlement to potential class members.").

## D.  Notice of the Proposed Settlement

Finally, Lead Plaintiff seeks approval of the proposed form and manner of notice of the settlement to be sent to Class Members.  Rule 23(c)(2)(B) provides that for Rule

23(b)(3) classes, as here, the Court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  The notification procedure outlined in the Settlement Agreement satisfies that standard.  (*See* Settlement Agreement Exh. A ¶ 7–8.)

At some point after the entry of this Order (the parties do not say), the Claims Administrator will mail the Notice and Proof of Claim form by First-Class Mail to all Class Members who can be identified with reasonable effort, as well as post the form on its website and post a Summary Notice in *Investor's Business Daily* and the *Business Wire*.  (*Id.*)[4]  The Claim Form and Class Notice adequately explain the terms of the settlement.  The notice must "clearly and concisely state, in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that the class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).  The Class Notice form provides clear information about the definition of the class and nature of the action, a summary of the terms of the proposed settlement, the terms of the released claims, the process of objecting to the settlement, and the consequences of inaction.  (*See* Settlement Agreement Exh. A-1.)  The Claim Form that is to be provided along with the Class Notice is similarly acceptable.  (*Id.* Exh. A-2.)  Class Members will have 90 days after the notice is mailed to either submit the Claim Form or request exclusion.  Finally, the notice materials comply with the special requirements found in the Private Securities Litigation Reform Act, which requires that, among other things, the notice materials inform class members of the amount of the

---

[4]  Many of the details of the parties' notice procedure are contained only in a proposed order filed by Lead Plaintiff, and not in either the Settlement Agreement or the Notice of Claim.  The Court presumes that the parties agree to the procedures in the proposed order, (Dkt. 196 Exh. A), and orders that notice be administered according to those procedures.

settlement in the aggregate and per-share basis, whether the parties disagree on the amount, the amount of desired attorneys' fees, contact information for counsel, and an explanation for the settlement.  15 U.S.C. §78u-4(a)(7)(A)–(F).

As the notice procedure comports with Rule 23(c)(2)(B), the Court directs that notice be distributed to Class Members according to the terms and timeline provided in the Settlement Agreement and attendant exhibits.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS provisional certification of the class for settlement purposes only; GRANTS preliminary approval of the settlement; APPROVES the appointment of Lead Counsel as Class Counsel; APPROVES Lead Plaintiff to be the class representative; APPROVES Gilardi to be the Claim Administrator; and APPROVES of the proposed distribution of notice to the class. Notice shall be distributed to class members by **February 1, 2016**.  The final approval hearing shall be held on **Monday, July 11, 2016 at 1:30 p.m.**

DATED:     December 4, 2015

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE