JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| PAWEL I. KMIEC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>POWERWAVE TECHNOLOGIES, INC., et al.,<br><br>Defendants. | Case No.: SACV 12-00222-CJC(JPRx)<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES** |

## I. INTRODUCTION

This is a consolidated securities class action brought on behalf of all persons who purchased or otherwise acquired Powerwave Technologies, Inc. ("Powerwave") securities between October 28, 2010 and October 18, 2011 (collectively, "Plaintiffs")

against Defendant Powerwave officers Ronald J. Buschur and Kevin T. Michaels. The operative Second Amended Consolidated complaint ("SACC") alleges violations of § 10(b) and § 20(a) of the 1934 Securities Exchange Act and Rule 10b-5 based on purportedly false and misleading statements related to demand for Powerwave's products, false and misleading statements regarding revenue forecasts, and improper revenue recognition. (Dkt. No. 72 ["SACC"].) The parties reached a settlement, and the Court granted preliminary approval of the Settlement Agreement on December 4, 2015. (Dkt. 198 ["Prelim. Approval Order"]; *see also* Dkt. 196 ["Settlement Agreement"].) Currently before the Court are two motions: Plaintiffs' motion for final approval of the Settlement Agreement, (Dkt. 200), and Plaintiffs' motion for attorneys' fees, costs, and a reimbursement of some of the Lead Plaintiff's expenses, (Dkt. 201). Defendants have not opposed the motions, although one class member filed an objection. (Dkt. 209.) For the following reason, Plaintiffs' motion for final approval is GRANTED, and Plaintiffs' motion for attorneys' fees, costs, and reimbursements is GRANTED IN PART.

## II. BACKGROUND

According to the SACC, between 2010 and 2011, in a period when demand for Powerwave products was steeply declining, Defendants "engaged in an accounting scheme to artificially inflate [Powerwave's] revenue and earnings," and "hide the fact that demand was not as strong as [D]efendants claimed." (SACC ¶¶ 35–36.) Plaintiffs allege that this scheme involved "(1) shipping 'bulk orders' of unsold and/or unsellable inventory to resellers on a contingent basis whereby Powerwave would explicitly waive payment, grant special extended payment terms, and/or grant rights to return the product if it could not be sold, and (2) knowingly and deliberately shipping product that Powerwave knew did not function with the promise to replace the defective products in a later quarter." (SACC ¶ 35.) According to the allegations in the SACC, Powerwave's practice of shipping unneeded bulk orders was unsustainable and resulted in one of

Powerwave's major customers, AT&T,[1] accumulating too much inventory by the third quarter of 2011 ("3Q11"), whereupon it stopped placing new purchase orders. (SACC ¶ 57.) On October 18, 2011, Defendants "disclosed figures reflecting [Powerwave's] true financial condition." (SACC ¶ 200.) Powerwave's revenue for 3Q11 fell 50% short of projections. (SACC ¶ 50.) During a conference call with investors, Mr. Buschur, Powerwave's CEO, acknowledged that the revenue decline was due, at least in part, to an "inventory buildup" at North American customers. (SACC ¶ 71.) The following day, Powerwave stock fell 40%, from $1.46 per share to $0.68 per share, and the company eventually filed for bankruptcy on January 28, 2013. (SACC ¶ 6.)

This action was originally filed in February 9, 2012. (Dkt. 1.) The Government of Bermuda ("Bermuda") was appointed Lead Plaintiff on April 26, 2012, (Dkt. 35), and after motion practice, the SACC was filed on June 14, 2013. (Dkt. 72.) The parties reached a settlement in September 2015.

### III. ANALYSIS

When the parties reach a settlement agreement prior to class certification, the Court must "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The Court will first assess the propriety of class certification, followed by the fairness of the settlement agreement. Then, it will address the issues of attorneys' fees and expenses, administration costs, and Lead Plaintiff's reimbursement request. Finally, the Court will consider the objection.

---

[1] AT&T purchased parts through a reseller called Team Alliance. (SACC ¶¶ 33–34.)

### A. Class Certification

A plaintiff seeking class certification must satisfy two sets of requirements under Federal Rule of Civil Procedure 23: (1) the four requirements under Rule 23(a) concerning numerosity, commonality, typicality, and adequacy; and (2) the requirement that the action fall within one of the three "types" of classes described under the subsections of Rule 23(b). In this case, Plaintiff seeks certification of the class pursuant to Rule 23(b)(3), which allows certification if "the court finds the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Court previously concluded that Plaintiff had presented sufficient evidence to show that the proposed class satisfied the numerosity, commonality, typicality, and adequacy requirements under Rule 23(a), as well as the predominance and superiority requirements under Rule 23(b)(3). (*See* Prelim. Approval Order at 3–9.) Having reviewed those elements again, the Court adopts its prior analysis with respect to class certification and grants certification of the proposed class for purposes of settlement only.

### B. Fairness of the Proposed Settlement

The Ninth Circuit has a "'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) (quoting *Class Plaintiffs v. Seattle*, 995 F.2d 1268, 1276 (9th Cir. 1992)). Federal Rule of Civil Procedure 23 "'requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable.'" *Staton*, 327 F.3d at 959 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (emphasis omitted)). To determine whether this standard is met, a district court must consider a number of factors, including "'the strength of the

plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement.'" *Id.* (quoting *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003)). Having fully considered the *Staton* factors, the Court finds this settlement fundamentally fair and reasonable to the parties involved.

### 1. Strength of the Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

Although Plaintiffs are convinced of the merits of their claims, they concede that their path to recovery was fraught with obstacles. "Courts routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear." *In re Top Tankers, Inc. Securities Litig.*, No. 06 Civ. 13761(CM), 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008). At trial, Plaintiffs would have been required to prove "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied that (5) proximately caused his injury." *McGonigle v. Combs*, 968 F.2d 810, 817 (9th Cir. 1992). Throughout this litigation, Defendants have vigorously disputed Plaintiffs' ability to prove these elements. They argue that Powerwave's statements regarding its inventory and agreements with resellers were not false, and that in any event, they were not made with the requisite mental state. Individual Defendants testified that they had no knowledge of any fraud, and a deposition of Defendants' outside auditor, Deloitte & Touche, LLP, revealed that an audit had not unearthed any fraud or fraudulent practices during the Class Period. (Dkt. 204 ["First Henssler Decl."] ¶ 145.) Moreover, Powerwave never restated its Class Period financials, nor was it advised by Deloitte to do so. (*Id.* ¶ 143.) Although Plaintiffs continue to believe that they mustered credible evidence of fraud, they concede that they would have

been "hard-pressed" to prevail at trial based on the content of Powerwave's actual statements. (*Id.* ¶ 144.)

Plaintiffs also faced significant difficulties in proving up damages and loss causation. Setting aside the fact that the correct test for loss causation in securities fraud actions is unclear, and a case on the question is currently before the Ninth Circuit, (*see* First Henssler Decl. ¶ 147 & n.8), Defendants have long insisted that the alleged fraudulent practices at issue here were never even *disclosed* to the public, casting significant doubt on Plaintiffs' ability to prove that Powerwave's stock price declined as a result of the practices they have targeted here. (*See id.* ¶ 146 & n.7.) Here again, although Plaintiffs express optimism as to their chances at trial, they acknowledge that "the determination of loss causation and damages is a complicated process," that their trial expert was at risk of being excluded, and that a favorable outcome for Plaintiffs at trial was "far from certain." (*Id.* ¶¶ 149–50.)

Moreover, Powerwave filed for Chapter 11 bankruptcy in 2013, (First Henssler Decl. ¶ 22), and there are serious questions about Powerwave's ability to fund a large trial award, (*id.* ¶ 151.) Plaintiffs represent that available insurance policies were likely to be completely depleted by discovery, judgment, pre-trial motion practice, trial, and a (virtually certain) appeal, thereby transferring any available resources from class members to attorneys. (*Id.* ¶ 151.) A defendant's financial condition can "predominate[]" in a district court's determination of whether to approve a settlement agreement, *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993), and here, Powerwave's financial condition clearly supports final approval. *Cf. In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement.")

## 2. Amount Offered in Settlement

Given the uncertainties of trial and the weaknesses of Plaintiffs' case, the amount offered in the Settlement Agreement also supports final approval. Class Members will receive $8.2 million, less deductions for attorneys' fees, costs, reimbursements to Bermuda, and administration fees. The money will be paid to be paid to Class Members in accordance with the amount of Powerwave stock they held and the time for which they held it. (*See* Prelim. Approval Order at 11.) Plaintiffs aver that the total settlement fund represents approximately 13 percent of the maximum damages that Plaintiffs could reasonably expect to recover at trial. (First Henssler Decl. ¶ 163.) Courts commonly approve awards in this range. *See Weeks v. Kellogg Co.*, No. CV 09-08102 (MMM) (RZx), 2013 WL 6531177, at *15 n.85 (C.D. Cal. Nov. 23, 2013) (granting final approval where settlement represented 10 percent of maximum damages); *DeStefano v. Zynga, Inc.*, Case No. 12-cv-04007-JSC, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016) (granting final approval where settlement represented roughly 14 percent of maximum recoverable damages). And it bears repeating that proceeding to trial entailed significant risks, including that any potential recovery would be squandered in trial preparation, or that Defendants would prevail and Plaintiffs would be left with nothing.

## 3. Extent of Discovery Completed, Stage of Proceedings, and Experience and View of Counsel

The extent of the proceedings and the view of counsel also favor final approval here. The parties here did not settle until after significant motion practice, including two amended complaints, two motions to dismiss, and a motion for judgment on the pleadings. The parties also conducted extensive discovery, including numerous depositions and expert reports. (*See*, *e.g.*, Henssler Decl. ¶ 3.) And settlement did not occur until after the parties had engaged an experienced mediator. (*Id.* ¶ 4.)

Additionally, counsel for both sides is experienced in this type of litigation, and every indication is that they have engaged in vigorous representation of their clients.  (*See* Prelim. Approval Order at 6–7.)  This history of hard-fought litigation clearly favors a finding that the Settlement Agreement is fair and adequate.  *See In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005) ("A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery."); *see also Satchell v. Fed. Express Corp.*, No. C03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").  Additionally, the fact that the parties did not settle until after the conclusion of fact discovery indicates that Plaintiffs were well aware of the merits of their case and the difficulties awaiting them at trial.  *See Zynga*, 2016 WL 537946, at *12 ("By the time the parties reached the [s]ettlement, litigation had proceeded to a point in which the parties had a clear view of the strengths and weaknesses of their cases.").  Finally, Lead Counsel indicate their belief that the settlement is an "extraordinary recovery" for Class Members.  (First Henssler Decl. ¶ 12.)  This assessment is entitled to significant weight.  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").  This factor therefore weighs in favor of final approval.

### 4. Reaction of Class Members

The reaction of Class Members likewise favors final approval.  The Claims Administrator, Gilardi & Co. LLC ("Gilardi"), mailed 35,613 Claim Packages to Class Members and nominees.  (Dkt. 213 ["Gilardi Decl."].)  As of the relevant deadlines, only one request for exclusion, and one objection, had been received.  (*Id.* ¶ 4; *see also* Dkt. 209.)  To date, 3,698 Proofs of Claim were filed with Gilardi.  (*Id.* ¶ 5.)  The small

number of objections and requests for exclusion supports final approval. *DIRECTV*, 221 F.R.D. at 529 ("("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."); *see also Catala v. Resurgent Capital Servs. L.P.*, Civil No. 08cv2401 NLS, 2010 WL 2524158, at *5 (S.D. Cal. June 22, 2010) ("The lack of opt-outs and objections favor[s] approving the settlement."). Lead Plaintiff Bermuda also communicates its satisfaction with the settlement. (Dkt. 205 ¶ 4 ("Bermuda believes that the Settlement represents a very good recovery for the Class.").) This factor therefore weighs in favor of final approval.

Having considered the bearing of the *Staton* factors on this case, the Court finds that final approval of the class settlement is warranted. The terms of the Settlement Agreement appear to be fair, the notice procedure was appropriate, and the reaction of Class Members has been overwhelmingly favorable.

**C. Attorneys' Fees**

A district court has the authority and the duty to determine the fairness of attorneys' fees in a class action settlement. *See Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323 (9th Cir. 1999). The amount of fees awarded rests in the court's sound discretion. *Evans v. Jeff D.*, 475 U.S. 717, 736 n.26 (1986). When, as here, a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942–43 (9th Cir. 2011). Class Counsel has provided the Court with the information necessary to employ both methods. The Court will perform the benchmark percentage-of-recovery method and then evaluate that method against the lodestar to determine whether it is reasonable.

### 1. Percentage-of-Recovery Method

Under the percentage-of-recovery method, the Ninth Circuit has held that 25% of a common fund is the "benchmark" for a reasonable fee award, and courts must provide adequate explanation in the record of any "special circumstances" to justify a departure. *In re Bluetooth*, 654 F.3d at 942–43 (citing *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ("We note with approval that one court has concluded that the 'bench mark' percentage for the fee award should be 25 percent. That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in this case." (internal citation omitted)). Here, Lead Counsel requests a fee award of $2,460,000, which represents 30% of the Settlement Fund—a departure from the Ninth Circuit's benchmark. This departure is warranted, Lead Counsel say, because of the amount of recovery obtained for the Class and the significant risks Lead Counsel faced in bringing and prosecuting this action, which they did on a contingency basis.

The Court disagrees. Although Lead Counsel's work in this matter has been admirable, the results of this settlement and the benefits obtained for the class are not the type of "exceptional" or "remarkable" results that warrant a higher fee award. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (affirming 28% fee award where counsel "achieved exceptional results for the class"). Nor is the Court persuaded that the issues in this lawsuit are so complex as to merit an unusually high award. Similarly, Lead Counsel miss the mark when they argue that particular *factual* circumstances of this case justify a high fee. Lead Counsel argue that certain evidentiary difficulties made their case unusually precarious: because Powerwave never restated its financials, no auditors resigned, and no governmental investigation or settlement occurred, Plaintiffs were going to be forced at trial to "rely on a significant amount of

circumstantial evidence" to prove their allegations of securities fraud. (*See* Dkt. 202 at 14.) But Lead Counsel's acknowledgement that their case was somewhat thin cannot justify a high award, for that would lead to the uncomfortable rule that stronger cases garner lower awards than weaker ones. Such a policy would incentivize the bringing of weak cases aimed at procuring quick settlements for which counsel, newly recognizing the shakiness of their cases, could request a high fee. The Court will not travel that road. *Cf. In re Top Tankers*, 2008 WL 2944620, at *16 (awarding only a 10% fee because of the "significant possibility" that the case "would not have resulted in any recovery for the class").

The fact that Lead Counsel took this case on a contingency basis is worth *something* in the determination whether an upward variation from the benchmark is appropriate. But "contingency representation is common" in class actions, *Ross v. Trex Co., Inc.*, No. C. 09-670 JF (PVT), 2009 WL 2365865, at *3 (N.D. Cal. July 30, 2009), and awarding an upward variance from the benchmark every time class counsel took a case on contingency may simply have the effect of creating a new benchmark. Additionally, some courts have expressed skepticism about contingency enhancements in securities class actions, which frequently settle and therefore entail less risk than other categories of actions which are likelier to proceed to trial. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000) (holding that "compensation for risk" was not "an appropriate starting assumption" in securities cases, and expressing a "nagging suspicion that attorneys in [securities] cases are routinely overcompensated for such things as contingency risk"). The Court also notes the size of Lead Counsel's requested expenses award, which itself is approximately 13% of the entire settlement amount. Awarding a 30% fee on top of the requested expenses amount would result in more than 40% of the settlement flowing to attorneys—a troublingly high amount. The Court will therefore adhere to the Ninth Circuit's benchmark.

Additionally, the Court will calculate the attorneys' fee award *after* the deduction for attorneys' expenses. Calculating a fee and then deducting expenses, as Lead Counsel urges, has the unusual effect of reimbursing counsel for their expenses—like transportation, hotels, deposition costs, and photocopying—and then awarding them 25% of their expenses as a fee. There is no principled reason to calculate a fee in this manner. *See Kanawi v. Bechtel Corp.*, No. C 06-05566 CRB, 2011 WL 782244, at *1 (N.D. Cal. Mar. 1, 2011) (calculating attorneys' fee from net settlement award after deducting costs and administrative expenses); *cf. In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d 1176, 1182 (N.D. Cal. 2014) (calculating a 25% fee from a net settlement fund, after deducting administration expenses).

### 2. Lodestar Cross-Check

Lead Counsel also provide the Court with the data necessary to perform a rough lodestar analysis. Courts commonly—even after having decided to utilize the percentage-of-recovery method—perform a "lodestar cross-check" by comparing the percentage-of-recovery figure with a "rough calculation of the lodestar . . . to assess the reasonableness of the percentage award." *Weeks*, 2013 WL 6531177, at *25; *see also In re Bluetooth*, 654 F.3d at 943 (encouraging a "comparison between the lodestar amount and a reasonable percentage award"). Here, counsel for plaintiffs aver that they spent over 13,800 hours of attorney and paraprofessional time prosecuting this action, leading to a total lodestar figure of $6,839,027.75. (*See* Dkt. 207 ["Second Henssler Decl."] ¶ 4; Dkt. 208 ¶ 4.)

The fact that the lodestar significantly outpaces an award based on the 25% benchmark is somewhat unusual. Nonetheless, it is not a compelling reason to depart from the Ninth Circuit's benchmark, particularly absent evidence of exceptional risk or difficulty. *See also Sandoval v. Tharaldson Employee Mgmt., Inc.*, No. EDCV 08-482-

VAP (OPx), 2010 WL 2486346, at *9 (C.D. Cal. June 15, 2010) (where the lodestar exceeded the 25% benchmark, rejecting an argument that this alone merited a departure from the benchmark because the plaintiff did not "present[] evidence of unusual circumstances that justify a departure from the Ninth Circuit's benchmark" aside from the high lodestar).

### 3. Expenses

Lead Counsel request reimbursement for $1,096,595.87 in expenses.  Expenses in common funds cases like this one are generally reimbursable if they "would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 20 (9th Cir. 1994). Lead Counsel break these expenses down into twelve categories:

- "Filing, Witness and Other Fees" ($14,486.76)
- "Business Wire" ($1,022.75)
- "Transportation, Hotels & Meals" ($47,813.61)
- "Messenger, Overnight Delivery" ($1,085.89)
- "Court Hearing and Deposition Reporting, and Transcripts" ($60,776.04)
- "Experts/Consultant/Investigators" ($661,462.06)
- "Outside Bankruptcy Counsel" ($17,191.21")
- "Other Outside Counsel" ($78,528.29)
- "Photocopies" ($13,189.26")
- "Outside ESI Collection/Processing/Imaging" ($28,309.73)
- "Online Legal and Financial Research" ($46,350.73)
- "Database Management and Hosting" ($95,582.90)
- "Mediation Fees" ($30,796.64)

(Second Henssler Decl. Exh. B.)  Lead Counsel also provide the Court with partial schedules for some of these categories, describing occurrences of expenses, although not the amounts of particular expenses.  (*See generally* Second Henssler Decl.)  The Court has reviewed these expenses and concludes that they are of the sort ordinarily billable to paying clients.  Lead Counsel's request for reimbursement of expenses is therefore GRANTED, and they are awarded **$1,096,595.87**.

### 4. Bermuda's Reimbursement

Finally, Lead Plaintiff Bermuda requests $5,460 in reimbursements for time its Treasury and Investments Manager, Michael C. Simmons, spent working on the case. Simmons' involvement included reviewing documents, corresponding with Lead Counsel, and attending a deposition.  (Dkt. 205 ¶ 3.)  Simmons estimates that he spent a total of 78 hours on this case, and indicates that his hourly rate is $70.  (*Id.* ¶ 6.)  He therefore requests $5,460 in reimbursement.  Courts have discretion to award incentive payments to lead plaintiffs for work done on behalf of the class.  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  Mr. Simmons requests reimbursement for time spent on this action that he otherwise could have spent "at [his] job," and reimbursement is therefore appropriate.  *See Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014).  Bermuda's request is GRANTED.

### C. Objection

One Class Member, Roy Tom Coyle, Jr., submitted an objection.  Mr. Coyle objects to the estimated settlement payout of $.06 per share (before deductions).  He believes that due to a reverse split of Powerwave stock that occurred *after* the Class Period, the Court should multiply the settlement amount by a factor of five.  No doubt Mr. Coyle would like to get a larger settlement, but his objection does not call into

question the fairness of the Settlement Agreement or demonstrate that it is the "product of fraud or overreaching by, or collusion between, the negotiating parties." *Rodriguez* 563 F.3d at 965 (9th Cir. 2009). This settlement was reached after years of hard-fought litigation by both sides and multiple conferences with a mediator, against the complicated backdrop of Powerwave's bankruptcy. Every indication is that Plaintiffs extracted as much value as they could from Defendants. Additionally, Mr. Coyle does not explain why a stock split that occurred after the Class Period is relevant to the Settlement Agreement at all, seeing as the Settlement Fund will be divvied up according to the number of shares held by Class Members during the Class Period. (Settlement Agreement Exh. A-1 at 8.) The objection is therefore OVERRULED.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for final approval of the Settlement Agreement, (Dkt. 200), and GRANTS IN PART Plaintiffs' motion for attorneys' fees, (Dkt. 202). Of the $8,200,000.00 Settlement Fund, Lead Counsel are awarded **$1,096,595.87** in reimbursements for expenses, and 25% of the remainder, or **$1,775,851.03**,[2] as attorneys' fees. Bermuda is awarded **$5,460** as an incentive award. The Court trusts that the remaining **$5,322,093.10** will be distributed to Class Members and used to pay administration fees, in accordance with the terms of the Settlement Agreement and the plan of allocation.[3]

DATED:  July 11, 2016

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[2] $(8,200,000 - 1,096,595.87) * (.25) = 1,775,851.03$.

[3] The Settlement Agreement provides for the payment of a fee to the Claims Administrator, Gilardi. (Settlement Agreement ¶ 2.8.) Plaintiffs do not defend this fee in their motion for attorneys' fees and expenses, but the estimated pre-final judgment fee—$175,000, or roughly 2% of the Settlement Fund—appears to be in the normal range. *Vanwagoner v. Siemens Indus., Inc.*, No. 2:13-cv-01303-KJM-EFB, 2014 WL 7273642, at *3 (awarding approximately 3.8% of the settlement fund to the claims administrator); *Chavez v. PVH Corp.*, Case No. 13-CV-01797-LHK, 2015 WL 9258144, at *8 (N.D. Cal. Dec. 18, 2015) (awarding roughly 3.3% of a settlement fund to the claims administrator).